IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DOUGLAS W. CURTIS,                          )
                                            )
        Petitioner,                         )
                                            )    No. 3:20-cv-00559
v.                                          )
                                            )    JUDGE RICHARDSON
BERT C. BOYD, Warden,                       )    MAGISTRATE JUDGE NEWBERN
                                            )
        Respondent.                         )

## **MEMORANDUM OPINION**

Pending before the Court is a Second Motion to Request Leave for Discovery (Doc. No.

48) filed by pro se Petitioner Douglas W. Curtis.[1]

## **I. BACKGROUND**

Petitioner, an inmate of the Northeast Correctional Complex in Mountain City, Tennessee,

filed a pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus challenging his 2016

conviction for four counts of rape of a child in Lewis County, Tennessee, for which he currently

is serving a term of eighty years of imprisonment in the Tennessee Department of Correction.

(Doc. No. 1). Subsequent to filing his initial petition, Petitioner filed a Motion to Amend.[2] (Doc.

No. 9). The Court granted the Motion by Order entered on July 20, 2020, finding that the Motion

sought no substantive amendments to the habeas petition and was filed shortly after the filing of

the original petition. (Doc. No. 12 at 2).

---

[1] Also pending before the Court are the following motions by Petitioner: Motion for Partial Summary Judgment and Motion to Appoint Counsel (Doc. No. 49); Motion to Request Permission to Exceed Page Limit (Doc. No. 51); and Motion to Request the Habeas Court to Take Judicial Notice under Fed. R. Evid. 201 (Doc. No. 52). The Court will address these Motions by subsequent Order.

[2] Because the Motion to Amend did not make substantive changes to the initial habeas petition (Doc. No. 12 at PageID# 254) and because Respondent cites to the original petition in his filings (*see, e.g.*, Doc. No. 28 at PageID# 3105), the Court will cite to the original petition for ease of reference.

The Court, in a July 15, 2020 Order, initially directed Respondent to file the state-court record and a response to the petition. (Doc. No. 7 at PageID# 227-29). The Court later stayed a response to the petition pending a response to Petitioner's discovery motion. (Doc. 12 at PageID# 254). By Order and Memorandum Opinion entered on November 16, 2020, the Court denied Petitioner's motion for discovery without prejudice. (Doc. No. 19 at PageID# 3021). The amended petition is now ripe, and Petitioner again seeks discovery prior to the Court ruling on his amended petition. (Doc. No. 48).

## II. STATEMENT OF FACTS

A full understanding of the facts presented at both Petitioner's trial and post-conviction hearing is necessary for resolving Petitioner's instant Motion.

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's trial as follows:

> This case arose after the victim, who was twenty-nine years old at the time of trial, came forward with allegations that the defendant, her father, raped her when she was a young girl. The victim testified that she was born December 27, 1985.
>
> The State's evidence came primarily from the testimony of the victim and a recorded telephone call. In the summer of 2011, the victim was living with the defendant, her brother, and her sister. At that point in time, she had been attending a church for almost a year and had developed a close relationship with the pastor's wife, Debbie Landers. During the summer, the victim witnessed an event that caused her to have concern for another individual.[3] She asked Ms. Landers for advice, and Ms. Landers testified that she told the victim that the victim had to report the incident. Ms. Landers recommended that the victim contact the Department of Children's Services ("DCS"), the sheriff's department, or the city police. The victim contacted DCS and the Child Advocacy Center ("CAC"), and the CAC directed her to Investigator Johnny Hilburn of the Lewis County Sheriff's Department. She went to speak with Investigator Hilburn about the incident, and he testified that based on his conversation with the victim, he began to believe that she was a victim of abuse herself. Investigator Hilburn asked the victim if there was anything in her past that she wished to discuss, and she stated that she was touched

---

[3] The victim's unease concerned Petitioner's conduct with his younger daughter. (*See* Doc. No. 13, Attach. 8 at Page ID# 1028, 1043, 1047; Doc. No. 13, Attach. 9 at Page ID# 1117, 1120, 1125).

by her father. The victim testified that prior to speaking with Investigator Hilburn, she had not contacted law enforcement regarding the defendant.

The victim testified about four instances of sexual abuse that the defendant committed against her. The first incident happened on February 14, 1998, when she was twelve years old. At that time, the victim and the defendant had "a very close relationship." The defendant allowed her to stay up late to watch television with him while her siblings had to go to bed, and she received privileges and gifts that her siblings did not. On Valentine's Day, the defendant gave the victim a bear, and she stayed up late to watch television and "hang out with" the defendant. Her mother, brother, and sister were each asleep in their bedrooms. The victim testified that the defendant went into his office and laid down a blanket. He returned to the victim and asked her if she "wanted to mess around." The victim "shrugged [her] shoulders," and the defendant took her by the hand and led her to the office. She lay down, and the defendant began to touch her body. She testified that the defendant rubbed his fingers across her vagina and digitally penetrated her vagina. Once he was finished, he picked up the blanket and went to bed. The victim testified that she went with the defendant to the office because she loved him and "felt special" and "wanted to do what he said."

The victim testified that a second, similar incident also occurred in 1998, when she was twelve years old. She recalled that she had finished the sixth grade and had recently made the cheerleading squad. She was staying up late with the defendant, and he congratulated her on making the cheerleading squad. The defendant then "disappeared and went into the office and laid down a blanket, came back and asked [her] if [she] wanted to mess around." She shrugged her shoulders and went with him to the office. She lay down, and the defendant touched her body. He touched her chest and then touched the outside of her vagina, eventually digitally penetrating her vagina.

A third incident occurred in July of 1998 when the defendant made her perform oral sex on him. The victim distinguished this incident from the previous two incidents because she recalled that it occurred on the defendant's birthday. The defendant and the victim were staying up late watching television when the defendant "disappeared to put the blanket down in the office." He returned and asked the victim if she "wanted to mess around." She shrugged her shoulders and went with him to the office. She testified that the defendant was wearing a bathrobe, and "he pulled it apart at the bottom and asked if he got something special." He sat the victim down beside him and "caressed [her] back and hair area." The defendant placed his hand on the victim's head, directing her head toward his penis. The victim placed her mouth on the defendant's penis, and he "guided [her] head up and down." The defendant then lifted the victim's head up and ejaculated onto his stomach. The defendant cleaned up the ejaculate with a blanket that was on the floor, and he placed the blanket in the washroom. The victim recalled that the defendant told her that "he wanted to be the one to show [her] the right way to do these things, he

wanted to be the one to show [her] how to treat a man." On cross-examination, the victim stated that this incident occurred in her bedroom on her futon.

The fourth incident occurred on a date between February 7, 1997, and December 26, 1998. The victim testified that during these dates, the defendant drove a church bus that would pick up the elderly and children and take them to church on Wednesday nights. One Wednesday night, the victim accompanied the defendant. After they had dropped off the parishioners and were alone in the van, the defendant asked the victim if she wanted to mess around. He used his hand to direct the victim to his penis, and she put her mouth on his penis. After this incident, the victim told the defendant that she did not want to do these things any longer because it made her "feel disgusting."

During the summer between the victim's eighth and ninth grade years, the victim's parents separated, and the defendant moved to Florida. Each child went to visit him separately, and the victim went first. Eventually, the victim, her mother, brother, and sister all moved to Florida, but the defendant and his wife could not reconcile. The family moved back to Tennessee, and the defendant and the victim's mother divorced when the victim was in the tenth grade. The victim's mother, brother, and sister moved to Tullahoma, Tennessee. The victim lived with the defendant in Hohenwald, Tennessee, and she testified that she did so voluntarily. The victim continued to have a relationship with the defendant during her high school and college years, and she described the relationship as "a very husband and wife kind of relationship." She testified that she continued to visit and live with the defendant in college because she "loved him and he was [her] dad." She testified that she loved the defendant at the time and cared about him. She explained that she waited so long to disclose the abuse because she could "forgive and forget," but seeing someone else suffering abuse prompted her to contact authorities.

After disclosing the abuse to Investigator Hilburn, the victim participated in a "perp phone call" with the defendant, which was a controlled telephone call that Investigator Hilburn recorded. The victim testified that she was reluctant to make the phone call because she did not "want to betray" the defendant. Investigator Hilburn directed the victim to ask the defendant about allegations of sexual abuse against a second child, and he scripted several questions for the victim to ask the defendant. One particular question was what made the defendant "sexually attract[ed] to an eight-year-old." The recorded phone call was played for the jury, and we have included the relevant portions of that conversation:

> Victim: [A child] said that you touch her, like you did when I was a kid, like touch her.
>
> Defendant: No, that's bullcrap.
> ...
>
> Defendant: I have never touched that child except to give her a bath ....

Victim: I cannot believe that. I cannot believe it. I'm sorry.
...

Defendant: I promise you that's not going on. You just don't know how many times I want to kill myself over the other deal already. And it's not going to happen again.

Victim: Can I ask you why you did it to me?

Defendant: Well you know why.

Victim: No, I don't.

...

Victim: After all these years, I still don't know. I need that closure.

Defendant: Well like I said, I know, I know the damage that was done there, I, you know, I never will forgive myself for that. You know, you just don't know.

Victim: I don't think you know the damage that was truly done. How I grew up just hating you so much. ... I've truly forgiven you inside, but it's so hard to forget.

Defendant: I know that. And if there is anything I could do to change it, I would. But as far as [the child], there's nothing like that going on and there never will be.

...

Victim: I really need to know ... why. Honestly ... what makes you think it's okay to do that though? To have sex with a little girl? A twelve-year-old girl.

Defendant: It wasn't right.

Victim: Then why did you do it, Daddy?

Defendant: I have no answer for that other than I loved you and I'm [unintelligible] stupid. And I still love you to death, you know that.

...

Victim: So you thought it was okay to show your love like that?

Defendant: In a way, at the time I did. And of course I have regrets about it. I've told you. And if there was anything I could do to turn back time, it never would have happened.

...

Defendant: I've told you before, you know, unfortunately, you're the only person that I ever even crossed the line, and I don't know why. Like I said, I love you, and I just made a stupid, stupid, stupid mistake, you know? But, I don't know, that's why when—I know when you came back to live at home you was worried about that too, and that's why I've not even, you know, tried to make you act or see things any different than a father-daughter relationship, and that's maybe, I guess it's too late for that now. But that's—I wish, in my heart, that's what I want, you know?

Victim: ... I can never have that love that I wanted for a father, and it hurts my heart so bad.

Defendant: I wish you had told me way back then, you know?

Victim: I did! Do you not remember me telling you, I wanted stop because I felt gross? And you just wouldn't. You didn't. You cried, and it made me feel bad for wanting to stop.

Defendant: Well, just that one time you did, yeah. And then, after that, you never said nothing else to me. When we moved back here and everything, you never said a word to me. I guess in my unreality of the whole thing, I thought you were happy too.

Victim: What, what—I want to know one more thing. At eight years old, okay, what, just let me, I don't know what made you attracted to me at eight years old, like, I don't know.

Defendant: You weren't eight.

Victim: How old was I?

Defendant: Like I said about twelve. Eleven, twelve.

...

Defendant: To me, what we had in my stupidity and idiotic self was special, you know? I—I never touched your brother or your sister, and it's not like I'm just a pervert running around, you know, molesting kids or whatever. You know what I'm saying? It's just not that way. And I'm sorry that—that it happened to you, and I don't know what else to say to you. I tried to make up

for it any way I can, but I know I can't, and I try to make the best of a bad situation, if that makes any sense. I try and make you feel as comfortable as possible, you know. Because I—I do know, because I—you don't know what I've been through either. It's a two-way thing there. I'm sure it's worse on you, but it's still—it's bad on me too.

Victim: Alright.

Defendant: And I was hoping you did forgive me, and the way you've been acting, you did forgive me. And I was just hoping that it was a mistake that was gonna go away. That you could see me as your dad and nothing more, and just really be your daddy, you know.

Victim: I've never looked at you and not seen that person. Not once have I ever looked at you and thought, this is my sweet Dad that I love so much. Not one time, Dad.

Defendant: Well, I don't know what to say about that either. I deserve it.

Victim: Alright.

Defendant: But I wish you would forgive me....

Victim: Alright.

...

Defendant: And I really am—I really am sorry .... You just don't know how sorry I am and how much hurt I've been through as well, and it all revolves around did I hurt you. I'm—I know, you know, you may not think I know, but I know.

Shortly after the phone call, Investigator Hilburn briefly met with the defendant. The next day, he interviewed the defendant and informed him that the victim had made allegations against him. The defendant told Investigator Hilburn that the victim was upset with him and likely retaliating over a situation that occurred a week prior to the interview. Investigator Hilburn asked the defendant if he had received a phone call from the victim the previous day. The defendant replied that he received numerous phone calls from the victim, and Investigator Hilburn asked him if he remembered a particular conversation and how he would respond if he knew that conversation was recorded. The defendant answered that he did not know what conversation Investigator Hilburn was referring to, and he denied that he was the person on the recording after Investigator Hilburn played him portions of the call. Investigator Hilburn received permission to examine the defendant's cell phone, and he saw that there was a call from the victim's phone number that matched the time and duration of the recording. The defendant responded that he

did not receive a phone call from the victim or speak to her at that time. Investigator Hilburn testified that he had interacted with the defendant prior to the phone call and was familiar with the defendant's voice. He said that the voice on the recording appeared to be the defendant's voice.

Investigator Hilburn agreed that his employment with the Lewis County Sheriff's Department was terminated after the conclusion of the investigation into the defendant for reasons unrelated to the investigation. He agreed that there were no references in his notes to the dates that the victim said the abuse occurred.

The victim testified that she paid her college tuition with college loans, and she used her uncle to co-sign one loan application. She testified that she received permission from her aunt to use her uncle as a co-signer, but she stated that she had not personally received permission from him to do so. She later learned that her uncle did not know about the loan and had not given her permission to use his name. She testified that she had not asked the defendant for money to help pay off the loan shortly before making the accusations against him. She also testified that after graduating from college, she worked for a mental health facility as a caseworker, and she was fired for violating company policy.

The jury convicted the defendant of four counts of rape of a child as charged.

*State v. Curtis*, No. M2015-01372-CCA-R3-CD, 2016 WL 7654946, at *1-5 (Tenn. Crim. App.

Aug. 26, 2016) (footnote added).

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's

post-conviction hearing as follows:

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief, asserting a myriad of claims against trial counsel, appellate counsel, the trial court, and the State. After the appointment of counsel, the petitioner filed two amended petitions for post-conviction relief, arguing trial counsel was ineffective for failing to introduce expert testimony, establish an alibi, review the bill of particulars with the petitioner, and adequately advise the petitioner regarding a plea offer, and for stipulating to the authenticity of the recording. The petitioner also argued appellate counsel was ineffective for failing to raise "the aforementioned issues" on direct appeal.

At the post-conviction hearing, the petitioner testified he hired trial counsel prior to his arrest based on good "word of mouth." The petitioner and trial counsel met three times, twice in trial counsel's office and once in jail following the petitioner's arrest on methamphetamine charges. Although trial counsel did not review discovery or discuss trial strategy, the petitioner believed the State's evidence would consist of

the testimony of the victim and a recording of an alleged phone conversation between the victim and the petitioner.

The petitioner denied seeing the indictment or bill of particulars in his case, and, if he had known the dates of the alleged rapes, he would have provided trial counsel with information supporting his alibi. Specifically, the petitioner testified the home office where two of the rapes occurred did not exist during the year the victim alleged, and, although the victim testified she was raped on the petitioner's birthday in 1998, the family was camping in California on that date. The victim also alleged she was raped on Valentine's Day in 1998. However, the petitioner testified he and his wife "made a big deal" of the holiday and "had a very intimate evening" together. Additionally, the petitioner could not have raped the victim in the church van on a Wednesday night because he used his own vehicle to drive to the nursing home on Thursday nights and only drove the church van on Sunday mornings. The petitioner testified he told trial counsel about the home office, but trial counsel refused to introduce the petitioner's alibi at trial because the petitioner did not have any evidence to support his claim.

Regarding the recording, the petitioner believed the victim secretly recorded conversations with him and used the skills she learned in her college audio engineering classes to splice together pieces of the recorded conversations with questions about child rape. The petitioner testified he hired Mitch Davis, a private investigator in Nashville, to perform an analysis of the recording. Mr. Davis confirmed the voice on the recording was the petitioner's but found inconsistencies in the recording he was not qualified to analyze. Mr. Davis recommended the petitioner hire Tom Owen to perform further analysis into the recording's authenticity.

The petitioner paid Mr. Owen $9,500 to perform a forensic analysis of the recording which revealed multiple anomalies and caused Mr. Owen to question its authenticity. Unbeknownst to the petitioner, a second version of the recording, which was taken directly from the server at the Lewis County Sheriff's Department, was later sent to Mr. Owen for analysis because the first recording was not "in wave form." Mr. Owen analyzed this second recording and again found evidence of tampering. At a pre-trial hearing, Mr. Owen testified the anomalies in the second recording were caused by (1) someone manually pausing the recorder and (2) poor cell phone reception. Although Mr. Owen testified the recording was not made by splicing together separate conversations, he was not aware the victim had taken audio engineering classes, and the petitioner believed this knowledge may have changed Mr. Owen's opinion. On cross-examination, the petitioner conceded phone records showed he received a call from the victim's cell phone on the day of the recording and the duration of the call approximately matched the duration of the recording. However, the petitioner testified he did not have his cell phone in his possession on that day.

The petitioner believed Mr. Owen was going to testify on his behalf at trial because his findings "vindicated" the petitioner. However, a few weeks prior to trial, the petitioner received a letter from trial counsel stating Mr. Owen demanded $17,000 to analyze the original recorder and to replace travel expenses that were lost when the trial was continued. Because the petitioner was unable to pay the additional funds, the trial court declared the petitioner indigent, and trial counsel orally requested a continuance to allow Mr. Owen time to analyze the recorder and $17,000 to pay for the analysis and travel expenses. Although the trial court directed trial counsel to make these requests in writing, trial counsel failed to do so. Mr. Owen did not testify at the petitioner's trial, and trial counsel never explained his concerns regarding Mr. Owen's potential testimony. On cross-examination, the petitioner acknowledged trial counsel was able to argue the recording was manipulated without Mr. Owen's testimony.

Prior to the petitioner's trial, the State presented a plea offer of ten years at 100 percent which would resolve all charges related to both the victim and the victim's younger sister. Because the petitioner believed trial counsel was going to obtain a continuance to allow Mr. Owen to analyze the recorder, the petitioner rejected the offer. Trial counsel then forced the petitioner to sign a statement acknowledging he was rejecting the offer because he "would rather go to trial and face the rest of [his] life in prison." Although the petitioner initially refused to sign the paper, the trial court later ordered him to sign it. However, if the petitioner had known trial counsel was not going to allow Mr. Owen to testify, the petitioner would have accepted the plea offer. Additionally, during the trial, when the petitioner learned Mr. Owen was not going to testify, he advised trial counsel he wanted to accept the plea offer but was told it was "too late."

During the victim's trial testimony, the petitioner wanted trial counsel to question the victim about her experience and education in audio and video engineering. The petitioner believed these questions were essential to prove the recording was not authentic. The petitioner also wanted trial counsel to question the victim about student loan documents and time sheets she had forged. However, trial counsel chose to attack the victim's credibility by asking her about a television show she testified was on prior to one of the rapes. Trial counsel also introduced evidence proving the show aired in the early evening and was not on at 10:30 p.m. as the victim had alleged. The petitioner testified trial counsel did not look into the victim's background, and, if he had, trial counsel would have discovered two arrests for theft.

During cross-examination, the petitioner acknowledged the victim was asked about her education, and she stated her degree was in university studies with a concentration in recording industry and speech and theater. However, the petitioner testified the victim changed her major prior to his trial so she could testify she was not an audio engineer. The petitioner also conceded the victim was asked about the forged loan documents and time sheets, but insisted her answers were misleading because she did not disclose the details surrounding these incidents.

When asked about the issues appellate counsel failed to include in his direct appeal, the petitioner testified appellate counsel should have appealed the trial court's decision to allow the jury to hear about the allegations against the petitioner's younger daughter. Although the petitioner asked appellate counsel to include this issue in the motion for new trial and direct appeal, appellate counsel failed to do so. However, the petitioner was able to orally raise the issue during the motion for new trial hearing. Additionally, the petitioner believed appellate counsel should have appealed the trial court's failure to conduct a proper *Daubert* hearing to test the State's expert's qualifications and methods. Following the denial of his direct appeal, appellate counsel did not inform the petitioner of the possibility of filing a Rule 11 application with the supreme court.

On cross-examination, the petitioner agreed the strategy at trial was to attack the authenticity of the recording. He also agreed trial counsel advised the trial court that the recording did not need to be redacted because it was not "fair to the State" to ask them to redact portions of the conversation and later argue the recording was manipulated.

Trial counsel testified he was hired by the petitioner to represent the petitioner on pending rape of a child charges in Lewis County. Prior to the petitioner's preliminary hearing, trial counsel attempted to obtain a copy of the recorded conversation between the petitioner and the victim but was unsuccessful. Trial counsel later received a copy of the recording in discovery, and, after he and the petitioner listened to it, the petitioner insisted the male voice on the recording was not his. Although trial counsel believed it was the petitioner's voice, the petitioner hired Mr. Owen to analyze the recording for inconsistencies. Because Mr. Owen's initial report indicated the recording was in an unusual format, trial counsel contacted the prosecutor to obtain a "strike off of the original recording" and sent the second recording to Mr. Owen for analysis. This second recording was later played for the jury at the petitioner's trial.

Because the recording was "so devastating," trial counsel's trial strategy was to attack its authenticity. The petitioner first took the position that the voice on the recording was not his. However, when trial counsel was unable to find an expert who agreed with this conclusion, the petitioner next theorized the victim used her expertise in audio engineering to splice together snippets of several conversations with the petitioner and then scripted her side of the conversation to play against the petitioner's manufactured responses. However, at Mr. Owen's *Daubert* hearing, he testified the recording contained "pauses and clicks" which were the result of "manipulation by the operator of the recording device" and "cell tower transmission." Additionally, while Mr. Owen testified it was possible to manipulate a recording in the manner theorized by the petitioner, Mr. Owen did not believe that had happened in this case. Trial counsel was frustrated because Mr. Owen's testimony at the hearing differed greatly from his initial report. Although Mr. Owen found a large number of inconsistencies in the first recording, when he analyzed

the second recording taken from the Lewis County Sheriff's Department's server, he discovered "80 percent ... of these problems ... were the result of this being a recording as opposed to a one-off from the digital version." The few inconsistencies that remained on the second recording did not advance the petitioner's theory. Overall, trial counsel believed Mr. Owen's testimony at the pre-trial hearing "went extremely poorly for him," and trial counsel was afraid Mr. Owen would fall apart on cross-examination if he testified at trial. Because Mr. Owen's pre-trial testimony contradicted much of his initial report, trial counsel believed "the only benefit to Mr. Owen as a witness would be to confuse the less intelligent jurors" on the panel.

Additionally, following Mr. Owen's testimony at the *Daubert* hearing, trial counsel spoke to Mr. Owen about his travel plans for the petitioner's trial. Mr. Owen informed trial counsel he would need several thousand dollars for airfare, hotel accommodations, and time. Mr. Owen explained he needed the additional money because he had used the petitioner's funds to pay for travel expenses associated with the petitioner's prior trial date, and, although he obtained refunds when the trial was continued, any money paid to him was nonrefundable. The petitioner was unable to pay the additional expenses, and, because trial counsel now believed Mr. Owen was "a charlatan and a fraud," he made a strategic decision not to call Mr. Owen to testify at trial.

On cross-examination, trial counsel testified he would not be surprised to learn Mr. Owen signed a sworn affidavit stating he was not able to recoup his original travel expenses because "Mr. Owen says whatever he needs to say to make himself look better." However, trial counsel reiterated Mr. Owen told him that he "got most of [the money he spent on travel expenses] back" but refused to testify without additional funds. Although trial counsel agreed the jury, as the triers of fact, assigns weight to expert testimony, trial counsel believed any "minuscule benefit" obtained by Mr. Owen's testimony would be "greatly outweighed" by his performance on cross-examination.

After trial counsel made the decision not to call Mr. Owen to testify, he focused his trial strategy on attacking the credibility of the victim and establishing the petitioner did not have his cell phone on the day of the recorded conversation. Trial counsel researched the victim's forged loan documents and time sheets. However, because the victim admitted to signing her uncle's name on the loan documents and altering the time sheets, trial counsel was unable to introduce any extrinsic evidence. Furthermore, although the petitioner indicated the victim had an arrest record for theft, trial counsel was unable to locate any convictions for the victim. Trial counsel also researched television shows that were airing at the time of the rapes to poke holes in the victim's timeline. The victim testified *Dharma and Greg* was playing shortly before one of the rapes occurred. However, trial counsel was able to present evidence that the show was not in syndication during the year the victim alleged she was raped and would not have aired at 10:30 p.m.

Because the petitioner's strategy at trial was to attack the authenticity of the recording, trial counsel testified he could not ask the State to redact the victim's younger sister's name from the recording and later argue the same recording was manipulated or altered. Additionally, the portion of the recording that contained the references to the victim's younger sister also included the purported anomalies. If this portion of the recording was redacted, the jury would be unable to hear these anomalies.

Trial counsel testified he and the petitioner reviewed the bill of particulars within a month of the petitioner's trial. Because the victim testified at the preliminary hearing that she and the petitioner had sex on a daily basis for several years, the petitioner needed to decide whether he wanted to attack the victim's story of daily sex as "impossible, implausible and incredible" or whether they would eliminate the introduction of possible evidence of grooming by attacking only the four incidents listed in the bill of particulars. After weighing both options, the petitioner decided to limit the victim's testimony to only the incidents listed in the bill of particulars. While reviewing the bill of particulars, trial counsel asked the petitioner if he had an alibi for any of the incidents. However, the petitioner was not able to provide any names or other information for trial counsel to investigate. Without this information, the only way to introduce the alibis at trial was through the petitioner's testimony, and the petitioner chose not to testify.

On cross-examination, trial counsel acknowledged the petitioner told him that he drove the church bus on Thursdays instead of Wednesdays. However, trial counsel did not believe this was helpful because the petitioner could not provide church records to show when he drove the bus or the name of someone who could verify his story. Additionally, there was nothing to stop the victim from admitting she was mistaken about the day of the week on which the rape occurred. The petitioner also told trial counsel he was on vacation in Florida during one of the dates. However, trial counsel did not want to explore this alibi at trial because the victim was with the petitioner during this trip, and trial counsel was afraid the petitioner would be susceptible to prosecution in Florida.

Approximately two weeks prior to trial, the State offered the petitioner a plea deal of ten years at 100 percent. Although trial counsel was "extremely excited" about the offer, the petitioner told trial counsel he could not plead guilty to something he did not do. The State agreed to let the petitioner enter a best interest plea, but the petitioner was not convinced and requested to speak with his family. Trial counsel arranged a phone call between the petitioner and his sister, who encouraged the petitioner to accept the offer. However, after speaking with his sister, the petitioner told trial counsel he was unable to accept the offer.

Because trial counsel believed the possibility of the petitioner being convicted was "alarmingly strong" and he wanted to protect himself against future post-conviction proceedings, trial counsel asked the petitioner to sign a piece of paper acknowledging the terms of the offer and that he rejected those terms. The

petitioner initially refused to do so, and the trial court ultimately ordered the petitioner to sign the paper. Trial counsel testified, at the time the offer was rejected, the petitioner knew it was unlikely that Mr. Owen would testify at trial. Additionally, at no time during the trial did the petitioner tell trial counsel he had changed his mind about accepting the offer. If the petitioner had done so, trial counsel would have asked the State if the offer was still available.

At the conclusion of the post-conviction hearing, because the petitioner was "rambling" throughout his extensive testimony, the post-conviction court did not have "a clear understanding of what facts [the p]etitioner relie[d] on" to support his claims of ineffective assistance of counsel. Therefore, the post-conviction court ordered post-conviction counsel to prepare a final summation of the petitioner's claims. The petitioner's summation was filed on June 28, 2018, and included the following claims:

a. [Trial counsel] failed to adequately challenge the State's expert;
b. [Trial counsel] failed to call an expert to testify on behalf of [the p]etitioner at his trial;
c. [Trial counsel] failed to introduce an alibi defense and did not review the [b]ill of [p]articulars with [the p]etitioner; and
d. [Trial counsel] failed to adequately advise [the p]etitioner regarding the State's offer.

On July 11, 2018, the petitioner filed a pro se motion seeking time to amend the summation to include an additional claim against appellate counsel. However, because the petitioner was represented by counsel, the post-conviction court granted post-conviction counsel ten days to add the appellate claim if she deemed it appropriate. On July 18, 2018, post-conviction counsel filed a response stating she had reviewed the petitioner's claims against appellate counsel and found they either lacked merit or were addressed at the post-conviction hearing.

After its review of the evidence presented, the post-conviction court denied relief. *Curtis v. State*, No. M2018-01712-CCA-R3-PC, 2020 WL 476907, at *6-9 (Tenn. Crim. App. Jan. 30, 2020).

### III. LEGAL STANDARD

Habeas petitioners do not have an automatic right to discovery. *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997) (finding that a "habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."); *Johnson v. Mitchell*, 585 F.3d 923, 924 (6th Cir. 2009) (same). Discovery in habeas cases is controlled by Rule 6(a) of the Rules

Governing Section 2254 Cases in the United States District Courts, which states in pertinent part that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." R. 6(a), Rules Gov'g § 2254 Cases. "Good cause" is not demonstrated by "bald assertions" or "conclusory allegations." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). Rather, the requested discovery must be materially related to claims raised in the habeas petition and likely to "resolve any factual disputes that could entitle [the petitioner] to relief." *Williams v. Bagley*, 380 F.3d 932, 975 (6th Cir. 2004) (internal quotations omitted) (citing *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)). The moving party bears the burden of demonstrating the materiality of the requested information. *Id*. Rule 6(a) does not "sanction fishing expeditions based on a petitioner's conclusory allegations." *Id*.

Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts provides that, "[i]f the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition." R. 7(a), R. Gov'g § 2254 Cases. In other words, expansion of the record is not permitted unless the Court does not dismiss the petition using the pleadings and the state court record before it. The "the purpose [of Rule 7(a)] is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." R. 7, R. Gov'g § 2254 Cases advisory committee's note. Thus, under Rule 7, the Court should not permit expansion of the record if the pleadings and state court record adequately resolve Petitioner's claims.

Further, the United States Supreme Court generally limits federal habeas corpus review to the state-court records on claims that were adjudicated on the merits in state court. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).[4]

## IV. ANALYSIS

Petitioner's instant Motion (Doc. No. 48) seeks the discovery of his client file from trial counsel John S. Colley, III ("Colley") which allegedly includes (1) forensic expert Tom Owen's reports; (2) other case-related forensic interviews and reports; (3) the original recorder device used to record the controlled phone call allegedly made between Petitioner and his older daughter (also referred to herein as "the victim"); and (4) the Qc2 recording, which Petitioner alleges is a third copy of the recording of the controlled call produced by the State at its facility. Petitioner alleges that he has requested "his client file" from his "attorney of record, John S. Colley, III, on multiple occasions and has been denied his property by Mr. Colley." (*Id*. at PageID# 4093).The Court will address each requested item in turn.

As a preliminary matter, the Court previously has addressed Petitioner's request for the return of all files held by attorney Colley arising out of his representation of Petitioner at trial. (*See* Doc. No. 19 at PageID# 3018 n.1). In a prior Order, after noting Petitioner's vigorous litigation of this issue in state court, the Court reviewed the March 2019 decision of Judge Michael E. Spitzer of the 21st Judicial District, Division V Circuit Court on Petitioner's motion for return of all files held by Colley "arising out of his representation of the Petitioner at trial." (*Id*.) Judge Spitzer denied Petitioner's motion after "having made an inquiry of Mr. Colley, an officer of the Court," that he "has supplied to the Petitioner, or to the Petitioner's subsequent legal counsel, any and all

---

[4] However, even where the state court adjudicated the claim on the merits, the *Pinholster* bar may be lifted if the state court's adjudication was either "contrary to" or an "unreasonable application of" clearly established Supreme Court precedent. Likewise, a state court's unreasonable factual determination under Section 2254(d)(2) may limit the *Pinholster* bar.

files that he held for or on behalf of Petitioner in years past and no longer has any files in his possession concerning this or any other matter of Petitioner's." (*Id.* citing Doc. No. 16, Attach. 1 at PageID# 2967). Further, Judge Spitzer found that "Mr. Colley related that the Petitioner had previously filed a complaint against him with the Tennessee Board of Professional Responsibility of and concerning this issue, and that body had concluded that Mr. Colley had no files belonging to the Petitioner and dismissed that complaint." (*Id.*)

Although Petitioner continues to insist that he is entitled to his client file from attorney Colley, Petitioner has not offered any evidence calling into question Judge Spitzer's holding that the file is no longer in the possession of Colley or any of Petitioner's former attorneys. Petitioner states that "[a]ll four of the lawyers appointed to Petitioner have informed him that they never received any files from Mr. Colley" and lists the lawyers' names and addresses. (Doc. No. 48 at PageID# 4). But Petitioner provides no affidavits from these attorneys supporting his assertions. Petitioner's unsupported assertions are insufficient to call into question the decisions of Judge Spitzer and the Tennessee Board of Professional Responsibility. The Court is unaware of the location of Colley's client file for Petitioner, and it is unclear whether the file still exists.

A. <u>Reports from Tom Owen</u>

First, Petitioner requests discovery of his "attorney's client file that contains forensic reports from the defense audio expert, Mr. Tom Owen", the audio expert Petitioner hired to analyze the recording of the controlled call. (Doc. No. 48 at PageID# 4093). According to Petitioner, the reports he seeks "contain[] hundreds of pages of forensic tests that were completed on the recording used to convict petitioner at trial, and which the expert based on his opinion that the evidence has been tampered with upon." (*Id.*) Petitioner asserts that he paid $9,500.00 "out of his

own pocket" for these forensic tests and believes that the file is his "personal property." (*Id*. at PageID# 4095, 4115).

Before addressing whether a petitioner is entitled to discovery, the court must "first identify the essential elements of" the claim for which the petitioner seeks discovery. *Bracy*, 520 U.S. at 904. Here, Petitioner seeks the return of his client file to support Ground One, his claim of ineffective assistance of trial counsel for failure to call Owen as an expert witness for the defense. (Doc. No. 1 at PageID# 4). To establish a claim of ineffective assistance of trial counsel, the petitioner must show both that trial counsel's performance was objectively deficient and that the petitioner suffered prejudice due to counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If the petitioner does not make both of these showings, the claim fails, and the court need not continue its analysis. *Id*. To establish deficient performance, the petitioner must prove that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. Strategic decisions made after thorough investigation of the law and facts "are virtually unchallengeable." *Id*. To establish prejudice, the petitioner must prove that, but for counsel's deficient performance, there was a reasonable probability of a different result at the proceeding. *Id*. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Petitioner properly exhausted Ground One by raising it in his post-conviction appellate brief (Doc. No. 13, Attach. 25 at PageID# 2657-62), and the Tennessee Court of Criminal Appeals denied relief on the claim under both *Strickland* prongs. *Curtis*, 2020 WL 476907, at *11. Petitioner now argues that the requested documents "are invaluable in meeting the habeas standards of 2254(d) in showing that the state court's rulings as to Petitioner's ineffective assistance claim are 'contrary to or involved an unreasonable application of clearly established

federal law, as determined by the Supreme Court of the United States.'" (*Id.*) But the record as it exists refutes Petitioner's argument.

In his post-conviction petition, Petitioner argued that trial counsel was ineffective for failing to present Owen at trial. (Doc. No. 13, Attach. 25 at PageID# 2652). The post-conviction court disagreed, finding that trial counsel made a strategic decision not to use Owen's reports or testimony. The court determined that counsel's decisions regarding Owen "were well-informed and the result of adequate preparation." *Curtis*, 2020 WL 476907, at *11. The court further determined that trial counsel "articulated many sound reasons in support of his decision not to call Mr. Owen as an expert witness" and that Petitioner's argument "is made with the benefit of hindsight, a benefit to which he is not entitled [] for purposes of supporting his [p]ost-[c]onviction petition." *Id.*

In affirming the post-conviction court's denial of relief on this claim, the Tennessee Court of Criminal Appeals credited trial counsel's testimony to the effect that: (i) he did not believe Owen's testimony would have advanced Petitioner's theory of how the recording was made; (ii) although Owen's initial report appeared favorable to the defense, he withdrew many of his previous conclusions after Owen analyzed a second copy of the recording; (iii) counsel "was afraid Mr. Owen would fall apart on cross-examination"; and (iv) when Owen "demanded additional money before agreeing to testify" after Petitioner's trial was continued—despite Owen having told trial counsel that he (Owen) had been able to recoup his travel expenses from Petitioner's previous trial date—trial counsel believed Owen was "a charlatan and a fraud." *Curtis*, 2020 WL 476907, at *11; (Doc. No. 13, Attach. 21 at Page ID# 2280-81, 2324-25). The appellate court noted that "nothing in the record preponderates against the post-conviction court's factual findings" and "the fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a

claim for ineffective assistance of counsel." *Id*. at *11. Thus, the appellate court denied relief on this claim, agreeing with the post-conviction court that "trial counsel made a strategic decision to not call Mr. Owen as an expert witness." *Curtis*, 2020 WL 476907, at *11; (Doc. No. 13, Attach. 21 at Page ID# 2290-91).[5]

Petitioner argues that the discovery he seeks would essentially shore up Owen's credibility and demonstrate his usefulness to the defense at trial, supporting Petitioner's claim that trial counsel should have called Owen to testify for the defense. Petitioner insists that trial counsel misunderstood or misrepresented Owen's request for additional funds and points to a signed sworn affidavit by Owens dated May 11, 2018, stating that (1) he was not able to recoup his original travel expenses and thus needed additional funding as compensation for his time and travel in order to appear at Petitioner's new trial date and (2) Owen had favorable evidence to submit to the jury on Petitioner's behalf. (Doc. No. 48 at PageID# 4099 (citing Doc. No. 13, Attach. 24 at PageID# 2574-75)).

With respect to the former, Petitioner alleges that Owen's affidavit shows that trial counsel performed deficiently when he failed to acquire needed funds to ensure Owen's attendance. On cross-examination during Petitioner's post-conviction hearing, trial counsel was presented with Owen's affidavit and testified that "he would not be surprised to learn Mr. Owen signed a sworn affidavit stating that he was not able to recoup his original travel expenses because 'Mr. Owen says whatever he needs to say to make himself look better.'" *Curtis*, 2020 WL 476907, at *8. Trial

---

[5] The appellate court affirmed the post-conviction court's denial of relief as to this claim on the additional grounds that Petitioner failed to call Owen at the post-conviction hearing. *Curtis*, 2020 WL 476907, at *11 (citing *Plyant v. State*, 263 S.W.3d 854 (Tenn. 2008)). In *Plyant*, the Tennessee Supreme Court held that, "[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Id*. at 869. Thus, the state courts could not properly judge whether there was a "reasonable probability" of a different trial outcome had Owen testified, because Petitioner offered no evidence at the post-conviction hearing beyond his own self-serving speculation. *Pinholster* therefore provides an alternative reason for denying Petitioner's discovery request.

counsel reiterated that Owen told him he (Owen) "got most of [the money he spent on travel expenses] back" but still refused to testify without additional funds. In other words, trial counsel did not find Owen's affidavit testimony to be credible. Trial counsel testified that he believed that any "'minuscule' benefit" obtained by Owen's testimony would be "outweighed" by his performance on cross-examination. *Id*. at *11. Based on his assessment of Owen's helpfulness, or lack thereof, trial counsel focused his trial strategy on attacking the credibility of the victim and establishing that Petitioner did not have his cell phone with him on the day of the controlled call.

Petitioner now requests discovery of another affidavit, "the alleged $17,000 affidavit document to clarify the record as to the actual amount Mr. Colley was being asked to reimburse, and whether his decision not to attempt to acquire the needed funds was 'unreasonable' under the holdings in *Wiggins*, 123 S. Ct. 2527 (2003)." (Doc. No. 48 at PageID# 4099). However, the record shows that trial counsel was aware of Owen's affidavit testimony that he (Owen) had not received refunds for the expenses he (Owen) incurred in connection with Petitioner's initial trial date and did not find Owen's affidavit testimony to be credible. Furthermore, the record shows that trial counsel believed Owen's testimony at the pre-trial hearing "went extremely poorly for him," and trial counsel was afraid Owen would "fall apart" on cross-examination if he testified at trial. *Id* at *8. Because Owen's pre-trial testimony contradicted much of his initial report, trial counsel believed that "the only benefit to Mr. Owen as a witness would be to confuse the less intelligent jurors" on the panel. *Id*.

With respect to Petitioner's allegation that Owen had favorable evidence to submit to the jury on Petitioner's behalf, the existing record shows that, based on the second analysis Owen performed, Owen was likely to testify at trial—as he did at the *Daubert* hearing—that he discovered anomalies in the digital recording that was provided to him in July 2013. (Doc. No. 13,

Attach. 17 at PageID# 1864). Specifically, Owen had testified at the *Daubert* hearing (and thus was likely to testify at trial): (i) to the absence of a slate ("[T]his is Officer Jones, the time is such and such"); (ii) that "every time [the male voice] starts to say something, there's a loud click in the beginning and hers as well," which Owen stated was "not normal"; (iii) that "there's a set of double clicks" right after the male voice speaks; (iv) that in Owen's opinion, the recording has been altered and "doesn't represent the event as it actually occurred"; and (v) that some of the clicks are caused "through cell tower drop-outs," while others are caused "[b]y hitting the pause button and releasing it." (*Id*. at #1864, 1868, 1874). Owen also likely would have testified that he did not conclude that the controlled call was "actually a recording between [the victim] and a prerecorded snippet of a conversation with Mr. Curtis." (*Id*. at PageID# 1872-73). He reiterated at the *Daubert* hearing: "I don't know where you're getting this, but I don't think I've ever said to anybody that it was a prerecording of this gentleman and then they cut her in and cut him in or whatever." (Doc. No. 13, Attach. 5 at PageID# 796-97). Owen would have testified that while this "could be done . . . it would probably be able to be identified because it's very hard to do something like that and make it sound natural." (*Id*. at PageID# 1873).

The Court has carefully considered Petitioner's assertions and reviewed the existing record, paying special attention to the portions pointed out by Petitioner in his Motion. The Court concludes that it can determine on the existing record whether Petitioner is entitled to relief on this claim;[6] thus, discovery of Owen's notes, affidavit, and reports—even assuming they are available—will be denied.

---

[6] To the extent that Petitioner's ineffective-assistance-of-counsel claim based on trial counsel's failure to call Owen as a defense witness overlaps with Petitioner's ineffective of counsel claim based on trial counsel's failure to obtain the original recorder for use in Owen's testing, the Court addresses the latter *infra*. As to both claims, the Court finds that discovery is not warranted. While it is possible that Owen may have provided additional testimony favorable to the defense if he had availed himself of the opportunity to test the original recorder, Petitioner did not present Owen

B. <u>Forensic Interviews and Reports</u>

Next, Petitioner seeks discovery of "forensic interviews and physical forensic reports concerning an alleged 'second victim' in the case,'" Petitioner's younger daughter, which Petitioner alleges are contained in attorney Colley's file. (Doc. No. 48 at PageID# 4095). According to Petitioner, these reports show that Petitioner's younger daughter "never accused [him] of any molestation or which the forensic tests verified there was no sign of any molestation[.]" (Doc. No. 2 at PageID# 212-13). In addition, Petitioner alleges that "[t]here are other forensic reports from the Department of Children's Services, through Meharry General Hospital in Nashville, Tennessee, both physical and psychological, that again found there was no visible signs or evidence of abuse or verbal accusations by alleged Victim 2 [Petitioner's younger daughter], concerning any molestation by the Petitioner." (Doc. No. 48 at PageID# 4095). Petitioner states that these reports were held in his "client file by Mr. Colley" and Petitioner was unable to obtain copies directly from the hospital due to the charges against him. (*Id.*)

Although Petitioner does not make it entirely clear, it appears that he seeks this discovery for three reasons: (1) to support a claim of error on the part of the trial court "when it violated both State and Federal Rule 14(b) Severing of Offenses" (*see* Doc. No. 1 at PageID# 52-54); (2) to support a claim of ineffective assistance of counsel based on trial counsel's alleged failure to object to evidence of Petitioner's other crimes or bad acts under Tennessee Rule of Evidence 404(b) (*see*

---

at Petitioner's post-conviction hearing to testify as to what favorable information Owen might have provided had he been afforded such opportunity. And Owen himself testified that his report "was not incomplete," even without having tested the original recorder. Moreover, because the victim testified in detail as to the four instances of rape and no corroborating physical evidence is required to convict Petitioner of those counts, the Court need not permit discovery of the original recorder device by Owen or any other defense expert at this late date. The existing record is sufficient for the Court to determine whether attorney Colley provided ineffective representation based on the use (or lack thereof) of Owen and the original recorder.

*id.* at PageID# 6-7); and (3) to support Petitioner's insufficiency-of-evidence claim (*see id.* at PageID# 60-63).

### 1. *Ground Twelve: Trial Court Error*

The Court will begin with the claim of trial-court error. In Ground Twelve of his petition, Petitioner alleges that the trial court violated his right to due process because evidence concerning the rape of his younger daughter was admitted during Petitioner's trial (which involved charges concerning only the rape of his older daughter). (Doc. No. 1 at PageID# 52-54). Petitioner also alleges that, in permitting this evidence, the trial court violated "both State and Federal Rule 14(b) Severing of Offenses." (*Id.*)

According to Petitioner, the discovery he seeks will show that the trial judge should not have allowed any testimony about Petitioner's alleged molestation of his younger daughter because such ruling was "contrary to or involved an unreasonable application of clearly established law, as determined by the Supreme Court of the United States." (Doc. No. 48 at PageID# 4096). Specifically, Petitioner maintains that this discovery "will enable the petitioner to show this reviewing court that the 'preponderance of the evidence' was not that he has committed this alleged other crime, and yet the trial court allowed the entire trial to be permeated with accusations that the petitioner was molesting someone else 14 years after the alleged molestation he was on trial for allegedly committing." (*Id.* at PageID# 4098).

Petitioner raised this claim to the Tennessee Court of Criminal Appeals on post-conviction appeal, but the Tennessee Court of Criminal Appeals invoked the waiver rule articulated in *Cauthern v. State*, 145 S.W. 571, 599 (Tenn. Crim. App. 2004), to deny relief because the issue was not included in Petitioner's final summation and the post-conviction court did not render a

ruling on the issue in its order denying relief. (Doc. No. 13, Attach. 25 at Page ID# 2694-2700); *Curtis*, 2020 WL 476907, at *16.

The *Cauthern* rule constitutes an adequate and independent state procedural ground on which the Tennessee Court of Criminal Appeals could rest its denial of relief. *See Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002). When determining whether a claim has been procedurally defaulted based on an adequate and independent state procedural rule, the court applies the following test:

> (1) the court must determine that there is a state procedural rule with which the petitioner failed to comply; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) the state procedural rule must have been an adequate and independent state procedural ground upon which the state could rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error.

*Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002). Assuming for purposes of this analysis that the first three *Monzo* factors are satisfied, the Court can address this claim only if Petitioner pleads sufficient cause and prejudice to excuse the default or shows that the Court's failure to address this claim would result in a fundamental miscarriage of justice. The existing record permits the Court to make this determination.

First, Petitioner's claim concerning the alleged misapplication of Tennessee Rule of Criminal Procedure 14 is not cognizable in habeas corpus. "[F]ederal habeas corpus relief does not lie for errors of state law" because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)(quotation omitted); *Clifton v. Carpenter*, 775 F.3d 760, 764 (6th Cir. 2014); *see also Watts v. Leibach*, No. 3:17-cv-795, 2019 WL 4343549, at *12-13 (M.D. Tenn. Sept. 12, 2019) (finding

that an alleged error concerning severance of offenses brought pursuant to Tennessee Rule of Criminal Procedure 14 is not cognizable for review under Section 2254).

Second, Petitioner's claim concerning Federal Rule of Criminal Procedure 14's applicability to his state-court criminal trial also is not cognizable. The Federal Rules of Criminal Procedure do not apply to state proceedings and are not constitutional mandates that state courts must follow. *Murphy v. Sloan*, No. 1:14-cv-2445, 2015 WL 7450993, at *12 (N.D. Ohio Oct. 27, 2015), *report & recommendation adopted* 2015 WL 7455564, at *1 (N.D. Ohio Nov. 23, 2015); *Felder v. Ohio Adult Parole Auth.*, No. 1:07-cv-1535, 2009 WL 3763067, at *14 (N.D. Ohio Nov. 9, 2009) (citing *Alvarez v. Straub*, 21 F. App'x 281, 283 (6th Cir. 2001)); *see Ahlswede v. Wolff*, 720 F.2d 1108, 1110 (9th Cir. 1983) (an alleged violation of a federal rule of criminal procedure is not cognizable in a petition for a writ of habeas corpus).

Third, the record before the Court shows that the witnesses' testimonial statements about which Petitioner complains were sterilized pursuant to the trial court's order on the State's motion in limine concerning Petitioner's conduct with his younger daughter. (*See* Doc. No. 13, Attach. 8 at Page ID# 1028, 1043, 1047; Doc. No. 13, Attach. 9 at Page ID# 1117, 1120, 1125). The victim acknowledged only that she had "become concerned . . . for another individual" before describing the steps she took which eventually led to Petitioner's prosecution. (*See* Doc. No. 13, Attach. 8 at PageID# 1028-1030). The victim conformed her testimony during cross-examination to the trial court's instructions when she noted that she waited to pursue charges against Petitioner "[b]ecause [she] can forgive and forget, but when [she] saw someone else in trouble with that, that's why [she] went to [police]." (*Id*. at PageID# 1043). Witness Debbie Landers complied with the court's order by acknowledging that the victim asked her for advice because she was "concern[ed] about another person." (Doc. No. 13, Attach. 9 at PageID# 1117). Likewise, both M'Le Hudgins and

Investigator Hilburn did not reveal the younger daughter's identity when testifying. (*Id*. at PageID#1120, 1125). Although Petitioner contends that the trial court's admission of this evidence so permeated the trial that Petitioner could not receive a fair trial, the record shows that the victim and witnesses' testimonies were sufficiently neutralized to protect Petitioner's rights while allowing the victim to provide important context on the very material issue of why, after such a long hiatus, she finally reported the rapes. And to the extent Petitioner contends that evidence about an alleged second victim constituted improper propensity evidence (*see* Doc. No. 1 at PageID# 54), there was a very proper non-propensity purpose for this testimony, namely, explaining why the victim came forward when she did come forward.

In summary, the Court can determine, based on the existing record, whether Petitioner's claim of trial-court errors are meritorious. Thus, this claim does not warrant the discovery Petitioner seeks.

### 2. *Ground Two: Ineffective Assistance of Trial Counsel*

Petitioner additionally seeks this discovery to support Ground Two, his claim of ineffective assistance of counsel based on trial counsel's alleged failure to object to evidence of Petitioner's other crimes or prior bad acts under Tennessee Rule of Evidence 404(b). (Doc. No. 1 at PageID# 6-7). As evidence of trial counsel's failure to properly object to Rule 404(b) evidence, Petitioner points to a comment the victim made about their "husband and wife relationship" when she was a teenager and in college (*id*. at PageID# 6) and to witness trial testimony concerning Petitioner's alleged molestation of his younger daughter. (*Id*.) *Strickland* is the governing federal law over this claim and corresponding discovery request, requiring Petitioner to prove deficient performance and prejudice. 466 U.S. at 687.

a. "Husband and Wife Relationship" Statement

First, the victim testified that she and Petitioner had a "husband and wife relationship" when she was a teenager and in college. In Ground Two, Petitioner alleges that trial counsel was ineffective because he failed to object to this testimony under Tennessee Rule of Evidence 404(b). (Doc. No. 1 at PageID# 6-7). Petitioner did not present this claim to the Tennessee Court of Criminal Appeals on post-conviction appeal, the first court of competent jurisdiction. (*See* Doc. No. 13, Attach. 25 at Page ID# 2662-63); *see Curtis*, 2020 WL 476907, at *12. By failing to present the federal constitutional claim to the state courts, Petitioner procedurally defaulted the claim. 28 U.S.C. § 2254(c); *Coleman*, 501 U.S. at 732. He therefore has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice or that the Court's failure to address this claim would result in a fundamental miscarriage of justice.

Petitioner attempts to excuse his default by pointing to failures of counsel. (Doc. No. 1 at PageID# 7-9). However, even if the Court were to determine that Petitioner has established both cause and prejudice to overcome his default, Petitioner is not entitled to the requested discovery. Petitioner has not shown that, with respect to Ground 2, the requested discovery is likely to "resolve any factual disputes that could entitle [Petitioner] to relief." *Williams*, 380 F.3d 932, 975. The existing records show that trial counsel could not remember if he objected at the time the victim made the "husband-wife" comment or if he (counsel) made a motion to strike following the victim's testimony. (*See* Doc. No. 13, Attach. 21 at PageID# 2300-01). However, during Petitioner's post-convicting hearing, counsel explained that he may not have responded at all, believing that he would have drawn attention to the at-issue testimony or, as he put it, "r[a]ng[] the bell twice". (*Id*. at PageID# 20301). Petitioner does not dispute that this was in fact counsel's

belief. The Court therefore can determine, based on the existing record, whether Petitioner is entitled to relief on Ground Two. Discovery related to this claim will be denied.

b. Witness Testimony Regarding Molestation of Younger Daughter

Petitioner also alleges that trial counsel was ineffective because he failed to prevent the introduction of trial testimony concerning the alleged molestation that Petitioner committed against his younger daughter. (Doc. No. 1 at PageID# 6). According to Petitioner, although the trial judge "barred" any such testimony from the victim and other witnesses, the testimony was allowed, "infecting the trial with inadmissible other alleged crime evidence." (Doc. No. 48 at PageID# 4097). Citing *Cauthern*, 145 S.W. 571, 599, the Tennessee Court of Criminal Appeals determined that Petitioner had waived review of this claim because he failed to incorporate it into his final summation presented to the post-conviction court. *Curtis*, 2020 WL 476907, at *9, *12. Thus, the claim is procedurally defaulted because the Tennessee Court of Criminal Appeals invoked an adequate and independent state procedural ground to bar review of the claim. Assuming for purposes of this analysis that the first three *Monzo* factors are satisfied, the Court can address this claim only if Petitioner demonstrates sufficient cause and prejudice to excuse the default or shows that the Court's failure to address this claim would result in a fundamental miscarriage of justice.

With respect to his claim that trial counsel was ineffective for failing to object to Rule 404(b) testimony, Petitioner states that "4 of the 5 government witnesses . . . were allowed to inform the jury, without objection from counsel, the name, age, relationship, and allegations made against petitioner concerning the alleged other victim." (Doc. No. 1 at PageID #6; *see* Doc. No. 48 at PageID# 4097). However, the existing record belies Petitioner's assertions. The record shows instead that the trial court granted the State's motion in limine to allow testimony of prior bad acts

committed by Petitioner (Doc. No. 13, Attach. 2 at PageID# 481-82) because the observations the victim made concerning Petitioner's alleged abuse of his younger daughter were "relevant to demonstrate to the jury why [the victim] delayed in notifying law enforcement of her previous abuse."[7] (*Id.* at PageID# 481). However, the trial court significantly limited this testimony. (*Id.*) The victim and other witnesses were ordered to limit their testimonies "to the effect that [the victim] observed something that caused her to become concerned about another person." (*Id.*) The trial court specified that no witness, including the victim, could testify "as to what [the victim] saw, the identity of the [younger daughter] or the subsequent conversation with the minor child." (*Id.*)

At trial, the victim testified about four instances of rape before she reached the age of thirteen. *Curtis*, 2016 WL 7654946, at *1-2. Four State witnesses testified, including the investigator who recorded the controlled call and Debbie Landers, the victim's friend who urged the victim to report what she witnessed concerning "another individual." *See generally id.* at *1-4. The record shows that these witnesses all testified in accordance with the trial court's order concerning Petitioner's prior bad acts. (Doc. No. 13, Attach. 8 at PageID# 1028, 1043, 1047; Doc. No. 13, Attach. 9 at PageID# 1117, 1120, 1125).

Petitioner concedes that the trial court issued the limiting order but asserts, without providing evidence, that "alleged Victim 1, as well as[] all of the other witnesses including the prosecutor" violated the order. (Doc. 48 at PageID# 4097). In any event, a close reading of Petitioner's Motion reveals that Petitioner's main argument with respect to this testimony is that the victim's testimony was not credible and the trial judge allowed four witnesses to offer hearsay

---

[7] Notably, testimony admitted for this (limited) purpose—*i.e.*, to demonstrate to the jury why the victim delayed in notifying law enforcement of her previous abuse—is not withing the scope of Tennessee Rule of Evidence 404(b), because it was not "admi[tted] to prove the character of [the Petitioner] in order to show action in conformity therewith."

testimony. With respect to the former, Petitioner alleges that the victim "admitted on the record that 'she was not sure if petitioner's hand was inside or on the outside of the shirt' of the alleged 4 year old other victim." (*Id.* at PageID# 4098). With respect to the latter, Petitioner alleges that the victim told these four witnesses that "she thought" Petitioner was molesting the alleged other victim, and the trial judge allowed these witnesses to testify "[a]lthough none of these witnesses ever saw any actual molestation or abuse." (*Id.* at PageID# 4097-98). Essentially, then, Petitioner's arguments speak to the sufficiency of the evidence used to convict him, not to trial counsel's alleged failures to object to testimony that Petitioner claims violated the trial court's limiting order. Petitioner raises a sufficiency of evidence claim in his habeas petition in which he questions the victim's credibility. (*See* Doc. No. 1 at PageID# 60-63). That brings us to the final reason Petitioner seeks discovery of the forensic reports—to support that insufficiency-of-the-evidence claim.

### 3. *Ground Fourteen: Insufficiency of the Evidence*

Finally, Petitioner alleges that he needs the forensic reports to show that none of the witnesses observed Petitioner molest his younger daughter, and that therefore the trial court allowed those witnesses to testify that the victim told them she thought Petitioner was molesting the other alleged victim. In addition, Petitioner alleges that the reports would show that the victim "admitted on the record that 'she was not sure if petitioner's hand was inside or on the outside of the shirt' of the alleged 4 year old other victim." (Doc. No. 48 at PageID# 4097-98). According to Petitioner, the victim's testimony was not credible and the trial judge allowed four witnesses to offer hearsay testimony; thus, there was insufficient evidence to convict him. Petitioner's desired discovery relates to Ground Fourteen in which he alleges that the State failed to introduce sufficient evidence to convict him of the child rapes. (Doc. No. 1 at PageID# 60-63).

Although Petitioner properly exhausted an insufficiency-of-the-evidence claim regarding the State's use of leading questions [8](*see* Doc. No. 13, Attach. 14 at PageID# 1719-21), Petitioner has not exhausted an insufficiency-of-the-evidence claim based on the credibility of the victim and other State witnesses' testimony. Therefore, the claim is procedurally defaulted. And even if Petitioner can show cause and prejudice to excuse his default, the Court can resolve the insufficiency-of-the-evidence claim on the existing record.

Petitioner was convicted of four counts of rape of a child. Tennessee defines "rape of a child" as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2010). "Fellatio" and "any other intrusion, however slight, of any part of a person's body" constitutes "sexual penetration." *Id*. § 39-13-501(7). Here, the victim's testimony satisfies the elements of "rape of a child." At trial, she described Petitioner "penetrat[ing] her vagina with his fingers" on Valentine's Day in 1998; described a similar incident of digital-vaginal penetration after being named a cheerleader later that year; described performing fellatio on Petitioner on his birthday in 1998; and described performing fellatio on Petitioner in a church bus. *Curtis*, 2016 WL 7654946, at \*1-2, \*7. The victim testified that these rapes occurred when the victim was twelve. *Id*. at \*1, \*7. She testified that, after the fourth incident, she told Petitioner that she wanted the abuse to stop because it made her "feel gross." *Id*. at \*7. The State does not need to corroborate the victim's testimony to establish Petitioner's guilt. *See State v. Smith*, 42 S.W.3d 101, 106 (Tenn. 2000) (finding that "there is no requirement that the [rape] victim's testimony be corroborated").

---

[8]On direct appeal, Petitioner argued that the trial judge should not have allowed the prosecutor's use of leading questions when questioning Petitioner's older daughter and, without the testimony garnered from those leading questions, the evidence used to convict Petitioner was insufficient. (*See* Doc. No. 13, Attach. 14 at PageID# 1719).

In arguing that the evidence is insufficient, Petitioner questions the victim's credibility. (*See* Doc. No. 1 at PageID# 60-63). However, the jury clearly believed the victim, even after hearing her admit to dishonest conduct and even after considering trial counsel's attempt to prove that Petitioner did not have his cell phone in his possession on the day of the controlled call. *Curtis*, 2016 WL 7654946, at *4; *Curtis*, 2020 WL 476907, at *8. "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact." *State v. Cribs*, 967 S.W.2d 773, 793 (Tenn. 1998). Additionally, "[a]n attack on witness credibility does not challenge the sufficiency of the evidence, only its quality." *Humphrey v. Mills*, 54 F. App'x 433, 434 (6th Cir. 2002). Because Petitioner's insufficiency-of the-evidence claim can be resolved on the existing record, Petitioner is not entitled to the discovery he seeks in support of that claim.

      C. <u>Original Recorder</u>

Petitioner also seeks discovery of the original recorder that captured the controlled phone call allegedly between Petitioner and the victim. (Doc. No. 48 at PageID# 4106). In the controlled phone call, the person alleged to be Petitioner admits to sexually abusing the victim, acknowledges the incident where she asked him to stop because it made her feel gross, and corrects her when she said the abuse occurred when she was eight years old, saying that she was eleven or twelve years old when the abuse occurred. *Curtis*, 2016 WL 7654946, at *7. Petitioner, however, contends that he was not the male voice on the controlled call. He asserts that the original recorder should be produced and tested and the results of the testing will prove Petitioner's innocence.

This discovery request relates to two claims in the instant federal habeas petition: Ground Six and Ground Eleven.

1. *Ground Six: Ineffective Assistance of Trial Counsel*

In Ground Six, Petitioner alleges that trial counsel was ineffective for "failing to send the critical recorder device to the forensic expert for testing as ordered by the trial judge." (Doc. No. 1 at PageID# 22-25). *Strickland* applies to this claim, requiring Petitioner to prove trial counsel rendered deficient performance that resulted in a reasonable probability of a different trial outcome. 466 U.S. at 687-94.

Petitioner raised this claim on post-conviction appeal (Doc. No. 1 at PageID# 22-24), but the Tennessee Court of Criminal Appeals invoked an adequate and independent state procedural ground to bar review of the claim, citing *Cauthern*. *Curtis*, 2020 WL 476907, at *4. Even assuming, however, that Petitioner can show cause and prejudice for the default, Petitioner is not entitled to the discovery he seeks because the Court can resolve this claim on the existing record.

Petitioner correctly points out that even though the trial judge ordered trial counsel to send the original recorder to Owen (Doc. No. 13, Attach. 2 at PageID# 447), trial counsel elected not to do so. During Petitioner's post-conviction hearing, trial counsel testified that as a matter of strategy, he decided not to pursue further testing and testimony from Owen after he (Owen) testified at Petitioner's *Daubert* hearing. (Doc. No. 13, Attach. 21 at PageID# 2400-010). In explaining his decision, trial counsel stated that after he proved unsuccessful in finding an expert to support Petitioner's assertion that he was not the male voice on the controlled call, the defense pursued a new strategy, devised by Petitioner: to attack the recording's authenticity, specifically by claiming that "the victim used her expertise in audio engineering to splice together snippets of several conversations with the petitioner and then scripted her side of the conversation to play against the petitioner's manufactured responses." *Curtis*, 2020 WL 476907, at *8. However, according to trial counsel, this theory fell apart at the *Daubert* hearing. *Id*. There Owen testified

that, while it was "possible to manipulate a recording in the manner theorized by the petitioner," Owen did not believe splicing occurred. *Id.* at \*8; (Doc. No. 13, Attach. 17 at PageID# 1873). In fact, Owen testified that a spliced recording "would probably be able to be identified because it's very hard to do something like that and make it sound natural." (Doc. No. 13, Attach. 17 at PageID# 1873). Owen confirmed that the "pauses and clicks" heard on the recording resulted from "manipulation by the operator of the recording device and cell tower transmission." *Curtis*, 2020 WL 476907, at \*8. Thus, to trial counsel "it became clear" after the *Daubert* hearing "that the overwhelming majority of the problems with the recording were the result of it being a copy, that it was pointless to—it really didn't matter whether [Owen] got the original device or not." (Doc. No. 13, Attach. 21 at PageID# 2372). Trial counsel ultimately described the defense's splicing theory as a "far-fetched mission impossible perp call" that Owen "was going to shoot down" if he was called to testify again because the theory was "far-fetched to begin with." (Doc. No. 13, Attach. 21 at PageID# 2334). Later in his testimony, trial counsel stated the theory "frankly . . . wasn't believable or plausible." (*Id.* at PageID# 2335). He likewise testified that he had no expert testimony to support Petitioner's splicing theory. (*Id.* at PageID# 2286).

Further, trial counsel believed that Owen's testimony at the pre-trial hearing "went extremely poorly for him," leading trial counsel to fear that Owen would "fall apart" on cross-examination if he testified at trial. *Curtis*, 2020 WL 476907, at \*8. Because Owen's pre-trial testimony contradicted much of his initial report, trial counsel believed that "the only benefit to Owen as a witness would be to confuse the less intelligent jurors" on the panel. *Id*. Further, when trial counsel spoke to Owen "about getting the recorder to him," Owen demanded more money, leading trial counsel to believe that Owen was a fraud. (Doc. No. 13, Attach. 21 at PageID# 2399-2400). And while it is true that the trial court judge opined that "there is not a level playing in this

trial until [a defense expert] has the same opportunity to examine" the original recorder (Doc. No. 13, Attach. 7 at PageID# 1904), Owen explicitly testified at Petitioner's post-conviction hearing that he did not need the original recorder to offer his expert opinion on the recording's authenticity:[9]

> Q. But my question is, is your analysis incomplete since you did not look at the original recorder?
>
> A. **No.** There are examinations done every day where you don't have the original recorder. In fact, most of the time you don't have the original recorder, especially when the event happens and three years later it goes to trial, nobody knows where the original recorder went, regardless of what kind of recorder it is. But there are many, many instances where you don't have the original recorder. It's nice to have to original recorder, but sometimes you just don't have it.

(Doc. No. 13, Attach. 17 at PageID# 1885) (emphasis added). Trial counsel reiterated that "at no point did [Owen] tell [trial counsel], [Owen] can't do this analysis unless you give [him] the original." (Doc. No. 13, Attach. 20 at Page ID# 2271). Further, the trial judge noted that Owen's failure to test the original recorder "doesn't invalidate his report." (Doc. No. 13, Attach. 17 at PageID# 1907).

> But Petitioner argues in his instant Motion:
>
> This is the tragedy in this instant case[] because the petitioner is being denied the court-ordered access to the only physical evidence that ties him to the crimes he is convicted of committing, and the courts themselves have estopped him from providing the critical proof that he did not incriminate himself in the alleged perp-call used to convict him at trial. This is a "Manifest Injustice in the 1st Degree" and should be cured by this court ordering the Respondent to turn over the recorder device for the court ordered testing.

(Doc. No. 48 at PageID# 4115). Despite Petitioner's assertion, the record shows that the recorder was available for Owen to examine and test prior to trial, but he did not request it. During a pre-

---

[9] Although Owen testified that it would be "beneficial" to examine the original recorder and that he would have run a test on the original recorder if it had been provided to him (Doc. No. 13, Attach. 17 at PageID# 1872), Owen testified without reservation that his analysis was complete without having examined the original recorder.

trial hearing on August 6, 2014, the trial judge confirmed with the State that the recorder "is actually in evidence" and " in control of the clerk", and "[t]he state is stating it has no objection to it being sent to Mr. Owen and tested." (Doc. No. 13, Attach. 7 at PageID# 929). However, at that time, for the reasons discussed above, trial counsel elected not to pursue court funding that would enable Owen to test the original recorder.

More critically, also discussed above, the prosecution is not required to corroborate a rape victim's testimony with physical (or audio) evidence to satisfy its burden of proof. *See State v. Elkins*, 102 S.W.3d 578, 582 (Tenn. 2003) (affirming defendant's conviction for child rape where "jury had to decide who to believe, [the victim] or his mother" and "[c]learly, the jury chose to believe [the victim]" despite inconsistencies in his testimony); *State v. Smith*, 42 S.W.3d 101, 106 (Tenn. 2000) (finding that "there is no requirement that the [rape] victim's testimony be corroborated"); *State v. Johnson*, No. 03C01-9105CR00157, 1992 WL 80349, at *7 (Tenn. Crim. App. Apr. 22, 1992) ("prima facie evidence of the rape" can be "proven through the victim's testimony").

Based on the existing record, the Court can determine whether Petitioner is entitled to relief on Ground Six. Thus, Petitioner's request for discovery of the original recorder device will be denied.

### 2. *Ground Eleven: Actual Innocence*

In Ground Eleven, Petitioner alleges that he is actually innocent of the four counts of rape of a child of which he was convicted. (Doc. No. 1 at PageID# 47-49). Petitioner contends that the recorder device should be tested because it could show "the recording was made at some other time or some other place", thus proving Petitioner's innocence. (Doc. No. 1 at PageID# 48).

Freestanding claims of actual innocence are not cognizable on federal habeas review outside of the capital-case context. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993); *Cress v. Palmer*, 848 F.3d 844, 854-55 (6th Cir. 2007). This is not a capital case. Because this claim can be resolved on the existing record, Petitioner's request for discovery of the original recorder device will be denied.

D. Qc2 Recording

Next, Petitioner seeks what he calls the Qc2 recording, which he alleges is a third copy of the recording of the controlled call produced by the State at its facility. Petitioner alleges that there is no chain of custody information "or any mention of how and why this mysterious third copy of the recording was supplied to the state expert for authentication analysis." (Doc. No. 48 at PageID# 4102). As Petitioner contends:

> It is important that this court grant discovery of this item of evidence because, "if the analysis performed by the Petitioner's expert in waiting, Primeau Forensics[,] shows that they are indeed different copies," as the evidence leans toward them being then the facts would show that a 'fraud was perpetrated upon the court' and the expert opinion testimony of the state expert, Mr. Lacey, was not trustworthy or reliable, therefore, the judgment cannot be considered reliable either under *Strickland*, and Petitioner would be entitled to relief because his trial would have been inherently "unfair" under Due Process Clause of the 14th Amendment.

(Doc. No. 48 at PageID# 4102-03).

This discovery request relates to Ground Three in which Petitioner alleges that he received ineffective assistance of trial counsel when trial counsel failed to request a hearing pursuant to Tennessee Rule of Evidence 104(a) concerning the qualifications of the State's expert witness, Douglas Lacey. (Doc. No. 1 at PageID# 9-10). Petitioner raised this claim in his post-conviction appellate brief. (Doc. No. 13, Attach. 25 at PageID# 2663-67). The Tennessee Court of Criminal Appeals invoked the rule articulated in *Cauthern*, 145 S.W.3d at 599 (an issue raised for the first time on appeal is waived). *See Curtis*, 2020 WL 476907, at *12. Assuming for purposes of this

analysis that the first three *Monzo* factors are satisfied, the Court can address this only claim if Petitioner pleads sufficient cause and prejudice to excuse the default or shows that the Court's failure to address this claim would result in a fundamental miscarriage of justice. Like Petitioner's other claims thus far, the Court can resolve Ground Three using the record presently before the Court.

Under *Strickland*, counsel must provide an objectively reasonable performance under the circumstances of the case. 466 U.S. at 688. Tennessee Rule of Evidence 104(a) states that "[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court[.]" Tenn. R. Evid. 104(a). When a party seeks to introduce expert testimony, the trial court must determine whether the witness possesses the "knowledge, skill, experience, training, or education" to qualify as an expert in a field. Tenn. R. Evid. 702.

Here, the record shows that trial counsel questioned Lacey's qualifications at the *Daubert* hearing. (*See* Doc. No. 13, Attach. 3 at Page ID# 642-49, 654-57). And while trial counsel did not object to Lacey's "testifying as an expert based on his stated qualifications" at trial, trial counsel attacked whether Lacey was qualified (*see* Doc. No. 13, Attach. 9 at PageID# 1196-97) and cross-examined Lacey in an attempt to show bias, pointing out that Lacey was being paid by the State for his testimony and travel time. (See Doc. No. 13, Attach. 9 at PageID# 1219-20). The trial court determined that Lacey was qualified as an expert in the field of audio forensics under Tennessee Rule of Evidence 702. (Doc. No. 13, Attach. 19 at Page ID# 2106). In so deciding, the court found that Lacey has been subject to peer review, that his methodologies have been tested, that the evidence presented has been accepted within the scientific community, and that research has been conducted outside of litigation. (*Id*.)

Petitioner nevertheless contends that he is entitled to discovery to determine whether the evidence known as Qc2, on which Lacey relied for his expert testimony, is fraudulent because "the only 'fact in issue' at the trial of the Petitioner was the authenticity of the recording used as evidence against appellant at his trial." (Doc. No. 48 at PageID# 4100, 4103). Petitioner further contends that "[t]he entire trial was based on whether or not the recording was authentic and whether or not [it] had been manipulated." (*Id*. at PageID# 4100). But as the Court addressed *supra*, Petitioner's contentions are mistaken. Prima facie evidence of rape can be proven through a victim's testimony. *See Elkins*, 102 S.W.3d 578, 582; *Smith*, 42 S.W.3d 101, 106; *Johnson*, 1992 WL 80349, at *7. Therefore, the content of the victim's testimony and the credibility of the victim were very much issues of fact in Petitioner's trial. The jury resolved those factual findings in favor of the State. The victim's testimony stands, regardless of Petitioner's stated concerns regarding the authenticity of the recording admitted and played at trial. Even if Owen had opined that there were anomalies in the controlled call and one or more jurors determined the controlled call was suspect, the jury would have heard the victim's testimony as well as Petitioner's concession that "phone records showed he received a call from the victim's cell phone on the day of the recording and the duration of the call approximately matched the duration of the recording." *Curtis*, 2020 WL 476907, at *6.

Based on the existing record, the Court can determine whether Petitioner is entitled to relief on Ground Three. Thus, Petitioner's request for discovery of the Qc2 recording will be denied.

E. Entire File

Finally, Petitioner seeks discovery of "his entire client file" from attorney Colley which includes Owen's reports, the forensic interviews and reports, the Qc2 recording, and "the $17,000 affidavit." (Doc. No. 48 at PageID# 4100).

To the extent Petitioner seeks discovery of Colley's entire client file, Petitioner has not shown good cause. Such a request is overbroad. While Petitioner provides reasons for the specific items he seeks, Petitioner provides no reason for discovery of the entire client file, especially considering that a Tennessee state court and the Tennessee Board of Professional Responsibility determined that Colley no longer has such file in his possession, and it is unclear whether the file even still exists. This Court will not sanction a fishing expedition. Therefore, Petitioner's request for the entire client file is conclusory and "not enough to warrant discovery" under Rule 6(a).

## V. CONCLUSION

For the reasons discussed herein, Petitioner's Second Motion to Request Leave for Discovery (Doc. No. 48) will be denied.

An appropriate Order will be entered.

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE