# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DOUGLAS W. CURTIS,          )
                                   )

     Petitioner,           )
                                   )     **No. 3:20-cv-00559**

v.                         )
                                   )     **JUDGE RICHARDSON**

BERT C. BOYD, Warden,     )     **MAGISTRATE JUDGE**
                                   )     **NEWBERN**

     Respondent.       )

## MEMORANDUM OPINION

Petitioner Douglas W. Curtis, an inmate of the Northeast Correctional Complex in Mountain City, Tennessee, filed a pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus challenging his 2016 conviction on four counts of rape of a child in Lewis County, Tennessee, for which he currently is serving a term of eighty years' imprisonment in the Tennessee Department of Correction. (Doc. No. 1). Respondent filed an Answer to the habeas petition in which he asks the Court to dismiss the petition. (Doc. No. 28). Petitioner filed a Reply to the Answer. (Doc. No. 41).

Also pending before the Court are the following pro se motions filed by Petitioner: Motion for Partial Summary Judgment and Motion to Appoint Counsel (Doc. No. 49); Motion to Request Permission to Exceed Page Limit (Doc. No. 51); Motion to Request the Habeas Court to Take Judicial Notice under Fed. R. Evid. 201 (Doc. No. 52); Motion to Request District Court to Rehear Second Motion to Request Leave for Discovery (Doc. No. 55); and Motion to Request Permission to Amend Habeas Corpus Petition with Recent Decision from the Sixth Circuit. (Doc. No. 56). Respondent has not responded to any of these motions. As explained herein, Petitioner's motions

will be denied, with the exception of his Motion to Request the Habeas Court to Take Judicial Notice under Fed. R. Evid. 201 (Doc. No. 52), which will be denied in part and granted in part.

The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. *See Christian v. Hoffner*, No. 17-2105, 2018 WL 4489140, at *2 (6th Cir. May 8, 2018) ("A district court is not required to hold an evidentiary hearing if the record 'precludes habeas relief.'") (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007))). The petition therefore will be denied, and this action will be dismissed.

## I. MOTIONS FOR PARTIAL SUMMARY JUDGMENT, APPOINTMENT OF COUNSEL, AND TO EXCEED PAGE LIMIT

First, although Petitioner titled his motion "Motion for Partial Summary Judgment and Appointment of Counsel" (Doc. No. 49), Petitioner makes no request for the appointment of counsel within his fourteen-page motion. To the extent that Petitioner intends for the title of his motion alone to request the appointment of counsel, his request will be denied. In any event, Petitioner has filed numerous lengthy pro se motions after filing his initial petition, evidencing his ability to represent himself.

Next, Petitioner contends that because Respondent did not respond to Petitioner's Second Motion for Leave to Conduct Discovery (Doc. No. 42), Petitioner is entitled to partial summary judgment as a matter of law. Middle District of Tennessee Local Rule 56.01 provides that, "[i]n order to assist the Court in ascertaining whether there are any material facts in dispute, any motion for summary judgment made pursuant to Fed. R. Civ. P. 56 must be accompanied by a separate, concise statement of the material facts as to which the moving party contends there is no genuine issue of material fact." Rule 56.01 continues:

Each fact must be set forth in a separate, numbered paragraph. Each fact must be supported by specific citation to the record. After each paragraph, the word "response" must be inserted and a blank space provided that is reasonably calculated to allow the non-moving party sufficient space to respond to the assertion that the fact is undisputed. A copy of the statement of undisputed material facts must also be provided to opposing counsel in an editable electronic format. The requirement that a statement of undisputed material facts in the described format must accompany any motion for summary judgment applies to pro se parties. Pro se parties are excused from providing a copy of the statement of undisputed material facts to opposing counsel in an editable electronic format.

M.D. Tenn. Local Rule 56.01(b).

Along with his Motion for Partial Summary Judgment, Petitioner submitted a Memorandum in support of his motion (Doc. No. 50) and a "Motion to Request Permission to Exceed Page Limit Concerning Memorandum of Law." (Doc. No. 51). Petitioner did not, however, submit the required statement of undisputed facts in the format required by the Local Rules. Per Local Rule 56.01(b), Petitioner is not exempt from this requirement merely because he is proceeding pro se. Petitioner's failure to comply with Local Rule 56.01(b) renders his Motion for Partial Summary Judgment unreviewable by the Court. Accordingly, the motion (Doc. No. 49) will be denied, and the Motion to Request Permission to Exceed Page Limit (Doc. No. 51) will be denied as moot.

True, Respondent did not respond to Petitioner's Second Motion for Leave to Conduct Discovery. Local Rule 7.01(3)(a) provides that, excluding motions for reconsideration, "any party opposing a motion must serve and file a memorandum of law in response, and, if necessary to support assertions of fact, affidavits and depositions, not later than fourteen (14) days after service of the motion . . . *unless otherwise directed by the Court*." M.D. Tenn. Local Rule 7.01(a)(3) (emphasis added). The Rule further provides that, "[i]f a timely response is not filed, the motion shall be deemed to be unopposed, except for motions for reconsideration . . . ." *Id*.

In the Court's Order entered on January 24, 2022, the Court directed the Clerk to refile Petitioner's Second Motion for Leave to Conduct Discovery, which was originally docketed as Doc. No. 42, in its entirety as a pending motion with Addenda A-D and Attachments. (Doc. No. 47 at PageID# 4090). The Court specifically ordered, "Respondent may, *but is not required*, to respond to the Motion within 45 days" (*id.*) (emphasis added), therefore exempting Respondent from Rule 7.01(3)'s strict requirement to respond to Petitioner's motion. Thus, even if Petitioner had complied with Local Rule 56.01(b), Petitioner would not have prevailed on his Motion for Partial Summary Judgment simply because no response was filed by Respondent to Petitioner's Second Motion for Leave to Conduct Discovery.

## II. MOTION TO REQUEST THE DISTRICT COURT TO REHEAR SECOND MOTION TO REQUEST LEAVE FOR DISCOVERY

By Order and accompanying Memorandum Opinion entered on September 28, 2022, the Court denied Petitioner's Second Motion to Request Leave for Discovery. (Doc. Nos. 53 and 54). Petitioner asks the Court to "rehear" or reconsider that motion. (Doc. No. 55).

There is no federal procedural rule permitting motions for reconsideration. While the Federal Rules do not explicitly permit motions to reconsider, Rule 54(b) of the Federal Rules of Civil Procedure gives district courts broad discretion to revise interlocutory orders (like the Court's challenged Order of September 28, 2022) under certain circumstances. *See Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). "This authority allows district courts 'to afford such relief from [interlocutory orders] as justice requires.'" *Id.* (quoting *Citibank N.A. v. Fed. Deposit Ins. Corp.*, 857 F. Supp. 976, 981 (D.D.C. 1994)). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez*, 89 F. App'x at 959. "This standard obviously vests

significant discretion in district courts." *Id*. at 959 n.7. The Court will construe Plaintiff's motion (Doc. No. 55) as a motion under Rule 54(b) to revise the Court's September 28, 2022 Order and accompanying Memorandum Opinion.

Petitioner does not allege that there has been an interviewing change of controlling law[1] or new evidence available. Rather, he alleges that the Court erred in denying his discovery motion, specifically that the Court considered the wrong motion submitted by Petitioner. He contends that the Court "cited to the original denial of discovery and the content of the original motion for discovery that was submitted by petitioner with his writ of habeas corpus petition" instead of Petitioner's Second Motion for Leave to Conduct Discovery (Doc. No. 55 at PageID# 4315). Petitioner references the Court's language in footnote 2 of its Memorandum Opinion to support his contention. In the referenced footnote, the Court observes that Petitioner filed a non-substantive amendment to his original habeas corpus petition. (Doc. No. 53 at PageID# 4273 n.2). Footnote 2 reads as follows, in its entirety:

> Because the Motion to Amend did not make substantive changes to the initial habeas petition (Doc. No. 12 at PageID# 254) and because Respondent cites to the original petition in his filings (*see, e.g.*, Doc. No. 28 at PageID# 3105), the Court will cite to the original petition for ease of reference.

*Id*. Contrary to Petitioner's assertion in his motion for reconsideration, the language of footnote 2 does not demonstrate that the Court "cited to the original denial of discovery and the content of the original motion for discovery that was submitted by petitioner with his writ of habeas corpus petition." (Doc. No. 55 at PageID# 4315). Instead, the language demonstrates that, in ruling on Petitioner's Second Motion to Request Leave for Discovery, the Court cited to Petitioner's original

---

[1] After filing his Motion to Rehear (Doc. No. 55), Petitioner filed a motion requesting permission to amend his habeas petition to include argument based on the Sixth Circuit's August 3, 2022 decision in *Rogers v. Mays*, 43 F.4th 530 (2022). (Doc. No. 56). However, as explained *infra*, that motion will be denied. In his Motion to Rehear, Petitioner does not refer to any change in existing law.

habeas petition (*see* Doc. No. 53 at PageID# 4273 n.2), as did Respondent (*see, e.g.*, Doc. No. 28 at PageID# 3105), for ease of reference. Because Petitioner's amendment to his original habeas petition did not make any substantive changes to the petition (*see* Doc. No. 12 at PageID# 254), neither Respondent nor the Court failed to consider any new claims or arguments made by Petitioner in his amended petition. Notably, the Court cites herein to Petitioner's original habeas petition once again to match the citation format used by Respondent in his response to the petition.

To support his assertion that the Court ruled on Petitioner's original discovery motion instead of his second discovery motion, Petitioner points to the Court's Order of August 3, 2021. (Doc. No. 55 at PageID# 4316). In that Order, the Court directed Petitioner to withdraw his original discovery motion and include everything he wanted in one "second" motion. (Doc. No. 45 at PageID# 4316). In compliance with that Order, Petitioner subsequently filed a "Motion to Withdraw First Motion for Discovery and Motion to Withdraw Amendments to Second Motion for Discovery/Habeas Corpus Relief Brief." (Doc. No. 46). In that motion, Petitioner sought to withdraw his First Motion for Discovery (Doc. No. 2) and replace it with his Second Motion for Leave to Conduct Discovery "with attached Memorandum, Addendums A-D, totaling 25 pages." (Doc. No. 42). Petitioner also sought to withdraw his Motion to Amend his Second Motion for Leave to Conduct Discovery. (Doc. No. 43). By Order entered on January 24, 2022, the Court liberally construed that motion as seeking permission to file a Second Motion for Leave to Conduct Discovery in excess of the 25-page limitation set forth in Local Rule 7.02(a)(2) and granted Petitioner permission to do so. (Doc. No. 47 at PageID# 4090). Further, the Court permitted Plaintiff to withdraw his First Motion for Discovery (Doc. No. 2) and his Motion to Amend his Second Motion for Leave to Conduct Discovery (Doc. No. 43). *See id*. Consequently, the Court directed the Clerk to refile Petitioner's Second Motion for Leave to Conduct Discovery, which

originally was docketed as Doc. No. 42, in its entirety as a pending motion with Addenda A-D and Attachments. (*Id.*)

The record shows that the Clerk complied with the Court's instructions, and the Court thereafter ruled on Petitioner's Second Motion for Leave to Conduct Discovery rather than on any prior motion filed by Petitioner seeking discovery in this case. The Court thoroughly considered Petitioner's Second Motion for Leave to Conduct Discovery and arguments advanced therein, as evidenced by the forty-one-page Memorandum Opinion entered by the Court addressing each discovery request made by Petitioner. (*See* Doc. No. 53). The Court has carefully reviewed Petitioner's motion to reconsider and the Court's previous denial of Petitioner's Second Motion for Leave to Conduct Discovery. The Court is not persuaded that its prior reasoning and denial are erroneous. The Court further addresses Petitioner's concerns about his client file in the subsequent section regarding Petitioner's Motion to Take Judicial Notice. Accordingly, Petitioner's "Motion to Request District Court to Rehear Second Motion to Request Leave for Discovery," which (as noted above) the Court construes as a motion for reconsideration under Rule 54(b), will be denied.

### III. MOTION TO TAKE JUDICIAL NOTICE

Petitioner also filed a "Motion to Request the Habeas Court to Take Judicial Notice Under F.R.Evid. 201." (Doc. No. 52). In his motion, Petitioner asks the Court to take judicial notice of certain documents as "adjudicative facts." (*Id.* at 1).

Federal Rule of Evidence 201 governs judicial notice of adjudicative facts. The Rule, in relevant part, provides that "[t]he Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned." Fed. R. Evid. 201(b)(1)-(2). The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

"Judicial notice 'is a limited tool,' and for it to be available, 'a high degree of indisputability is the essential prerequisite.'" *Frees v. Duby*, 2010 WL 4923535, at *2 (W.D. Mich. Nov. 29, 2010) (quoting *Ventana Med. Sys., Inc. v. St. Paul Fire & Marine Ins. Co.*, No. cv 09-102, 2010 WL 1752509, at *23 (D. Ariz. Jan. 13, 2010)). "A judicially noticed fact is conclusive in a civil case." *United States v. Husein*, 478 F.3d 318, 337 (6th Cir. 2007). Where "there is considerable dispute over the significance of [a document's] contents," judicial notice of the facts therein is not appropriate. *Husein*, 478 F.3d at 337 (citing *United States v. Bonds*, 12 F.3d 540, 553 (6th Cir. 1993)).

In this motion, Petitioner asks the Court to take judicial notice of the adjudicative facts within five groups of items: 1) the affidavits and evidence "found in Petitioner's Second Motion for Leave to Conduct Discovery";[2] 2) the correspondence between Petitioner and Ed Primeau at Primeau Forensics attached to Petitioner's Memorandum of Law in support of his Motion for Partial Summary Judgment;[3] 3) state court exhibits, records, and files attached to Petitioner's Motion to Compel Return of Client's File;[4] 4) state court exhibits, records, and files attached to

---

[2] In that motion (Doc. No. 48), Petitioner sought from trial counsel John S. Colley, III ("Colley") the discovery of his client file, which allegedly includes (1) Owen's reports; (2) other case-related forensic interviews and reports; (3) the original recorder device used to record the controlled phone call allegedly made between Petitioner and his older daughter; and (4) the Qc2 recording, which Petitioner alleges is a third copy of the recording of the controlled call produced by the State. The Court denied Petitioner's motion. (Doc. Nos. 53 & 54).

[3] These documents are docketed as Exhibit 1(D) to Doc. No. 50 at PageID# 4235-4267.

[4] Respondent filed these documents (Doc. No. 38, Attach. 6 at PageID# 3728-3751), in response to the Court's May 18, 2021 direction "to respond to Petitioner's allegation that certain enumerated documents are missing from the state court record . . . and that those documents are relevant to this case." (Doc. No. 34 at PageID# 3504). In that Order, the Court further stated, "Respondent may be inclined to simply file these documents as part of the record and permit the Court to consider their relevance as appropriate." (*Id*. at PageID# 3504-05). Respondent states that he did not include these documents in the initial state-court record because Respondent considers them "irrelevant to the Court's initial review of the pleadings." (Doc. No. 38 at PageID# 3521). These documents were not included in the official post-

Petitioner's Motion to Preserve Evidence;[5] and 5) exhibits, records, and files attached to Petitioner's Motion to Compel Compliance with Trial Court Order.[6] (Doc. No. 52 at PageID# 4270-71).

Petitioner's first and third requests relate to his attempts to secure the return of his client file from trial counsel. That is, he asks the Court to take judicial notice of such attempts. Despite having already addressed this issue by prior Order and Memorandum Opinion (*see* Doc. Nos. 53 and 54), the Court acknowledges Petitioner's continuing concerns that he has not received that to which he feels he is entitled. Therefore, the Court has carefully reviewed the documents referenced by Petitioner in the instant motion to specifically address Petitioner's concerns as set forth in his most recent Motion. The documents include Petitioner's written requests by letter and motion to obtain all or at least part of his client file from Colley beginning in 2013 and continuing through 2019 as well as responses to Petitioner's letters and motions by counsel, state courts, and the Tennessee Board of Professional Responsibility. (Doc. No. 38, Attach. 6 at PageID# 3728-3751). These documents show that, in 2016, Colley was in possession of the physical file at issue and

conviction technical record because Petitioner filed these documents after the post-conviction court transferred the record to the TCCA for Petitioner's post-conviction appeal. (*Compare* Doc. No. 38, Attach. 6 (noting motion was filed on December 21, 2018 and order was filed on March 5, 2019) *with* Doc. No. 13, Attach. 19 (noting order was filed on December 20, 2018)).

[5] Respondent filed this document, a March 27, 2019 order by the TCCA directing the trial court to preserve the recorder until further orders of the court (Doc. No. 38, Attach. 5 at PageID# 3724-45), in response to the Court's May 18, 2021 Order. (Doc. No. 34 at PageID# 3504). Respondent states that he did not include this order in the initial state-court record because Respondent considers the order "irrelevant to the Court's initial review of the pleadings." (Doc. No. 38 at PageID# 3521). The order was not included in the official post-conviction technical record because Petitioner filed his Motion to Preserve Evidence of the Defendant after the post-conviction court transferred the record to the TCCA for Petitioner's post-conviction appeal. *See supra* n.4.

[6] Respondent filed these documents (Doc. No. 38, Attach. 2 at PageID# 3609-3666) in response to the Court's May 18, 2021 Order. (Doc. No. 34 at PageID# 3504). Respondent states that he did not include this order in the initial state-court record because Respondent considers the order "irrelevant to the Court's initial review of the pleadings." (Doc. No. 38 at PageID# 3521). The order was not included in the official post-conviction technical record because Petitioner filed his Motion to Preserve Evidence of the Defendant after the post-conviction court transferred the record to the TCCA for Petitioner's post-conviction appeal. *See supra* n.4. These documents show Petitioner's efforts to obtain testing on the recorder to prove his splicing theory.

made it available to Petitioner. (*Id*. at PageID# 3736-41). However, Petitioner was incarcerated and unable to find anyone to retrieve the file for him. (*Id*.) The documents show that in August 2016, a Board of Professional Responsibility liaison attempted to facilitate a compromise whereby Colley scanned and burned Petitioner's file to a CD. (*Id*. at PageID# 3743). However, Petitioner provides no further documentation indicating whether Colley or anyone else created a CD of the file and/or whether Petitioner received a CD of his file. However, Petitioner submits a motion to compel he filed in state court on December 21, 2018, seeking the return of his file from Colley, which suggests that Petitioner had not at that time received his file or a CD of his file. (*Id*. at PageID# 3726).

Within the existing state-court record is an order entered on March 4, 2019, in which the state court denied Petitioner's December 21, 2018 motion, finding as follows:

> [T]he Court having made inquiry of Mr. Colley, an officer of the Court, finds that Mr. Colley has supplied to the Petitioner, or to Petitioner's subsequent legal counsel, any and all files that he held for or on behalf of the Petitioner in years past and no longer has any files in his possession concerning this or any other matters of the Petitioner's.
>
> Further, Mr. Colley related that the Petitioner had previously filed a complaint against him with the Tennessee Board of Professional Responsibility of and concerning this issue, and that body had concluded that Mr. Colley had no files belonging to the Petitioner and dismissed that complaint.

(Doc. No. 16, Attach. 1 at PageID# 2967). Petitioner challenges the state court's denial of his motion by asking this Court to expand the record in this habeas case to consider a "Sworn Affidavit" by Petitioner in which he states that "[e]ach of the attorneys listed below confirmed that they were not given any part of my client file, at any time, by [Colley] or any of his representatives." (Doc. No. 50, Attach. 1 at PageID# 4202). However, the "affidavit" is not signed or dated and bears no notary stamp. (*Id*.) Furthermore, while its contents are related to Petitioner's instant request for judicial notice, the affidavit does not contradict the state-court's decision.

Consequently, the Court will not expand the record to consider this document, and Petitioner has not offered any other evidence to call into question the decision of the state court and the Tennessee Board of Professional Responsibility. Simply put, the Court remains unaware of the location of Colley's client file for Petitioner, and it is unclear whether the file still exists.

Petitioner's second, fourth, and fifth requests in his Motion to Take Judicial Notice relate to Petitioner's attempt to get the original recorder device tested. Most of the documents to which Petitioner refers are not part of the state-court record in this case. Essentially, then, Petitioner is asking the Court to expand the record to consider these documents and take judicial notice of the alleged "specific adjudicative facts" therein as identified by Petitioner in his Motion.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) restricts the ability of a federal habeas court to develop and consider new evidence. *Shoop v. Twyford*, __ U.S. __, 142 S. Ct. 2037, 2043 (June 21, 2022). Review of factual determinations under Section 2254(d)(2) is expressly limited to "the evidence presented in the State court proceeding." *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that review of legal claims under Section 2254(d)(1) is "limited to the record that was before the state court.").

Notwithstanding the rule articulated in *Cullen*, Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts states that "[i]f the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition." R. 7(a), R. Gov'g § 2254 Cases. Rule 7's advisory notes state that "the purpose [of the rule] is to enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." R. 7, R. Gov'g § 2254 Cases advisory committee's note. "Unless it is clear from the pleadings and the files and records that the prisoner is entitled to no relief . . . [i]t may be perfectly appropriate . . . for the district court to

proceed by requiring that the record be expanded." *Id.* (quoting *Raines v. United States*, 423 F.2d 526, 52930 (4th Cir. 1970)). Thus, Rule 7 suggests that the Court should not permit expansion of the record if the pleadings and state court record adequately resolve Petitioner's claims.

If a petitioner moves to expand the record, "the petitioner ought to be subject to the same constraints that would be imposed if he had sought an evidentiary hearing." *Samatar v. Clarridge*, 225 F. App'x 366, 375 (6th Cir. 2007) (citing *Owens v. Frank*, 394 F.3d 490, 499 (7th Cir. 2005)). Therefore, Petitioner must also satisfy the statutory prerequisites articulated in Section 2254(e)(2) to expand the record. Section 2254(e)(2) states:

> (2)    If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> > (A)    the claim relies on—
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)-(B).

Petitioner has not met his burden to expand the record except with respect to the Affidavit of Thomas J. Owen dated May 11, 2018. (Doc. No. 48 at PageID# 4099) (citing Doc. No. 13, Attach. 24 at PageID# 2574-75). The Court will consider that affidavit in ruling on Petitioner's claims because 1) the affidavit is signed, dated, and sworn before a notary public; 2) Petitioner's trial counsel became aware of the affidavit and, under oath, provided an opinion about it that is

part of the existing state-court record in this case (Doc. No. 13, Attach. 21 at PageID# 2321-22); and 3) Petitioner offers Owen's affidavit in support of Petitioner's claim that trial counsel rendered ineffective assistance of counsel by failing to call Owen for the defense. The Court therefore believes that the interests of justice require the Court to consider the affidavit.

The Court can resolve the claims raised by Petitioner without otherwise expanding the record and without holding an evidentiary hearing. Petitioner's motion will be granted in part and denied in part.

### IV. MOTION TO REQUEST PERMISSION TO AMEND HABEAS PETITION

Petitioner requests permission to amend his habeas petition to include argument based on the Sixth Circuit's August 3, 2022 decision in *Rogers v. Mays*, 43 F.4th 530 (2022). In that decision, the Sixth Circuit found, as a matter of first impression, that the procedural default of a claim that counsel was ineffective on a motion for new trial in Tennessee can be excused under the exception allowing ineffective assistance at initial-review collateral proceedings to establish cause for procedural default of claim of ineffective assistance at trial. *Id.* at 530. The decision abrogated *Johnson v. Genovese*, No. 3:18-cv-00539, 2021 WL 3269954 (M.D. Tenn. July 30, 2021), and *Petty v. Hampton*, No. 3:18-cv-00576, 2020 WL 3964207 (M.D. Tenn. July 13, 2020).

The respondent in *Rogers* filed a petition for rehearing en banc which the Sixth Circuit granted on December 6, 2022. *Rogers v. May*, 54 F.4th 443 (2022). Sixth Circuit Rule 35(b) provides that "[t]he effect of the granting of a hearing en banc shall be to vacate the previous opinion and judgment of this court, to stay the mandate and to restore the case on the docket sheet as a pending appeal." Thus, the Sixth Circuit's August 3, 2022 decision and judgment in *Rogers* was vacated, the mandate was stayed, and the case was restored to the docket as a pending appeal. *Rogers*, 54 F.4th 443.

Because the *Rogers* decision on which Petitioner's Motion (Doc. No. 56) is based has been vacated, Petitioner's Motion will be denied.

## V. HABEAS PETITION

A. <u>PROCEDURAL HISTORY</u>

A Lewis County, Tennessee grand jury indicted Petitioner on four counts of rape of a child. *State v. Curtis*, No. M2015-01372-CCA-R3-CD, 2016 WL 7654946, at *1 (Tenn. Crim. App. Aug. 26, 2016), *no perm. appeal filed*. Petitioner proceeded to trial, and the jury convicted him as charged. *Id*. Petitioner received four consecutive twenty-year sentences. *See id.* The trial court denied Petitioner's motion for a new trial. *Id*. at *5.

Petitioner appealed, arguing that the evidence was insufficient to support his convictions and that a portion of the victim's testimony violated his right to a fair trial. *Id*. at *1. The Tennessee Court of Criminal Appeals (TCCA) affirmed Petitioner's conviction and sentence on August 26, 2016. *Id*. Petitioner did not apply for discretionary review in the Supreme Court of Tennessee. *See generally id.*

On February 2, 2017, Petitioner filed a timely pro se petition for state post-conviction relief. *Curtis v. State*, No. M2018-01712-CCA-R3-PC, 2020 WL 476907, at *5 (Tenn. Crim. App. Jan. 30, 2020), *perm. appeal denied*, (Tenn. June 4, 2020); Doc. No. 13, Attach. 17 at PageID# 1762. Post-conviction counsel was appointed, and she filed amended petitions for relief. *Id*. The post-conviction court held a hearing on the petitions. *Id*. at *5-9. At the end of the hearing, the post-conviction court expressed its lack of "clear understanding of what facts [the p]etitioner relie[d] on" to support his claims due to Petitioner's "rambling throughout his extensive testimony." *Id*. at *9 (internal quotation omitted). The post-conviction court ordered post-conviction counsel to file a "final summation" of the claims. *Id*. Post-conviction counsel filed the summation and included claims of ineffective assistance of trial counsel for failing to challenge the State's expert witness,

failing to call a defense expert at trial, failing to introduce an alibi defense and not reviewing the bill of particulars with Petitioner, and failing to adequately advise Petitioner regarding the plea offer. *Id*.

On July 11, 2018, Petitioner filed a pro se motion seeking time to amend the summation to include additional claims against appellate counsel. *Id*. at *9. Because Petitioner was represented by counsel, the post-conviction court granted post-conviction counsel ten days to add the claims if she deemed it appropriate. *Id*. On July 18, 2018, post-conviction counsel filed a response stating that she had reviewed Petitioner's claims against appellate counsel and found they either lacked merit or were addressed at the post-conviction hearing. *Id*. The post-conviction court denied relief. *Id*.

Petitioner waived his right to counsel on post-conviction appeal. *Id*. Petitioner presented numerous claims of ineffective assistance of both trial and direct appellate counsel on postconviction appeal before the TCCA, among other claims. *Id*. at *10. The TCCA affirmed the denial of post-conviction relief. *Id*. at *1. The TCCA adjudicated, on the merits, the claims of ineffective assistance of trial counsel for failure to call Owen at trial, failure to adequately advise Petitioner about the plea offer, and failure to discuss the bill of particulars with Petitioner. *Id*. at *11-15. On the other hand, the TCCA held that Petitioner waived review of his claims of ineffective assistance of trial counsel for failure to object to 404(b) evidence, failure to request a *Daubert* hearing, failure to properly request a continuance, and failure to send the recorder device to Owen for analysis. *Id*. The TCCA also determined that Petitioner waived review of his claim of ineffective assistance of direct appellate counsel, a *Brady* claim, and several due process claims. *Id*. at *15- 16. Petitioner applied for discretionary review in the Supreme Court of Tennessee, and the court summarily denied his application. (Doc. No. 13, Attach. 32 at Page ID# 2916).

Petitioner filed the instant pro se petition for a writ of habeas corpus in June 2020. (Doc. No. 1). After filing his initial petition, Petitioner filed a Motion to Amend. (Doc. No. 9). The Court granted the motion by Order entered on July 20, 2020, finding that the motion sought no substantive amendments to the habeas petition and was filed shortly after the filing of the original petition. (Doc. No. 12 at 2).

By Order entered on July 15, 2020, the Court initially directed Respondent to file the state-court record and a response to the petition. (Doc. No. 7 at PageID# 227-29). The Court later stayed a response to the petition pending a response to Petitioner's discovery motion. (Doc. 12 at PageID# 254). By Order and Memorandum Opinion entered on November 16, 2020, the Court denied Petitioner's motion for discovery without prejudice. (Doc. No. 19 at PageID# 3021).

B. <u>STATEMENT OF FACTS</u>

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's trial as follows:

> This case arose after the victim, who was twenty-nine years old at the time of trial, came forward with allegations that the defendant, her father, raped her when she was a young girl. The victim testified that she was born December 27, 1985.
>
> The State's evidence came primarily from the testimony of the victim and a recorded telephone call. In the summer of 2011, the victim was living with the defendant, her brother, and her sister. At that point in time, she had been attending a church for almost a year and had developed a close relationship with the pastor's wife, Debbie Landers. During the summer, the victim witnessed an event that caused her to have concern for another individual. She asked Ms. Landers for advice, and Ms. Landers testified that she told the victim that the victim had to report the incident. Ms. Landers recommended that the victim contact the Department of Children's Services ("DCS"), the sheriff's department, or the city police. The victim contacted DCS and the Child Advocacy Center ("CAC"), and the CAC directed her to Investigator Johnny Hilburn of the Lewis County Sheriff's Department. She went to speak with Investigator Hilburn about the incident, and he testified that based on his conversation with the victim, he began to believe that she was a victim of abuse herself. Investigator Hilburn asked the victim if there was anything in her past that she wished to discuss, and she stated that she was touched

by her father. The victim testified that prior to speaking with Investigator Hilburn, she had not contacted law enforcement regarding the defendant.

The victim testified about four instances of sexual abuse that the defendant committed against her. The first incident happened on February 14, 1998, when she was twelve years old. At that time, the victim and the defendant had "a very close relationship." The defendant allowed her to stay up late to watch television with him while her siblings had to go to bed, and she received privileges and gifts that her siblings did not. On Valentine's Day, the defendant gave the victim a bear, and she stayed up late to watch television and "hang out with" the defendant. Her mother, brother, and sister were each asleep in their bedrooms. The victim testified that the defendant went into his office and laid down a blanket. He returned to the victim and asked her if she "wanted to mess around." The victim "shrugged [her] shoulders," and the defendant took her by the hand and led her to the office. She lay down, and the defendant began to touch her body. She testified that the defendant rubbed his fingers across her vagina and digitally penetrated her vagina. Once he was finished, he picked up the blanket and went to bed. The victim testified that she went with the defendant to the office because she loved him and "felt special" and "wanted to do what he said."

The victim testified that a second, similar incident also occurred in 1998, when she was twelve years old. She recalled that she had finished the sixth grade and had recently made the cheerleading squad. She was staying up late with the defendant, and he congratulated her on making the cheerleading squad. The defendant then "disappeared and went into the office and laid down a blanket, came back and asked [her] if [she] wanted to mess around." She shrugged her shoulders and went with him to the office. She lay down, and the defendant touched her body. He touched her chest and then touched the outside of her vagina, eventually digitally penetrating her vagina.

A third incident occurred in July of 1998 when the defendant made her perform oral sex on him. The victim distinguished this incident from the previous two incidents because she recalled that it occurred on the defendant's birthday. The defendant and the victim were staying up late watching television when the defendant "disappeared to put the blanket down in the office." He returned and asked the victim if she "wanted to mess around." She shrugged her shoulders and went with him to the office. She testified that the defendant was wearing a bathrobe, and "he pulled it apart at the bottom and asked if he got something special." He sat the victim down beside him and "caressed [her] back and hair area." The defendant placed his hand on the victim's head, directing her head toward his penis. The victim placed her mouth on the defendant's penis, and he "guided [her] head up and down." The defendant then lifted the victim's head up and ejaculated onto his stomach. The defendant cleaned up the ejaculate with a blanket that was on the floor, and he placed the blanket in the washroom. The victim recalled that the defendant told her that "he wanted to be the one to show [her] the right way to do these things, he

wanted to be the one to show [her] how to treat a man." On cross-examination, the victim stated that this incident occurred in her bedroom on her futon.

The fourth incident occurred on a date between February 7, 1997, and December 26, 1998. The victim testified that during these dates, the defendant drove a church bus that would pick up the elderly and children and take them to church on Wednesday nights. One Wednesday night, the victim accompanied the defendant. After they had dropped off the parishioners and were alone in the van, the defendant asked the victim if she wanted to mess around. He used his hand to direct the victim to his penis, and she put her mouth on his penis. After this incident, the victim told the defendant that she did not want to do these things any longer because it made her "feel disgusting."

During the summer between the victim's eighth and ninth grade years, the victim's parents separated, and the defendant moved to Florida. Each child went to visit him separately, and the victim went first. Eventually, the victim, her mother, brother, and sister all moved to Florida, but the defendant and his wife could not reconcile. The family moved back to Tennessee, and the defendant and the victim's mother divorced when the victim was in the tenth grade. The victim's mother, brother, and sister moved to Tullahoma, Tennessee. The victim lived with the defendant in Hohenwald, Tennessee, and she testified that she did so voluntarily. The victim continued to have a relationship with the defendant during her high school and college years, and she described the relationship as "a very husband and wife kind of relationship." She testified that she continued to visit and live with the defendant in college because she "loved him and he was [her] dad." She testified that she loved the defendant at the time and cared about him. She explained that she waited so long to disclose the abuse because she could "forgive and forget," but seeing someone else suffering abuse prompted her to contact authorities.

After disclosing the abuse to Investigator Hilburn, the victim participated in a "perp phone call" with the defendant, which was a controlled telephone call that Investigator Hilburn recorded. The victim testified that she was reluctant to make the phone call because she did not "want to betray" the defendant. Investigator Hilburn directed the victim to ask the defendant about allegations of sexual abuse against a second child, and he scripted several questions for the victim to ask the defendant. One particular question was what made the defendant "sexually attract[ed] to an eight-year-old." The recorded phone call was played for the jury, and we have included the relevant portions of that conversation:

> Victim: [A child] said that you touch her, like you did when I was a kid, like touch her.
>
> Defendant: No, that's bullcrap.
> ...
>
> Defendant: I have never touched that child except to give her a bath ....

Victim: I cannot believe that. I cannot believe it. I'm sorry.
...

Defendant: I promise you that's not going on. You just don't know how many times I want to kill myself over the other deal already. And it's not going to happen again.

Victim: Can I ask you why you did it to me?

Defendant: Well you know why.

Victim: No, I don't.

...

Victim: After all these years, I still don't know. I need that closure.

Defendant: Well like I said, I know, I know the damage that was done there, I, you know, I never will forgive myself for that. You know, you just don't know.

Victim: I don't think you know the damage that was truly done. How I grew up just hating you so much. ... I've truly forgiven you inside, but it's so hard to forget.

Defendant: I know that. And if there is anything I could do to change it, I would. But as far as [the child], there's nothing like that going on and there never will be.

...

Victim: I really need to know ... why. Honestly ... what makes you think it's okay to do that though? To have sex with a little girl? A twelve-year-old girl.

Defendant: It wasn't right.

Victim: Then why did you do it, Daddy?

Defendant: I have no answer for that other than I loved you and I'm [unintelligible] stupid. And I still love you to death, you know that.

...

Victim: So you thought it was okay to show your love like that?

Defendant: In a way, at the time I did. And of course I have regrets about it. I've told you. And if there was anything I could do to turn back time, it never would have happened.

...

Defendant: I've told you before, you know, unfortunately, you're the only person that I ever even crossed the line, and I don't know why. Like I said, I love you, and I just made a stupid, stupid, stupid mistake, you know? But, I don't know, that's why when—I know when you came back to live at home you was worried about that too, and that's why I've not even, you know, tried to make you act or see things any different than a father-daughter relationship, and that's maybe, I guess it's too late for that now. But that's—I wish, in my heart, that's what I want, you know?

Victim: ... I can never have that love that I wanted for a father, and it hurts my heart so bad.

Defendant: I wish you had told me way back then, you know?

Victim: I did! Do you not remember me telling you, I wanted stop because I felt gross? And you just wouldn't. You didn't. You cried, and it made me feel bad for wanting to stop.

Defendant: Well, just that one time you did, yeah. And then, after that, you never said nothing else to me. When we moved back here and everything, you never said a word to me. I guess in my unreality of the whole thing, I thought you were happy too.

Victim: What, what—I want to know one more thing. At eight years old, okay, what, just let me, I don't know what made you attracted to me at eight years old, like, I don't know.

Defendant: You weren't eight.

Victim: How old was I?

Defendant: Like I said about twelve. Eleven, twelve.

...

Defendant: To me, what we had in my stupidity and idiotic self was special, you know? I—I never touched your brother or your sister, and it's not like I'm just a pervert running around, you know, molesting kids or whatever. You know what I'm saying? It's just not that way. And I'm sorry that—that it happened to you, and I don't know what else to say to you. I tried to make up

for it any way I can, but I know I can't, and I try to make the best of a bad situation, if that makes any sense. I try and make you feel as comfortable as possible, you know. Because I—I do know, because I—you don't know what I've been through either. It's a two-way thing there. I'm sure it's worse on you, but it's still—it's bad on me too.

Victim: Alright.

Defendant: And I was hoping you did forgive me, and the way you've been acting, you did forgive me. And I was just hoping that it was a mistake that was gonna go away. That you could see me as your dad and nothing more, and just really be your daddy, you know.

Victim: I've never looked at you and not seen that person. Not once have I ever looked at you and thought, this is my sweet Dad that I love so much. Not one time, Dad.

Defendant: Well, I don't know what to say about that either. I deserve it.

Victim: Alright.

Defendant: But I wish you would forgive me....

Victim: Alright.

...

Defendant: And I really am—I really am sorry .... You just don't know how sorry I am and how much hurt I've been through as well, and it all revolves around did I hurt you. I'm—I know, you know, you may not think I know, but I know.

Shortly after the phone call, Investigator Hilburn briefly met with the defendant. The next day, he interviewed the defendant and informed him that the victim had made allegations against him. The defendant told Investigator Hilburn that the victim was upset with him and likely retaliating over a situation that occurred a week prior to the interview. Investigator Hilburn asked the defendant if he had received a phone call from the victim the previous day. The defendant replied that he received numerous phone calls from the victim, and Investigator Hilburn asked him if he remembered a particular conversation and how he would respond if he knew that conversation was recorded. The defendant answered that he did not know what conversation Investigator Hilburn was referring to, and he denied that he was the person on the recording after Investigator Hilburn played him portions of the call. Investigator Hilburn received permission to examine the defendant's cell phone, and he saw that there was a call from the victim's phone number that matched the time and duration of the recording. The defendant responded that he

did not receive a phone call from the victim or speak to her at that time. Investigator Hilburn testified that he had interacted with the defendant prior to the phone call and was familiar with the defendant's voice. He said that the voice on the recording appeared to be the defendant's voice.

Investigator Hilburn agreed that his employment with the Lewis County Sheriff's Department was terminated after the conclusion of the investigation into the defendant for reasons unrelated to the investigation. He agreed that there were no references in his notes to the dates that the victim said the abuse occurred.

The victim testified that she paid her college tuition with college loans, and she used her uncle to co-sign one loan application. She testified that she received permission from her aunt to use her uncle as a co-signer, but she stated that she had not personally received permission from him to do so. She later learned that her uncle did not know about the loan and had not given her permission to use his name. She testified that she had not asked the defendant for money to help pay off the loan shortly before making the accusations against him. She also testified that after graduating from college, she worked for a mental health facility as a caseworker, and she was fired for violating company policy.

The jury convicted the defendant of four counts of rape of a child as charged.

*State v. Curtis*, No. M2015-01372-CCA-R3-CD, 2016 WL 7654946, at *1-5 (Tenn. Crim. App.

Aug. 26, 2016).

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's

post-conviction hearing as follows:

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief, asserting a myriad of claims against trial counsel, appellate counsel, the trial court, and the State. After the appointment of counsel, the petitioner filed two amended petitions for post-conviction relief, arguing trial counsel was ineffective for failing to introduce expert testimony, establish an alibi, review the bill of particulars with the petitioner, and adequately advise the petitioner regarding a plea offer, and for stipulating to the authenticity of the recording. The petitioner also argued appellate counsel was ineffective for failing to raise "the aforementioned issues" on direct appeal.

At the post-conviction hearing, the petitioner testified he hired trial counsel prior to his arrest based on good "word of mouth." The petitioner and trial counsel met three times, twice in trial counsel's office and once in jail following the petitioner's arrest on methamphetamine charges. Although trial counsel did not review discovery or discuss trial strategy, the petitioner believed the State's evidence would consist of

the testimony of the victim and a recording of an alleged phone conversation between the victim and the petitioner.

The petitioner denied seeing the indictment or bill of particulars in his case, and, if he had known the dates of the alleged rapes, he would have provided trial counsel with information supporting his alibi. Specifically, the petitioner testified the home office where two of the rapes occurred did not exist during the year the victim alleged, and, although the victim testified she was raped on the petitioner's birthday in 1998, the family was camping in California on that date. The victim also alleged she was raped on Valentine's Day in 1998. However, the petitioner testified he and his wife "made a big deal" of the holiday and "had a very intimate evening" together. Additionally, the petitioner could not have raped the victim in the church van on a Wednesday night because he used his own vehicle to drive to the nursing home on Thursday nights and only drove the church van on Sunday mornings. The petitioner testified he told trial counsel about the home office, but trial counsel refused to introduce the petitioner's alibi at trial because the petitioner did not have any evidence to support his claim.

Regarding the recording, the petitioner believed the victim secretly recorded conversations with him and used the skills she learned in her college audio engineering classes to splice together pieces of the recorded conversations with questions about child rape. The petitioner testified he hired Mitch Davis, a private investigator in Nashville, to perform an analysis of the recording. Mr. Davis confirmed the voice on the recording was the petitioner's but found inconsistencies in the recording he was not qualified to analyze. Mr. Davis recommended the petitioner hire Tom Owen to perform further analysis into the recording's authenticity.

The petitioner paid Mr. Owen $9,500 to perform a forensic analysis of the recording which revealed multiple anomalies and caused Mr. Owen to question its authenticity. Unbeknownst to the petitioner, a second version of the recording, which was taken directly from the server at the Lewis County Sheriff's Department, was later sent to Mr. Owen for analysis because the first recording was not "in wave form." Mr. Owen analyzed this second recording and again found evidence of tampering. At a pre-trial hearing, Mr. Owen testified the anomalies in the second recording were caused by (1) someone manually pausing the recorder and (2) poor cell phone reception. Although Mr. Owen testified the recording was not made by splicing together separate conversations, he was not aware the victim had taken audio engineering classes, and the petitioner believed this knowledge may have changed Mr. Owen's opinion. On cross-examination, the petitioner conceded phone records showed he received a call from the victim's cell phone on the day of the recording and the duration of the call approximately matched the duration of the recording. However, the petitioner testified he did not have his cell phone in his possession on that day.

The petitioner believed Mr. Owen was going to testify on his behalf at trial because his findings "vindicated" the petitioner. However, a few weeks prior to trial, the petitioner received a letter from trial counsel stating Mr. Owen demanded $17,000 to analyze the original recorder and to replace travel expenses that were lost when the trial was continued. Because the petitioner was unable to pay the additional funds, the trial court declared the petitioner indigent, and trial counsel orally requested a continuance to allow Mr. Owen time to analyze the recorder and $17,000 to pay for the analysis and travel expenses. Although the trial court directed trial counsel to make these requests in writing, trial counsel failed to do so. Mr. Owen did not testify at the petitioner's trial, and trial counsel never explained his concerns regarding Mr. Owen's potential testimony. On cross-examination, the petitioner acknowledged trial counsel was able to argue the recording was manipulated without Mr. Owen's testimony.

Prior to the petitioner's trial, the State presented a plea offer of ten years at 100 percent which would resolve all charges related to both the victim and the victim's younger sister. Because the petitioner believed trial counsel was going to obtain a continuance to allow Mr. Owen to analyze the recorder, the petitioner rejected the offer. Trial counsel then forced the petitioner to sign a statement acknowledging he was rejecting the offer because he "would rather go to trial and face the rest of [his] life in prison." Although the petitioner initially refused to sign the paper, the trial court later ordered him to sign it. However, if the petitioner had known trial counsel was not going to allow Mr. Owen to testify, the petitioner would have accepted the plea offer. Additionally, during the trial, when the petitioner learned Mr. Owen was not going to testify, he advised trial counsel he wanted to accept the plea offer but was told it was "too late."

During the victim's trial testimony, the petitioner wanted trial counsel to question the victim about her experience and education in audio and video engineering. The petitioner believed these questions were essential to prove the recording was not authentic. The petitioner also wanted trial counsel to question the victim about student loan documents and time sheets she had forged. However, trial counsel chose to attack the victim's credibility by asking her about a television show she testified was on prior to one of the rapes. Trial counsel also introduced evidence proving the show aired in the early evening and was not on at 10:30 p.m. as the victim had alleged. The petitioner testified trial counsel did not look into the victim's background, and, if he had, trial counsel would have discovered two arrests for theft.

During cross-examination, the petitioner acknowledged the victim was asked about her education, and she stated her degree was in university studies with a concentration in recording industry and speech and theater. However, the petitioner testified the victim changed her major prior to his trial so she could testify she was not an audio engineer. The petitioner also conceded the victim was asked about the forged loan documents and time sheets, but insisted her answers were misleading because she did not disclose the details surrounding these incidents.

When asked about the issues appellate counsel failed to include in his direct appeal, the petitioner testified appellate counsel should have appealed the trial court's decision to allow the jury to hear about the allegations against the petitioner's younger daughter. Although the petitioner asked appellate counsel to include this issue in the motion for new trial and direct appeal, appellate counsel failed to do so. However, the petitioner was able to orally raise the issue during the motion for new trial hearing. Additionally, the petitioner believed appellate counsel should have appealed the trial court's failure to conduct a proper *Daubert* hearing to test the State's expert's qualifications and methods. Following the denial of his direct appeal, appellate counsel did not inform the petitioner of the possibility of filing a Rule 11 application with the supreme court.

On cross-examination, the petitioner agreed the strategy at trial was to attack the authenticity of the recording. He also agreed trial counsel advised the trial court that the recording did not need to be redacted because it was not "fair to the State" to ask them to redact portions of the conversation and later argue the recording was manipulated.

Trial counsel testified he was hired by the petitioner to represent the petitioner on pending rape of a child charges in Lewis County. Prior to the petitioner's preliminary hearing, trial counsel attempted to obtain a copy of the recorded conversation between the petitioner and the victim but was unsuccessful. Trial counsel later received a copy of the recording in discovery, and, after he and the petitioner listened to it, the petitioner insisted the male voice on the recording was not his. Although trial counsel believed it was the petitioner's voice, the petitioner hired Mr. Owen to analyze the recording for inconsistencies. Because Mr. Owen's initial report indicated the recording was in an unusual format, trial counsel contacted the prosecutor to obtain a "strike off of the original recording" and sent the second recording to Mr. Owen for analysis. This second recording was later played for the jury at the petitioner's trial.

Because the recording was "so devastating," trial counsel's trial strategy was to attack its authenticity. The petitioner first took the position that the voice on the recording was not his. However, when trial counsel was unable to find an expert who agreed with this conclusion, the petitioner next theorized the victim used her expertise in audio engineering to splice together snippets of several conversations with the petitioner and then scripted her side of the conversation to play against the petitioner's manufactured responses. However, at Mr. Owen's *Daubert* hearing, he testified the recording contained "pauses and clicks" which were the result of "manipulation by the operator of the recording device" and "cell tower transmission." Additionally, while Mr. Owen testified it was possible to manipulate a recording in the manner theorized by the petitioner, Mr. Owen did not believe that had happened in this case. Trial counsel was frustrated because Mr. Owen's testimony at the hearing differed greatly from his initial report. Although Mr. Owen found a large number of inconsistencies in the first recording, when he analyzed

the second recording taken from the Lewis County Sheriff's Department's server, he discovered "80 percent ... of these problems ... were the result of this being a recording as opposed to a one-off from the digital version." The few inconsistencies that remained on the second recording did not advance the petitioner's theory. Overall, trial counsel believed Mr. Owen's testimony at the pre-trial hearing "went extremely poorly for him," and trial counsel was afraid Mr. Owen would fall apart on cross-examination if he testified at trial. Because Mr. Owen's pre-trial testimony contradicted much of his initial report, trial counsel believed "the only benefit to Mr. Owen as a witness would be to confuse the less intelligent jurors" on the panel.

Additionally, following Mr. Owen's testimony at the *Daubert* hearing, trial counsel spoke to Mr. Owen about his travel plans for the petitioner's trial. Mr. Owen informed trial counsel he would need several thousand dollars for airfare, hotel accommodations, and time. Mr. Owen explained he needed the additional money because he had used the petitioner's funds to pay for travel expenses associated with the petitioner's prior trial date, and, although he obtained refunds when the trial was continued, any money paid to him was nonrefundable. The petitioner was unable to pay the additional expenses, and, because trial counsel now believed Mr. Owen was "a charlatan and a fraud," he made a strategic decision not to call Mr. Owen to testify at trial.

On cross-examination, trial counsel testified he would not be surprised to learn Mr. Owen signed a sworn affidavit stating he was not able to recoup his original travel expenses because "Mr. Owen says whatever he needs to say to make himself look better." However, trial counsel reiterated Mr. Owen told him that he "got most of [the money he spent on travel expenses] back" but refused to testify without additional funds. Although trial counsel agreed the jury, as the triers of fact, assigns weight to expert testimony, trial counsel believed any "minuscule benefit" obtained by Mr. Owen's testimony would be "greatly outweighed" by his performance on cross-examination.

After trial counsel made the decision not to call Mr. Owen to testify, he focused his trial strategy on attacking the credibility of the victim and establishing the petitioner did not have his cell phone on the day of the recorded conversation. Trial counsel researched the victim's forged loan documents and time sheets. However, because the victim admitted to signing her uncle's name on the loan documents and altering the time sheets, trial counsel was unable to introduce any extrinsic evidence. Furthermore, although the petitioner indicated the victim had an arrest record for theft, trial counsel was unable to locate any convictions for the victim. Trial counsel also researched television shows that were airing at the time of the rapes to poke holes in the victim's timeline. The victim testified *Dharma and Greg* was playing shortly before one of the rapes occurred. However, trial counsel was able to present evidence that the show was not in syndication during the year the victim alleged she was raped and would not have aired at 10:30 p.m.

Because the petitioner's strategy at trial was to attack the authenticity of the recording, trial counsel testified he could not ask the State to redact the victim's younger sister's name from the recording and later argue the same recording was manipulated or altered. Additionally, the portion of the recording that contained the references to the victim's younger sister also included the purported anomalies. If this portion of the recording was redacted, the jury would be unable to hear these anomalies.

Trial counsel testified he and the petitioner reviewed the bill of particulars within a month of the petitioner's trial. Because the victim testified at the preliminary hearing that she and the petitioner had sex on a daily basis for several years, the petitioner needed to decide whether he wanted to attack the victim's story of daily sex as "impossible, implausible and incredible" or whether they would eliminate the introduction of evidence of possible grooming by attacking only the four incidents listed in the bill of particulars. After weighing both options, the petitioner decided to limit the victim's testimony to only the incidents listed in the bill of particulars. While reviewing the bill of particulars, trial counsel asked the petitioner if he had an alibi for any of the incidents. However, the petitioner was not able to provide any names or other information for trial counsel to investigate. Without this information, the only way to introduce the alibis at trial was through the petitioner's testimony, and the petitioner chose not to testify.

On cross-examination, trial counsel acknowledged the petitioner told him that he drove the church bus on Thursdays instead of Wednesdays. However, trial counsel did not believe this was helpful because the petitioner could not provide church records to show when he drove the bus or the name of someone who could verify his story. Additionally, there was nothing to stop the victim from admitting she was mistaken about the day of the week on which the rape occurred. The petitioner also told trial counsel he was on vacation in Florida during one of the dates. However, trial counsel did not want to explore this alibi at trial because the victim was with the petitioner during this trip, and trial counsel was afraid the petitioner would be susceptible to prosecution in Florida.

Approximately two weeks prior to trial, the State offered the petitioner a plea deal of ten years at 100 percent. Although trial counsel was "extremely excited" about the offer, the petitioner told trial counsel he could not plead guilty to something he did not do. The State agreed to let the petitioner enter a best interest plea, but the petitioner was not convinced and requested to speak with his family. Trial counsel arranged a phone call between the petitioner and his sister, who encouraged the petitioner to accept the offer. However, after speaking with his sister, the petitioner told trial counsel he was unable to accept the offer.

Because trial counsel believed the possibility of the petitioner being convicted was "alarmingly strong" and he wanted to protect himself against future post-conviction proceedings, trial counsel asked the petitioner to sign a piece of paper acknowledging the terms of the offer and that he rejected those terms. The

petitioner initially refused to do so, and the trial court ultimately ordered the petitioner to sign the paper. Trial counsel testified, at the time the offer was rejected, the petitioner knew it was unlikely that Mr. Owen would testify at trial. Additionally, at no time during the trial did the petitioner tell trial counsel he had changed his mind about accepting the offer. If the petitioner had done so, trial counsel would have asked the State if the offer was still available.

At the conclusion of the post-conviction hearing, because the petitioner was "rambling" throughout his extensive testimony, the post-conviction court did not have "a clear understanding of what facts [the p]etitioner relie[d] on" to support his claims of ineffective assistance of counsel. Therefore, the post-conviction court ordered post-conviction counsel to prepare a final summation of the petitioner's claims. The petitioner's summation was filed on June 28, 2018, and included the following claims:

a. [Trial counsel] failed to adequately challenge the State's expert;
b. [Trial counsel] failed to call an expert to testify on behalf of [the p]etitioner at his trial;
c. [Trial counsel] failed to introduce an alibi defense and did not review the [b]ill of [p]articulars with [the p]etitioner; and
d. [Trial counsel] failed to adequately advise [the p]etitioner regarding the State's offer.

On July 11, 2018, the petitioner filed a pro se motion seeking time to amend the summation to include an additional claim against appellate counsel. However, because the petitioner was represented by counsel, the post-conviction court granted post-conviction counsel ten days to add the appellate claim if she deemed it appropriate. On July 18, 2018, post-conviction counsel filed a response stating she had reviewed the petitioner's claims against appellate counsel and found they either lacked merit or were addressed at the post-conviction hearing.

After its review of the evidence presented, the post-conviction court denied relief. *Curtis v. State*, No. M2018-01712-CCA-R3-PC, 2020 WL 476907, at *6-9 (Tenn. Crim. App. Jan. 30, 2020).

## C. STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the

Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must

find that the state court's application was "objectively unreasonable." *Id*. (quoting *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations may be found unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Subject to Habeas Rule 7, review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with

powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id*. (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the TCCA. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). Claims that are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002).

A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U. S. 320, 327 (1985). Second, if a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is technically exhausted (given that there is nothing additional the petitioner could do to obtain relief in state court), but a petitioner is not automatically entitled to present his claim on federal habeas review, as his claim is procedurally defaulted. *Woodford v. Ngo*, 548 U. S. 81, 126 (2006).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Id*. at 386. The burden of showing cause and actual prejudice to excuse defaulted claims is on the habeas petitioner. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Lucas v.*

*O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id*.

Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488-89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id*. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can be used as cause for the underlying defaulted claim only if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral

proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id*. at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496). A petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *McQuiggin v. Perkins*, 569 U. S. 383, 399 (2013) (internal quotation marks omitted) (quoting *Schlup v. Delo*, 513 U. S. 298, 327 (1995)). For a petitioner to "pass through the gateway" and be permitted to argue the merits of his defaulted claims, he must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of

non-harmless constitutional error." *Id.* at 401 (internal quotation marks omitted) (quoting *Schlup*, 513 U. S. at 316).

With these principles in mind, the Court will turn to the examination of the claims raised in Curtis's petition for habeas relief.

D. <u>ANALYSIS</u>

Petitioner is not entitled to relief under Section 2254 because his claims are not cognizable under the Habeas Rules, are without merit, or are procedurally defaulted without sufficient cause. The Court will address each category of claims in turn.

1. <u>Claims Not Cognizable Under Habeas Rules</u>

Claims 9, 11, and 13 are not cognizable under the Habeas Rules.

a. *Claim 9*

In Claim 9, Petitioner contends that the post-conviction court deprived him of due process "by prematurely ending the Post-Conviction Evidentiary Hearing" and depriving him of a "fair opportunity to submit important material evidence to rebut the testimony of his trial counsel or in support of [Petitioner's] testimony at the PCR evidentiary hearing." (Doc. No. 1 at Page ID# 34-41).

Challenges to the adequacy of post-conviction proceedings are not matters that can be addressed by way of habeas corpus. *See Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986) (referred to in this circuit as "The *Kirby* rule"). That is because habeas corpus review is not available where a challenge to such post-conviction proceedings is not directly related to the petitioner's detention. *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *Alley v. Bell*, 307 F.3d 380, 387 (6th Cir. 2002). The claim of a habeas petitioner "must directly dispute the fact or duration of the confinement." *Kirby*, 794 F.2d at 248. "Because the result of habeas review of the adequacy

of a post-conviction challenge will not result in a release from confinement, the scope of the writ does not include such grounds involving the adequacy of state post-conviction proceedings." *Haight v. Parker*, No. 3:02-CV-206-S, 2015 WL 13548182, at *112 (W.D. Ky. July 17, 2015) (citing *Wright v. Lazaroff*, 643 F.Supp.2d 971, 990 (S.D. Ohio 2009); *Simpson v. Warren*, 662 F.Supp.2d 835, 847 (E.D. Mich. 2009); *Rockwell v. Palmer*, 559 F.Supp.2d 817, 831 (W.D. Mich. 2008); *Huffman v. Brunsman*, 650 F.Supp.2d 725, 736 (S.D. Ohio 2008)). Thus, Petitioner's claim concerning the post-conviction court's actions are not cognizable notwithstanding Petitioner's presentation of the claim on post-conviction appeal.

Petitioner also alleges a due process violation arising from the hearing on his motion for a new trial. (Doc. No. 1 at Page ID# 38). Petitioner believes his right to due process was violated because the "trial court ruled on his New Trial hearing without hearing all of petitioner's constitutional claims[.]" (*Id*. at PageID# 36). It is unclear whether challenges to the adequacy of a state hearing on a motion for new trial can be raised in a federal habeas claim.[7] The Supreme Court has never held that a hearing on a motion for a new trial is a "critical stage of a criminal proceeding[;]"thus, there is no clearly established federal law "creating a right to counsel at a hearing on a motion for a new trial." *Coleman v. Bergh*, 804 F.3d 816, 819 (6th Cir. 2015). *See Reid v. United States*, No. 2:15-cv-02118-JPM-tmp, 2018 WL 11303420, at *6-7 (W.D. Tenn. Mar. 26, 2018) (citing *Coleman* and finding there is no clearly established federal right to counsel at a hearing on a motion for new trial); *Haygood v. Quarterman*, 239 F. App'x 39, 42 (5th Cir. 2007) ("[T]he Supreme Court has not clearly established whether . . . the Sixth Amendment right to counsel[] attach[es]" at the motion-for-new-trial phase."); *see also Ford v. Pliler*, 99 F. App'x

---

[7] Even if such a challenge could be made, Petitioner did not exhaust this claim by raising it in his post-conviction proceedings and does not now assert cause to excuse his default. *See Curtis*, 2020 WL 476907, at *10 (listing issues raised by Petitioner).

766 (9th Cir. 2004) (finding that petitioner, whose motion for new trial based on new evidence "tending to exculpate him" was denied, "has not identified any Supreme Court precedent that required state trial court to grant him a new trial" based on a violation of due process).

In any event, the record shows that the trial court afforded Petitioner a full and fair hearing on his motion for a new trial. The transcription of that hearing consists of approximately eighty pages. (*See generally* Doc. No. 13, Attach. 13). Petitioner's testimony constitutes approximately half of the transcript; thus, clearly the trial judge afforded Petitioner ample opportunity to be heard. (*See id.* at PageID# 1630-68).

To the extent Petitioner raises a claim that he was denied a fair hearing based in state law, that claim also fails. Error in the application of state law is not cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). Claim 9 will be dismissed.

> b. *Claim 11*

Petitioner alleges an actual innocence claim in Claim 11. (Doc. No. 1 at Page ID# 47-49). He claims that is actually innocent of the four counts of rape of a child of which he was convicted. (*Id.*)

Freestanding claims of actual innocence are not cognizable on federal habeas review outside of the capital-case context. *Herrera v. Collins*, 506 U.S. 390, 404 (1993); *Cress v. Palmer*, 848 F.3d 844, 854-55 (6th Cir. 2007). This is not a capital case. This claim is not cognizable on federal habeas review and will be dismissed.

c. *Claim 13*

Petitioner alleges a cumulative error claim in Claim 13, arguing his entitlement to relief due to the "multiple instances of ineffective assistance of trial counsel and appellate counsel combined with the plain errors' of the trial court[.]" (Doc. No. 1 at Page ID# 57-60).

Pre-AEDPA, cumulative evidentiary errors could warrant habeas relief. *See Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983). However, post-AEDPA, "not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (citing *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002)). Today the law of this Circuit is that cumulative error claims are not cognizable on habeas review. *See Daniels v. Jackson*, No. 18-1342, 2018 WL 4621942, at *6 (6th Cir. July 17, 2018) (quoting *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006)) ("[T]he law of [the Sixth Circuit] is that cumulative error claims are not cognizable on habeas [review] because the Supreme Court has not spoken on this issue."). Petitioner's claim is not cognizable and therefore must be dismissed.

2. Claims Cognizable Under Habeas Rules and Not Procedurally Defaulted by Petitioner

In his petition Petitioner asserts eight claims of ineffective assistance of counsel. As explained below, the Court will adjudicate three of these claims on the merits (albeit not de novo but rather under the AEDPA standard).

Specifically, Petitioner challenges trial counsel's performance in: not calling a defense expert witness (Claim 1); not objecting to evidence pursuant to Tennessee Rule of Evidence 404(b) (Claim 2); not requesting a hearing to determine whether the State's expert could provide expert witness testimony pursuant to Tennessee Rule of Evidence 104(a) (Claim 3); allegedly not properly representing Petitioner during the plea-bargaining stage (Claim 4); not obtaining a continuance and not requesting state funding for expert-witness testimony (Claim 5); not sending

the recorder device to the defense's forensic expert for testing (Claim 6); and not providing the bill of particulars to Petitioner before trial (Claim 7). (Doc. No. 1 at Page ID# 4-28). In his sole claim challenging the performance of his appellate counsel, Petitioner faults his appellate counsel for not adding issues from Petitioner's pro se motion for a new trial into Petitioner's brief on direct appeal in Claim 8. (*Id*. at Page ID# 29-34). Petitioner exhausted three of these claims, and so the Court will address them substantively. But under the ADEPA's demanding standard, these claims afford Petitioner no relief, because as explained below the TCCA's resolution of those three claims was not unreasonable.

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A court hearing an ineffective-assistance-of-counsel claim must consider the totality of the evidence. *Strickland*, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision: "was contrary to" federal law as clearly established at the time in the holding(s) of the United States Supreme Court, § 2254(d)(1); "involved an unreasonable application of" such law; or "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, where (as here) a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under

AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (internal quotation marks and citation omitted). In other words, *Strickland* mandates deference to counsel's decisions, and the AEDPA mandates deference to state courts, so "[h]abeas claims based on ineffective assistance of counsel are evaluated under a "doubly deferential" standard. *Abby v. Howe*, 742 F.3d 221, 226 (6th Cir. 2014) (citing *Burt v. Titlow*, 571 U.S. 12, 15 (2013)).

The Court now turns to Petitioner's exhausted ineffective-assistance-of-counsel claims.

    a. *Claim 1: Ineffective assistance of trial counsel in not calling Tom Owen as an expert*

Petitioner alleges that he received ineffective assistance when trial counsel did not call Owen as an expert witness for the defense. (Doc. No. 1 at Page ID# 4).

Petitioner exhausted this claim. In his post-conviction petition, Petitioner argued that trial counsel was ineffective for failing to present Owen at trial. (Doc. No. 13, Attach. 25 at PageID# 2652). The post-conviction court disagreed, finding that trial counsel made strategic decisions not to use Owen's reports or testimony, decisions that "were well-informed and the result of adequate preparation." *Curtis*, 2020 WL 476907, at *11. The court found that Petitioner's ineffectiveness argument "[wa]s made with the benefit of hindsight, a benefit to which he is not entitled [] for purposes of supporting his [p]ost-[c]onviction petition." *Id*.

In affirming the post-conviction court's denial of relief on this claim, the TCCA credited trial counsel's testimony that he did not believe that Owen's testimony would have advanced Petitioner's theory of how the recording was made; although Owen's initial report appeared favorable to the defense, he withdrew many of his previous conclusions after analyzing a second

copy of the recording; and counsel "was afraid Mr. Owen would fall apart on cross-examination." And when Owen "demanded additional money before agreeing to testify" after Petitioner's trial was continued despite having told trial counsel that he had been able to recoup his travel expenses from Petitioner's previous trial date, trial counsel believed Owen was "a charlatan and a fraud." *Curtis*, 2020 WL 476907, at *11; (Doc. No. 13, Attach. 21 at Page ID# 2280-81, 2324-25). The TCCA noted that "nothing in the record preponderates against the post-conviction court's factual findings" and "the fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel." *Id*. at *11. Thus, the TCCA denied relief, agreeing with the post-conviction court that "trial counsel made a strategic decision to not call Mr. Owen as an expert witness." *Curtis*, 2020 WL 476907, at *11; (Doc. No. 13, Attach. 21 at Page ID# 2290-91).

Citing *Plyant v. State*, 263 S.W.3d 854 (Tenn. 2008), the TCCA affirmed the post-conviction court's denial of relief as to this claim on the additional ground that Petitioner failed to call Owen at the post-conviction hearing. *Curtis*, 2020 WL 476907, at *11. In *Plyant*, the Tennessee Supreme Court held that, "[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Id*. at 869. The TCCA found that the state courts could not properly judge whether there was a "reasonable probability" of a different trial outcome because Petitioner offered no evidence beyond his own self-serving speculation as to what Owen's testimony would have been. 2020 WL 476907, at *11.

The TCCA's adjudication did not result in a decision that contradicted federal law. Petitioner does not cite *Strickland* as the governing law over this ineffective-assistance claim. (Doc. No. 1 at PageID# 4). Instead, Petitioner relies on *Cuyler v. Sullivan*, 446 U.S. 335 (1980),

where the Supreme Court held that a petitioner claiming ineffective assistance of counsel based on his attorneys' multiple representation must show "that a conflict of interest actually affected the adequacy of . . . representation." *Id*. at 348-50 (where two lawyers represented three defendants indicted for the first-degree murders of the same two victims, remanding case to determine whether the multiple representation had given rise to an actual conflict of interest, as "the [mere] possibility of conflict is insufficient to impugn a criminal conviction."). According to Petitioner, trial counsel here created a conflict of interest by misappropriating funds. (Doc. No. 1 at PageID# 4). Petitioner, however, cites no evidence to support his allegation. (*See id*. at PageID# 4-5). Conclusory allegations without evidentiary support fail to substantiate habeas corpus relief. *Prince v. Straub*, 78 F. App'x 440, 442 (6th Cir. 2003). Thus, Petitioner has not shown the existence of an actual conflict under *Cuyler*. Nor has he shown that, as required under *Strickland*, any conflict of interest contributed to deficiencies in trial counsel's performance such that there is a reasonable probability that, but for these deficiencies, the outcome of Petitioner's trial would have been different.

Even if the Court assumes arguendo here that trial counsel's performance was deficient, Petitioner has failed to demonstrate that the state court's finding of no prejudice was unreasonable. As noted *supra*, the state courts could not properly judge whether there was a "reasonable probability" of a different trial outcome had trial counsel called Owen, because Petitioner failed to present Owen at his evidentiary hearing to testify about the contents of his putative trial testimony. *Curtis*, 2020 WL 476907, at *11. Petitioner failed to "come forth with any proof of any such information or potential testimony[,]" and his "failure to do so is fatal to any attempt to establish" prejudice under *Strickland*. *Moreland v. Bradshaw*, 635 F. Supp. 2d 680, 712 (S.D. Ohio 2009), *aff'd*, 699 F.3d 908 (6th Cir. 2012); *see also Stevenson v. Perry*, No. 1:16-cv-1052, 2018 WL 6186808, at *12 (W.D. Tenn. Nov. 27, 2018) (citing *Moreland* for the proposition that the

petitioner failed to show an unreasonable application of *Strickland*'s prejudice prong when he failed to call the at-issue witness during his evidentiary hearing).

And although Petitioner maintains that Owen had favorable evidence to submit to the jury on Petitioner's behalf (*see* Doc. No. 48 at PageID# 4099 citing Doc. No. 13, Attach. 24 at PageID# 2574-75), the record shows that, based on the testimony Owen provided at the *Daubert* hearing,[8] Owen's likely trial testimony would not have supported Petitioner's working theory regarding the (inauthenticity of the) recording.[9] After trial counsel abandoned Petitioner's first theory regarding the recording, at Petitioner's urging trial counsel pursued a second theory, under which "the victim used her expertise in audio engineering to splice together snippets of several conversations with the petitioner and then scripted her side of the conversation to play against the petitioner's manufactured responses." *Curtis*, 2020 WL 476907, at *8; (Doc. No. 13, Attach. 20 at PageID# 2277). But trial counsel explained that Owen's testimony at the *Daubert* hearing, given after he had tested the second copy of the recording, did not support the splicing theory. (*Id.* at PageID# 2280). Owen, in fact, testified at the *Daubert* hearing that he did not conclude that the controlled call was "actually a recording between [the victim] and a prerecorded snippet of a conversation

---

[8] During state-court proceedings, the attorneys for both Petitioner and Respondent consistently refer to the 2014 pre-trial hearing involving the qualifications for both expert witnesses as "the *Daubert* hearing." (*See e.g.*, Doc. No. 13, Attach. 20 at PageID# 2277). For ease of reference, the Court does the same. Notably, there were two parts to the *Daubert* hearing. The trial court conducted the first part of "the *Daubert* hearing" on July 22, 2014, which Owen did not attend. (Doc. No. 13, Attach. 3). Owen testified in the second part of the *Daubert* hearing on August 4, 2014. (*See* Doc. No. 13, Attach. 5 at PageID# 729 for additional context).The complete transcript of that hearing is found at Doc. No. 30, Attachs. 1 and 2.

Of note, Respondent previously filed an incomplete transcript of the August 4, 2014 hearing at Doc. No. 13, Attachs. 5 & 6. That transcript was missing pages 79 through 150. Both parties, and the Court, cite to pages from the August 4, 2014 hearing docketed at both Doc. No. 13, Attachs. 1 and 2, and Doc. No. 30, Attachs. 1 and 2, which are duplicative entries, other than the missing pages 79 through 150, which appear only in the attachments to Doc. No. 30.

[9] Trial counsel explained that, initially, Petitioner insisted that it was not his voice on the recording. (*See* Doc. No. 13, Attach. 20 at PageID# 2267-68). However, that theory was "pushed aside . . . because no one other than Doug Curtis would – would agree to that." (*Id.* at PageID# 2275-76). In fact, one expert consulted by the defense said, "[T]here's no question it's your client." (*Id.* at PageID# 2276).

with Mr. Curtis." (Doc. No. 13, Attach. 5 at PageID# 795-96). Owen reiterated: "I don't know where you're getting this, but I don't think I've ever said to anybody that it was a prerecording of this gentleman and then they cut her in and cut him in or whatever." (*Id*. at PageID# 796-97). Trial counsel summarized his understanding of Owen's opinion as follows: "[W]hile it's possible to have pulled off this recording in the way [Petitioner] had suggested, that wasn't [Owen's] opinion at all and he was not willing to stay that's what happened in this case." (Doc. No. 13, Attach. 21 at PageID# 2280).[10]

According to trial counsel's credited testimony, the defense received the first version of the recording during discovery. *Curtis*, 476907, at *7. Owen examined this recording. *Id*. His initial report "indicated the recording was in an unusual format," so trial counsel requested the State provide a "strike off of the original recording." *Id*. The State obliged trial counsel's request. *Id*. The TBI then "burned [the defense] one off of the actual digital recording which was on a server and [the defense] got that up to Mr. Owen." (Doc. No. 13, Attach. 20 at Page ID# 2271-72). It took seven months for Owen to receive the second, "strike off" recording. (Doc. No. 13, Attach. 5 at PageID# 777). Trial counsel acknowledged that this second recording, the "strike off," was "as close to the original of the phone call recording that [the defense] could get" because the original recording "had been overwritten and deleted off." (*Id*., Page ID# 2272). Owen and the State's expert, Lacey, then analyzed this second recording, which was later played at trial. *Curtis*, 2020 WL 476907, at *7.

---

[10] Trial counsel ultimately described Petitioner's splicing theory as a "far-fetched mission impossible perp call" that Owen "was going to shoot down" if he was called to testify again because the theory was "far-fetched to begin with." (Doc. No. 13, Attach. 21 at PageID# 2334). In another part of his testimony, trial counsel called the theory a "fantasy land idea." (*Id*. at PageID# 2393). He testified that he had no expert testimony to support Petitioner's splicing theory. (*Id*. at PageID# 2286).

While Owen produced a written report in January 2013 after analyzing the first recording he was provided, he did not provide a written report after analyzing the second, "strike off" recording. (Doc. No. 13, Attach. 5 at PageID# 785). However, at the *Daubert* hearing, Owen testified at length as to how his initial conclusions changed after reviewing the second recording. (*Id*. at PageID# 785-804). He testified that the recording "does not represent the event as it actually occurred" because the recording had been "altered" by someone "who ran the cell company" and someone "who is in control of the recorder." (*Id*. at PageID# 790-92). Owen, however, gave no indication that he would testify that the second recording was inauthentic. During this testimony, he unequivocally referred to the second digital recording as "the original." (*Id*. at PageID# 787). As trial counsel recounted:

> I don't recall when—when everything was said and done that Mr. Owen ever saying in my opinion this is not an authentic recording. But what the final verdict was for Mr. Owen, once he was exposed, is that there is [sic] some pauses at the beginning of this recording by the operator of the device and there is [sic] some dropped signal words missing, that type thing which were inadvertently through the fault of no one through cell transmission. That's a long way from saying this is an inauthentic recording.

(Doc. No. 13, Attach. 21 at PageID# 2335-36).

Furthermore, Owen was unlikely to testify that it was not Petitioner's voice on the controlled call. (*Id*. at PageID# 2236).[11] As trial counsel explained, "Mr. Owen was not going to be of much benefit, and with a skillful cross-examination would have come out and said, no, the words you are hearing on this, I have no doubt they actually occurred . . . And then we were going to have two experts saying this is the conversation that took place." (*Id*. at PageID# 2339). Owen's

---

[11] But Owen might have testified that "because there were some pauses by the device operator, there was part of this missing and it does not reflect the [conversation] that took place." (Doc. No. 13, Attach. 21 at PageID# 2237). And counsel admitted that had this testimony been introduced, it could have possibly given the jury some reasonable doubt "that, hey, this call, we're not getting the full scope of this conversation that occurred between Mr. Curtis and his daughter." (*Id*.) Nevertheless, counsel ultimately concluded that "the baggage that Mr. Owen brought after the *Daubert* hearings was outweighing the little bit of benefit we might have gotten from him, if he even showed up." (*Id*.) Trial counsel's informed, strategic decision made at that time cannot now be second-guessed with the benefit of hindsight.

testimony to this effect would have been particularly problematic for the defense, given that Investigator Hilburn testified that when he interviewed Petitioner the day after the controlled phone conversation, "it was clear that a phone call had been placed to Doug Curtis' phone and had taken place for the approximate 19 and a half minutes that the officer said the recorded phone call took place the day before[.]" (Doc. No. 13, Attach. 21 at PageID# 2284). Trial counsel conceded: "Unfortunately, the cell phone records from the carrier matched up perfectly in terms of length of the phone call, time of the phone call, her phone, Mr. Curtis' phone, everything matched unfortunately." (Doc. No. 13, Attach. 21 at PageID# 2284). Trial counsel reiterated the damning effect of this corroboration on cross-examination:

> Q. So at this point, you now have a recording of a phone call that according to the officer was placed by [Victim 1] to her father, that the cell phone provider records corroborated that there was this phone call, and that Doug Curtis' phone corroborated that there was this phone call; is that correct?
>
> A. That's correct.

(*Id*. at PageID# 2284-85).

The record shows that Owen *was* likely to testify at trial—as he did at the *Daubert* hearing—that he discovered anomalies in the second recording that was provided to him in July 2013. (Doc. No. 13, Attach. 17 at PageID# 1864). He believed these "pauses and clicks" would have been the result of manipulation by the operator of the recording device, although some of the pauses "were the result of cell tower transmission during the conversation because Mr. Curtis' phone and its transmissions were being transmitted by cell wave." (Doc. No. 13, Attach. 21 at PageID# 2280). Essentially then, Owen's testimony would have supported a third theory, that the recording was manipulated by the operator of the recorder device as the conservation occurred. Trial counsel testified that this testimony would not have advanced the defense's theory about the recording but could have possibly assisted the defense in a limited way:

> I mean, it -- of course sometimes if you don't have anything else, you want to raise questions for one of the 12 jurors. And you know if you have one conspiracy theorist on there and and they hear that the police officer who's now in Florida was cutting the recorder on and off, I -- I guess you could -- you could play on that and then try to create a reasonable doubt that way, but it was certainly much, much flimsier than what Mr. Owen had originally indicated to us.

(*Id*. at PageID# 2281). Trial counsel went on to explain that he cross-examined the officer who made the recording and challenged his credibility by asking him whether he had been fired from the sheriff's department. (*Id*. at PageID# 2282). Even so, trial counsel testified that Petitioner had never embraced a theory that "it must have been the officer who manipulated the recording" because Petitioner insisted that his daughter, with her college-acquired skills, "had somehow made this recording using past conversations." (*Id*. at PageID# 2282-83).

Petitioner points to an undated, unsigned document purportedly prepared by Owen containing four "Conclusions" and Owen's "Opinion" regarding the "tape" provided to Owen. (Doc. No. 50, Attach. 1 at PageID# 4220). Petitioner alleges that this document shows what Owen's testimony would have been if trial counsel had put Owen on the stand at Petitioner's trial. However, this document is not part of the state-court record. The document does not include Petitioner's name, his case number, or a date. The document is unsigned. This unsubstantiated document will not be considered by the Court in determining what trial testimony Owen might have provided.

Even if Owen had opined that there were anomalies in the controlled call, and one or more jurors determined the controlled call was suspect, Owen's credibility issues indicate that his testimony likely would not have changed the outcome of Petitioner's trial. If Owen had testified, and any of his testimony contradicted the State's expert witness's testimony, the jury would have weighed Owen's testimony against expert testimony presented by the State. With respect to

Owen's credibility, trial counsel, who had practiced law for over 30 years in this community, testified:

> There—maybe it would have been helpful for you to see these two witnesses, but there wasn't any comparison in terms of credibility of Mr. Lacy versus Mr. Owen. It was – it was – it was – they weren't even in the same ballpark. You had a T-ball player and a major league baseball player, and Mr. Owen absolutely fell apart in those hearings.

(Doc. No. 13, Attach. 21 at PageID# 2396-97). Counsel elaborated:

> It was clear he [Owen] did not want to come to Hohenwald, Tennessee, to testify. The hearing that we did late at night or afternoon, whenever it was in Lewis County with him, I thought went extremely poorly for him. You could tell that it flustered him, it frustrated him and I – I did not think he would appear – would hold up at all in front of a Lewis County jury.

(*Id*. at PageID# 2290). Thus, it is unlikely that the jury would have credited Owen's testimony over the State's expert witness.

Moreover, the victim testified in detail as to the four instances of rape, and no corroborating physical evidence is required to convict Petitioner of those counts. *See infra* at p. 77. Thus, the state courts reasonably determined that Petitioner had not shown prejudice resulting from trial counsel's failure to call Owen as an expert for the defense.[12]

In short, the TCCA's determination was not contrary to *Strickland*. Likewise, the TCCA's ineffective-assistance determination was not based on an unreasonable determination of the facts or an unreasonable applicable of *Strickland*'s standards to those facts. Claim 1 will be dismissed.

### b. *Claim 4: Ineffective assistance of trial counsel during plea bargaining*

Petitioner next argues that trial counsel provided ineffective assistance by failing to adequately advise Petitioner regarding a plea offer. (Doc. No. 1 at Page ID# 13-16).

---

[12] To the extent that Petitioner's ineffective-assistance-of-counsel claim based on trial counsel's failure to call Owen as a defense witness (Claim 1) overlaps with Petitioner's ineffective-assistance-of-counsel claims based on trial counsel's failure to seek a continuance and funding (Claim 5) and to obtain the original recorder for use in Owen's testing (Claim 6), the Court addresses those claims *infra* rather than here.

Petitioner raised this claim in his post-conviction proceedings. *See Curtis*, 2020 WL 476907, at *12-13. The post-conviction court found the evidence established that trial counsel fully informed Petitioner of the advantages and disadvantages of his decision to reject the plea offer and concluded that trial counsel was not deficient in explaining the terms of the plea agreement to Petitioner. *Id*.

Petitioner exhausted this claim on post-conviction appeal by arguing the claim's merits in his appellate brief filed in the TCCA. (Doc. No. 13, Attach. 25 at Page ID# 2667- 71). In reviewing the post-conviction court's denial of Petitioner's ineffective assistance claim based on counsel's explanation of the plea agreement, the TCCA began by noting that, when a petitioner alleges that he rejected a plea offer due to the ineffective assistance of counsel, he "has the burden to show by a reasonable probability that, but for counsel's deficient representation, (1) he . . . would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe that the penalty actually imposed." *Curtis*, 2020 WL 476907, at *13 (citing *Nesbit v. State*, 452 S.W. 3d 779, 800-01 (citing *Lafler v. Cooper*, 56 U.S. 156, 164 (2012)). The TCCA then found:

> At the post-conviction hearing, the petitioner testified the State presented a plea offer of ten years at 100 percent to resolve the charges related to both the victim and the victim's younger sister. The petitioner rejected this offer because he believed the trial was going to be continued to allow Mr. Owen to analyze the original recorder. However, if he had known Mr. Owen was not going to testify, the petitioner would have accepted the offer. During the trial, when the petitioner learned Mr. Owen was not testifying, the petitioner told trial counsel he wanted to take the offer but was told it was "too late." Trial counsel testified he was "extremely excited" about the offer and, after discussing the possibility that Mr. Owen may not testify at trial, encouraged the petitioner to accept it. After the petitioner initially rejected the offer, the State agreed to let the petitioner enter a best interest plea, and trial counsel allowed the petitioner to discuss the offer with his sister. When the petitioner ultimately decided to reject the offer, trial counsel wrote the details of the offer on a piece of paper and asked the petitioner to sign it,

acknowledging he had rejected the offer. The petitioner refused, and the trial court ordered the petitioner to sign the paper.

The petitioner acknowledged trial counsel discussed the terms of the plea offer with him and agreed he ultimately rejected the State's offer. Trial counsel testified, when he and the petitioner discussed the risks associated with proceeding to trial, he told the petitioner there was a possibility Mr. Owen would not testify. The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. Furthermore, as the post-conviction court noted, the petitioner's signed note acknowledged his decision to reject the offer. Accordingly, we conclude trial counsel's performance was not deficient during the petitioner's plea negotiations. The petitioner is not entitled to relief on this issue.

*Curtis*, 2020 WL 476907, at *13.

These findings by the TCCA were not contrary to law. The TCCA correctly cited and applied the relevant clearly established federal law, *Lafler*, to the facts of the case. *See Curtis*, 2020 WL 476907, at *12-13. *Lafler* requires a petitioner to show that, but for trial counsel's deficient performance, there was a reasonable probability that the petitioner would have accepted the plea. *Lafler*, 566 U.S. at 164. The TCCA reasonably found that Petitioner could not make this showing, as he had signed an acknowledgement filed under seal with the trial court that documented "his decision to reject the offer." *Curtis*, 2020 WL 476907, at *13.

Trial counsel testified at the evidentiary hearing that he was "extremely excited" when the State offered the plea and that he communicated the plea to Petitioner. (Doc. No. 13, Attach. 21 at Page ID# 2309). However, Petitioner told trial counsel he could not "plead guilty to something [he] didn't do[.]" (*Id.*) The State then agreed to allow Petitioner to enter a best-interest plea, but Petitioner wanted to speak with his family before deciding on the plea. (*Id.*) After speaking to his sister, Petitioner again rejected the agreement. (*Id.*, Page ID# 2309-10). Trial counsel decided to memorialize Petitioner's rejection of the agreement because he thought the chances of Petitioner "being convicted were alarmingly strong" and thought Petitioner would "probably file" a post-

conviction relief petition challenging counsel's performance. (*Id*. at Page ID# 2310-11). The trial court ordered Petitioner, who initially refused, to sign an acknowledgement that he was rejecting the offer. (*Id*. at Page ID# 2311, 2352-53); *Curtis*, 2020 WL 476907, at *9, *12-13. Counsel confirmed that Petitioner rejected the agreement knowing that Owen was unlikely to testify at his trial. 2020 WL 476907, at *9.

In his petition, Petitioner advances a different version of the facts (Doc. No. 1 at PageID# 13-16), which the post-conviction court rejected. *Curtis*, 2020 WL 476907, at *13. Petitioner, however, fails to explain how the TCCA's decision was based on an unreasonable determination of the established, credited facts or casts doubt by "clear and convincing evidence" of the "correctness" of the state court's findings. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007). The evidence shows that Petitioner understood the offer and rejected it in favor of trial. Given this evidence, there is no "reasonable probability" that Petitioner would have accepted the offer, and the TCCA's application of *Lafler* is supported in the record and is reasonable. *Donald*, 575 U.S. at 316. Consequently, the Court finds that Petitioner is not entitled to relief on this claim. Claim 4 will be dismissed.

c. *Claim 7: Ineffective assistance of trial counsel by failing to provide the bill of particulars to Petitioner before trial*

In Claim 7, Petitioner alleges that trial counsel was ineffective in failing to provide the bill of particulars to Petitioner before trial. (Doc. No. 1 at Page ID# 25-28). According to Petitioner, "he never saw a Bill of Particulars or knew what charges or dates he would be tried on that fateful day; thus, he was denied his due process right to offer an alibi defense to the trier of fact . . . ." (*Id*. at PageID# 25). Petitioner contends that, had he reviewed the bill of particulars, he would have provided trial counsel with alibis for several of the dates given by the victim. (*Id*.)

Petitioner raised this claim in his post-conviction proceedings. *See Curtis*, 2020 WL 476907, at *14. The post-conviction court found that trial counsel had reviewed the bill of particulars with Petitioner prior to trial and had discussed "each and every allegation and well as possible defense strategies"; had asked Petitioner to provide any names, records, or witnesses to help establish an alibi; and had pursued Petitioner's provided alibis and was never made aware of any records that would have corroborated those alibis. *Id*. The court credited trial counsel's further testimony that, without any records, Petitioner's only other option was to testify about occasions when he drove the church van and challenge the victim's credibility; however, Petitioner chose not to testify. *Id*. The post-conviction court determined, based on these findings, that Petitioner had not demonstrated that trial counsel was ineffective and denied this claim. *Id*.

Petitioner exhausted this claim by raising it on appeal. The TCCA denied relief, finding that the post-conviction court had credited the testimony of trial counsel, and that nothing in the record preponderated against its findings. *Curtis*, 2020 WL 476907, at *14-15 (citing *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996)). In addition, the TCCA found that, although Petitioner argued that trial counsel should have investigated alibi witnesses or introduced evidence to support Petitioner's alibi, Petitioner had failed to present any witnesses or evidence at his post-conviction hearing and therefore could not establish prejudice. *Id*. (citing *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990), and *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)).

The TCCA's decision was not contrary to law. The TCCA correctly noted and applied *Strickland* to its analysis of this claim. *Curtis*, 2020 WL 476907, at *14-15.

The TCCA reasonably applied *Strickland*'s performance prong. Although Petitioner testified that trial counsel had never reviewed the bill of particulars with him (Petitioner), the post-conviction court found trial counsel's testimony to be more credible than Petitioner's testimony.

On appeal, the TCCA found that nothing in the record preponderated against the trial court's findings. *Curtis*, 2020 WL 476907, at \*14. The record showed that, at Petitioner's post-conviction hearing, trial counsel testified that he had "reviewed the [b]ill of [p]articulars with [the p]etitioner prior to trial and discussed each and every allegation as well as possible defense strategies"; Petitioner told trial counsel about possible alibis, but he had not provided any evidence (including potential witnesses) to support the alibis for trial counsel to evaluate; he and Petitioner discussed an alibi for the "church van incident" but this alibi collapsed because "there would have been other people in the van or the kids went with [Petitioner] or something like that and that couldn't have happened" (Doc. No. 13, Attach. 21 at Page ID# 2304); and he and Petitioner "discussed each [alibi] and any possible weaknesses on those" and that on "two of the counts, [] there was such a wide range of dates that there's not any way to provide an alibi especially years and years later" (*id*. at Page ID# 2304-05). Trial counsel's accredited testimony provides sufficient justification for the TCCA's denial of relief based on *Strickland's* performance prong, given that "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). *See Davis v. Ayala*, 576 U.S. 257, 273-74 (2015) (citations omitted) ("the determinations of credibility and demeanor lie particularly within a trial judge's province" and, "in the absence of extraordinary circumstances," a federal habeas court should "defer to the trial court"); *Braxton v. Gansheimer*, 561 F.3d 453, 458 (6th Cir. 2009) ("a reviewing court must be careful not to substitute its own judgment for that of the state court by equating the more stringent standard of 'objectively unreasonable' with the more lax standard of 'clear error.'").

The TCCA also reasonably applied *Strickland*'s prejudice prong. The TCCA held that Petitioner failed to prove prejudice because he "failed to present any witnesses or evidence at the

post-conviction hearing[.]" *Curtis*, 2020 WL 476907, at *15. Petitioner's failure to "come forth with any proof of any such information or potential testimony . . . is fatal to any attempt to establish" prejudice under *Strickland*. *Moreland*, 635 F. Supp. 2d at 712; *see also Stevenson*, 2018 WL 6186808, at *12. In short, the TCCA's application of both *Strickland* prongs was reasonable.

Finally, Petitioner's argument as to Claim 7 is fact-based, which the Court construes as a challenge brought under 28 U.S.C. § 2254(d)(2). Petitioner's argument fails, however, because it does not address how the TCCA's decision was based on an unreasonable determination of the facts in light of the contents of the record. For example, while Petitioner contends that "bank records and witness testimony" could have provided alibis, he does not address the fact that he provided none of this evidence at his evidentiary hearing. (*See* Doc. No. 1 at Page ID# 26). Likewise, he claims that property records would have shown that "the rooms petitioner was convicted of committing sexual crimes in 1998[] did not even exist until the year 2000" but he did submit those property records at his evidentiary hearing either. (*Id*.) Petitioner claims that, had he known about the bill of particulars, he "would have informed [trial counsel] that on one count he [Petitioner] was in California on his birthday and could not have committed that crime, on another he never drove the van on a Wednesday night and could not have committed that crime, [and] also that he and his wife always made the celebration of Valentine's Day a major all night event and [therefore he] could not have committed that crime." (*Id*. at PageID#27). But again, Petitioner provided no evidence at his post-conviction hearing to support these assertions.[13]

---

[13] On cross-examination during Petitioner's post-conviction hearing, trial counsel acknowledged that Petitioner told him [trial counsel] that Petitioner drove the church bus on Thursdays instead of Wednesdays. *Curtis*, 2020 WL 476907, at *9. However, trial counsel did not believe this statement was helpful because Petitioner could not provide any church records or witnesses corroborating his story. *Id*. Additionally, there was nothing to stop the victim from testifying that she was merely mistaken about the day of the week on which the rape occurred. *Id*. Petitioner also told trial counsel that he was on vacation in Florida on one of the dates, but trial counsel did not want to explore this alibi at trial because the victim was with Petitioner during this trip, and trial counsel was afraid Petitioner would be susceptible to prosecution in Florida. *Id*.

Petitioner also tries to establish factual inconsistencies concerning trial counsel's meeting with Petitioner to review this alibi evidence. (*See generally* Doc. No. 1 at Page ID# 25-28). However, the accredited record contradicts Petitioner's contentions. Trial counsel testified that he and Petitioner "sat there and went over . . . the indictment and the bill of particular response side by side" because Petitioner needed to decide how the defense would conduct its cross-examination of the victim during trial. (Doc. No. 13, Attach. 21 at Page ID# 2312-13, 2339-40). Specifically, trial counsel advised Petitioner on whether the defense should impeach the victim on "all the implausibility of her original story"—that they were having sex hundreds of time over a period of years—or "just limit her to . . . four incidents."[14] (*Id.* at Page ID# 2339-40). Trial counsel recalled leaving the decision "entirely up to [Petitioner]." (*Id.* at PageID# 340). Second, while Petitioner claims that "counsel . . . never came to see him [Petitioner] while he was in jail (Doc. No. 13, Attach. 21 at PageID# 2386-87), trial counsel recalled meeting with Petitioner "at least five or six times" on days Petitioner had court hearings, during which time Petitioner was incarcerated. Finally, trial counsel testified that Petitioner never indicated that he had "bank records or financial statements" that could have substantiated a possible alibi defense. (*Id.* at Page ID# 2305). Consequently, Petitioner has failed to rebut the TCCA's factual determinations by "clear and

---

[14] At Petitioner's post-conviction hearing, Colley explained that he had been made aware at Petitioner's preliminary hearing of "hundreds" of alleged instances of abuse by Petitioner toward his older daughter, the victim. (Doc. No. 13, Attach. 21 at PageID# 2297). When the indictment came, the State had alleged (only) four instances. (*Id.*) Colley explained that he had two strategic options: "stick to the strictly charged offenses or . . . bring it all in and talk about how, essentially, how preposterous it is that it happened this many times." (*Id.* at PageID# 2298-99). Colley explained to Petitioner why he needed to decide which approach to take as "there were pros and cons to both sides." (*Id.* at PageID# 2298). When Petitioner decided to limit it to the four instances, it required Colley "to figure a way to keep her [name redacted] from diverging from a discussion about a specific date or a specific incident onto this story of having sex on several times a week or almost daily with Mr. Curtis because that would defeat . . . the whole purpose . . . ." (*Id.* at PageID# 2299). *See also* Colley's testimony during Petitioner's hearing on the motion for new trial. *Curtis*, 2016 WL 7654946 at *6 (trial counsel testified that he was aware of allegations of multiple acts of sexual abuse by Petitioner against his older daughter, the victim, that were not charged in the indictment and that the victim alleged the abuse occurred almost daily; trial counsel explained that he had two strategic options: to try just the four counts and exclude evidence of all other acts of abuse, or to allow evidence of all the abuse and attempt to attack the credibility of the victim's testimony; trial counsel explained these options to Petitioner, who instructed him to try just the four counts).

convinging evidence." *Pouncy*, 846 F.3d at 158. The factual determinations used by the TCCA to adjudicate this *Strickland* claim are supported by the record. Claim Seven will be dismissed.

### 3. Claims Cognizable Under Habeas Rules and Procedurally Defaulted by Petitioner

Petitioner procedurally defaulted five ineffective-assistance-of-counsel claims (Claims 2, 3, 5, 6, 8) and his Claims 10 and 14 without sufficient cause. The Court will begin with the five defaulted ineffective-assistance-of-counsel claims. *Strickland* is the governing federal law over these claims, requiring Petitioner to prove deficient performance by counsel and prejudice to Petitioner. 466 U.S. at 687.

#### a. *Ineffective-Assistance-of-Counsel Claims*

##### i. **Claim 2**

Petitioner alleges that trial counsel provided ineffective assistance when he failed to object to evidence of Petitioner's other crimes under Tennessee Rule of Evidence 404(b). (Doc. No. 1 at Page ID# 6-7). First, Petitioner points to a comment the victim made about their "husband and wife relationship" when she was a teenager and in college. Second, Petitioner points to trial testimony concerning the alleged molestation he committed against his younger daughter that was barred by pretrial order. Each of these instances of alleged ineffectiveness will be addressed in turn below as Claim 2a and 2b, respectively.

###### a) "Husband and Wife Relationship" Statement

In Claim 2a, Petitioner alleges that trial counsel was ineffective because he failed to object to particular testimony by the victim. (Doc. No. 1 at PageID# 6-7). Specifically, Petitioner testified that during her high school and college years, she had a "very close" relationship with her father, "a very husband and wife kind of relationship." (Doc. No. 13, Attach. 8 at PageID# 1045).

Petitioner did not present this claim to the TCCA on post-conviction appeal, the first court of competent jurisdiction. (*See* Doc. No. 13, Attach. 25 at Page ID# 2662-63); *see Curtis*, 2020

WL 476907, at *12. By failing to present the federal constitutional claim to the state courts, Petitioner procedurally defaulted it. 28 U.S.C. § 2254(c); *Coleman*, 501 U.S. at 732. He therefore has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice or that the Court's failure to address Claim 2a would result in a fundamental miscarriage of justice.

Petitioner maintains that he demonstrates cause to excuse the default under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014). Specifically, Petitioner alleges that post-conviction counsel performed ineffectively by failing to raise trial counsel's ineffectiveness in failing to object to the at-issue 404(b) testimony, and post-conviction counsel's ineffectiveness constitutes cause for Petitioner's procedural default of Claim 2a. As noted *infra*, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9.

The Sixth Circuit has directed a district court considering ineffective-assistance-of-counsel claims under *Martinez* and *Trevino* (discussed above) to first address whether the petitioner can demonstrate "(1) the absence or ineffective assistance of his post-conviction counsel and (2) the 'substantial' nature of his underlying [ineffective assistance of trial counsel claims]." *Woolbright v. Crews*, 791 F.3d 628, 637 (6th Cir. 2015). If the petitioner demonstrates these first two elements, the petitioner has established cause to excuse the procedural default, and the district court must then determine whether the petitioner can establish prejudice from the alleged ineffective assistance of trial counsel. *See id*. If the petitioner successfully establishes cause and prejudice, the

final step[15] is for the district court to evaluate the underlying ineffective assistance of trial counsel claims on the merits. *See Atkins v. Holloway*, 792 F.3d 654, 659-60 (6th Cir. 2015).

In demonstrating a substantial claim of ineffective assistance of trial counsel, the petitioner must prove prejudice under *Strickland*. *See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 752 (6th Cir. 2013) ("To be successful under *Trevino*, [a petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim." (internal citations omitted)). Under *Strickland*, a petitioner can prove prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. 668, 694. As one court explains, describing the interplay between *Coleman* (relating to the prejudice requirement for excusing procedural default of a claim, whether under *Martinez* or otherwise) and *Strickland* (relating to the prejudice requirement for an underlying ineffective-assistance-of-counsel claim):

> The "actual prejudice" requirement of *Coleman* and the prejudice requirement of *Strickland* overlap such that in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

*Thorne*, 2014 WL 4411680, at *23. The Supreme Court has defined this required "substantial" showing as a showing that the claim has some merit. *Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322, (2003)). The threshold inquiry "does not require full consideration of the

---

[15] As noted *infra*, this step may (to a degree) be taken into account in advance in considering whether the second above-stated element of prejudice is satisfied. *See Thorne v. Hollway*, No. 3:14-cv-0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014).

factual or legal basis supporting the claims." *Miller-El*, 537 U.S. at 336, 338. Thus, the Court will undertake a preliminary analysis of Petitioner's underlying ineffective assistance of trial counsel Claim 2a to determine whether it has some merit. *See Martinez*, 566 U.S. 1, 14. In that claim, Petitioner alleges that trial counsel was ineffective by failing to object to the victim's husband-wife statement under Rule 404(b).

*Martinez*, however, provides no relief because the defaulted claim is not substantial; it does not have merit. 566 U.S. at 14. During Petitioner's post-convicting hearing, trial counsel testified that he could not remember whether he objected at the time the victim made the "husband-wife" comment or whether he (counsel) made a motion to strike following the victim's testimony. (*See* Doc. No. 13, Attach. 21 at PageID# 2300-01). Counsel then explained that perhaps he did not object to the husband-wife statement, believing that he would have drawn attention to the at-issue testimony or, as he put it, "ring the bell twice." (*See* Doc. No. 13, Attach. 21 at PageID# 20301). Petitioner does not dispute that this was in fact counsel's belief. Thus, the record before the Court shows that trial counsel made a strategic decision not to draw attention to the at-issue comment by objecting. (Doc. No. 13, Attach. 21 at Page ID# 2301). Trial counsel made this decision based on his "32 years of practice," and that strategic decision is now "virtually unchallengeable." (*Id.*); *Strickland*, 466 U.S. at 688, 690. Therefore, Petitioner cannot show that trial counsel performed deficiently.

Even assuming *arguendo* that trial counsel performed deficiently, Petitioner has not established that he was prejudiced by the purported failure of trial counsel to object to the victim's husband-wife statement. *See Coleman*, 501 U.S. at 750. As noted by the TCCA on direct appeal, "the evidence against the defendant was substantial, and there is no evidence that [the victim's husband-wife statement] affected the outcome of the trial." *Curtis*, 2016 WL 7654946, at *7.

This claim is not substantial under *Woolbright*, 791 F.3d 628, 637, and Petitioner has not shown that he was prejudiced by post-conviction counsel's failure to raise it. Therefore, Petitioner cannot demonstrate cause and prejudice to excuse his procedural default of Claim 2a. The claim is without merit and will be dismissed.

b) Witness Testimony Regarding Molestation of Younger Daughter

In Claim 2b, Petitioner alleges that trial counsel was ineffective because he failed to prevent the introduction of trial testimony concerning the alleged molestation that Petitioner committed against his younger daughter ("younger-daughter testimony"). (Doc. No. 1 at PageID# 6). According to Petitioner, although the trial judge "barred" any such testimony from the victim and other witnesses, the younger-daughter testimony was allowed, "infecting the trial with inadmissible other alleged crime evidence." (Doc. No. 48 at PageID# 4097).

Petitioner included this claim in his pro se post-conviction petition, but he failed to pursue the claim in either of his amended petitions for post-conviction relief, and he did not specifically incorporate the claim in his pro se petition into his amended petitions. *Curtis*, 2020 WL 476907, at *12. Furthermore, when directed by the post-conviction court to present a summary of the claims upon which he was seeking relief, Petitioner failed to identify this claim. *Id.*[16] As a result, the post-conviction court did not render a ruling on this claim in its order denying relief. On appeal, citing *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App 2004) ("[A]n issue raised for the first time on appeal is waived."), the TCCA determined that Petitioner had waived review of this claim.

---

[16] At his post-conviction hearing, while represented by counsel, Petitioner filed a pro se motion to amend the final summation. *Curtis*, 2020 WL 476907, at* 16. Because a defendant in a criminal case cannot proceed pro se while simultaneously being represented by counsel, the post-conviction court ordered post-conviction counsel to determine whether Petitioner's claims had merit and, if so, to amend the final summation accordingly. *Id.* Post-conviction counsel reviewed the claims and determined that they either lacked merit or were previously addressed in the final summation. *Id.*

The *Cauthern* rule constitutes an adequate and independent state procedural ground on which the TCCA could (and did) rest its denial of relief.[17] *See Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002). "When 'a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Id.* at 575 (6th Cir. 2002) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Petitioner's attempt to excuse this procedural default fails. Attorney error does not constitute "cause" unless it rises to the level of a constitutional violation of the right to counsel under *Strickland*. *Murray*, 477 U.S. at 488. Petitioner blames his attorneys for failing to follow his directions to include this claim at the various levels of his state-court litigation. According to Petitioner, "4 of the 5 government witnesses . . . were allowed to inform the jury, without objection from counsel, the name, age, relationship, and allegations made against petitioner concerning the alleged other victim." (Doc. No. 1 at PageID #6; *see* Doc. No. 48 at PageID# 4097). The existing record belies Petitioner's assertions.

The record shows instead that the trial court granted the State's motion in limine to allow testimony of prior bad acts committed by Petitioner (Doc. No. 13, Attach. 2 at PageID# 481-82) because the observations the victim made concerning Petitioner's alleged abuse of his younger

---

[17] Here, Petitioner's post-conviction proceedings occurred in 2018 and 2019, and the rule articulated in *Cauthern* was followed by the state courts during this time as shown by numerous Tennessee courts citing this rule in a similar fashion when ruling on claims that were first presented on appeal. *See e.g., State v. Morris*, No. M2017-01229-CCA-R3-CD, 2017 WL 6375952, at *2 (Tenn. Crim. App. Dec. 13, 2017); *Croom v. State*, No. W2015-01000-CCA-R3-PC, 2016 WL 690689, at *8 (Tenn. Crim. App. Feb. 19, 2016), *perm. appeal denied*, (Tenn. June 24, 2016); *Taylor v. State*, No. M2008-00335-CCA-R3-PC, 2009 WL 2047331, at *2 (Tenn. Crim. App. July 14, 2009), *perm. appeal denied*, (Tenn. Oct. 19, 2009); *Williams v. State*, No. E2006-00230-CCA-R3-PC, 2006 WL 3410693, at *2 (Tenn. Crim. App. Nov. 27, 2006). Thus, the procedural rule in *Cauthern* cited by the TCCA when it declined to address this claim on its merits constitutes an adequate and independent state procedural bar to relief. *See Monzo*, 281 F.3d at 576.

daughter were "relevant to demonstrate to the jury why [the victim] delayed in notifying law enforcement of her previous abuse."[18] (*Id*. at PageID# 481). However, the trial court significantly limited this testimony. (*Id*.) The victim and other witnesses were ordered to limit their respective testimony "to the effect that [the victim] observed something that caused her to become concerned about another person." (*Id*.) The trial court specified that no witness, including the victim, could testify "as to what [the victim] saw, the identity of the [younger daughter] or the subsequent conversation with the minor child." (*Id*.)

At trial, the victim testified about four instances of rape before she reached the age of thirteen. *Curtis*, 2016 WL 7654946, at *1-2. Four State witnesses testified, including the investigator who recorded the controlled call, and Debbie Landers, the victim's friend who urged the victim to report what she witnessed concerning "another individual." *See generally id*. at *1-4. The record shows that these witnesses all testified in accordance with the trial court's order concerning Petitioner's prior bad acts. (Doc. No. 13, Attach. 8 at PageID# 1028, 1043, 1047; Doc. No. 13, Attach. 9 at PageID# 1117, 1120, 1125).

Under *Strickland*, trial counsel cannot have rendered a deficient performance by failing to object or act on a non-meritorious issue. *See Hollis v. Perry*, No. 3:17-cv-626, 2018 WL 6181354, at *18 (M.D. Tenn. Nov. 27, 2018) (counsel provided no deficient performance by failing to raise a nonmeritorious speedy-trial issue), *appeal dismissed*, No. 19-5051, 2019 WL 3206686 (6th Cir. Apr. 24, 2019). In other words, mere failure to raise a non-meritorious objection does not constitute deficient performance. Here, trial counsel had no reason to object, because the witnesses complied

---

[18] Testimony admitted for this (limited) purpose—*i.e.*, to demonstrate to the jury why the victim delayed in notifying law enforcement of her previous abuse—is not within the scope of Tennessee Rule of Evidence 404(b) because it was not "admi[tted] to prove the character of [the Petitioner] in order to show action in conformity therewith."

with the trial court's order. Thus, even if this subclaim were not defaulted, Petitioner cannot establish deficient performance by trial counsel. Claim 2b will be dismissed.

Petitioner concedes that the trial court issued the limiting order but asserts, without providing evidence, that "alleged Victim 1, as well as[] all of the other witnesses including the prosecutor" violated the order. (Doc. 48 at PageID# 4097). Petitioner's main argument with respect to this testimony is that the victim's testimony was not credible and the trial judge allowed four witnesses to offer hearsay testimony. Essentially, then, Petitioner's arguments speak to the sufficiency of the evidence used to convict him, not to trial counsel's alleged failures to object to testimony that Petitioner claims violated the trial court's limiting order. Petitioner raises an insufficiency of evidence claim in Claim 14 in which he questions the victim's credibility. (*See* Doc. No. 1 at PageID# 60-63). The Court will address that claim *infra*.

## ii. **Claim 3**

Petitioner alleges that he received ineffective assistance of trial counsel when trial counsel failed to request a *Daubert* hearing pursuant to Tennessee Rule of Evidence 104(a) concerning the qualifications of the State's expert witness, Douglas Lacey. (Doc. No. 1 at PageID# 9-10).

Although Petitioner raised this claim in his post-conviction appellate brief (Doc. No. 13, Attach. 25 at PageID# 2663-67), Petitioner failed to challenge trial counsel's decision not to request an additional *Daubert* hearing in his original or amended petition for post-conviction relief. *Curtis*, 2020 WL 476907, at *12. Additionally, even though Petitioner provided testimony questioning the State's expert's qualifications at Petitioner's post-conviction hearing, counsel did not raise in final summation trial counsel's ineffectiveness in failing to request a separate *Daubert* hearing for Lacey. Petitioner then filed a pro se motion to amend the final summation even though he was represented by counsel. *Id*. at *15. The post-conviction court refused to entertain

Petitioner's pro se motion, noting that a defendant in a criminal case may not proceed pro se simultaneously while represented by counsel. Instead, the post-conviction court directed counsel to amend the final summation if she believed Petitioner's issues had merit, and post-conviction chose not to amend the summation. Ultimately, the post-conviction court did not rule on whether trial counsel was ineffective by failing to seek a separate *Daubert* hearing for the State's expert. *Id*. Invoking *Cauthern*, 145 S.W.3d at 599, the TCCA found that Petitioner, bound by the actions of his counsel, had waived the claim by abandoning it at the trial level. *See Curtis*, 2020 WL 476907, at *12.

As noted *supra* at page 60, the *Cauthern* rule constitutes an adequate and independent state procedural ground on which the TCCA could rest its denial of relief for procedural default purposes. Thus, the Court can review this defaulted claim only if Petitioner "'can [either] demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[] or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Monzo*, 281 F.3d 568, 575 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Petitioner maintains that his appellate counsel was constitutionally ineffective for failing to argue that trial counsel rendered ineffective assistance when failing to request a *Daubert* hearing concerning Lacey's qualifications. As noted above, "[g]enerally, ineffective assistance of counsel, either appellate or trial counsel, as defined by *Strickland*, 466 U.S. at 698, 104 S. Ct. 205216, may satisfy the standard for 'cause' under *Coleman*, 501 U.S. at 750, 111 S. Ct. 2546." *Jamison v. Collins*, 100 F. Supp. 2d 521, 551 (S.D. Ohio 1998). However, Petitioner's attempt to show cause for his procedural default of Claim 3 fails.

"'[A]n ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted.'" *Hodges*, 727 F.3d at 530 (quoting *Edwards*,

529 U.S. at 453). Petitioner did not exhaust a claim that direct appellate counsel was ineffective for failing to attack Lacey's qualifications. *See Curtis*, 2020 WL 476907, at *15-16 (on appeal of the denial of post-conviction relief, Petitioner argued appellate counsel was ineffective by failing to withdraw, failing to inform Petitioner of his right to file a Rule 11 application, and failing to raise the 404(b) evidence issue at the motion for new trial hearing). Thus, Petitioner's ineffectiveness-of-appellate counsel claim is itself defaulted. However, even if the ineffectiveness-of-appeals-counsel claim was not defaulted, Petitioner's underlying claim (that trial counsel was ineffective by failing to request a *Daubert* hearing concerning Lacey's qualifications) lacks merit. Appellate counsel could not have been ineffective by failing to raise trial counsel's ineffectiveness when there was none.

Under *Strickland*, counsel must provide an objectively reasonable performance under the circumstances of the case. 466 U.S. at 688. Tennessee Rule of Evidence 104(a) states that "[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court[.]" Tenn. R. Evid. 104(a). When a party seeks to introduce expert testimony, the trial court must determine whether the witness possesses the "knowledge, skill, experience, training, or education" to qualify as an expert in a field. Tenn. R. Evid. 702. Considering the applicable Tennessee Rule of Evidence, trial counsel provided an objectively reasonable performance with respect to Lacey. The record demonstrates that trial counsel questioned Lacey's qualifications as an expert at the 2014 hearing concerning Owen's qualifications. (*See* Doc. No. 13, Attach. 3 at Page ID# 642-49, 654-57). And while, at Petitioner's trial, trial counsel did not object to Lacey's "testifying as an expert based on his stated qualifications," trial counsel did—in an attempt to undermine the weight, as opposed to the admissibility, of Lacey's testimony—attack whether Lacey was qualified (*see* Doc. No. 13, Attach.

9 at PageID# 1196-97) and cross-examined Lacey in an attempt to show bias, pointing out that Lacey was being paid by the State for his testimony and travel time. (*See* Doc. No. 13, Attach. 9 at PageID# 1219-20). The trial court determined that Lacey was qualified as an expert in the field of audio forensics under Tennessee Rule of Evidence 702. (Doc. No. 13, Attach. 19 at Page ID# 2106). In so deciding, the court found that Lacey had been subject to peer review, that his methodologies had been tested, that the evidence presented had been accepted within the scientific community, and that research had been conducted outside of litigation. (*Id.*)

Petitioner nevertheless contends that trial counsel should have done more to prevent Lacey from testifying based on what, according to Petitioner, is the fraudulent nature of the evidence known as Qc2,[19] on which Lacey relied for his expert testimony. Petitioner alleges that "the only 'fact in issue' at the trial of the Petitioner was the authenticity of the recording used as evidence against appellant at his trial." (Doc. No. 48 at PageID# 4100, 4103). Petitioner further contends that "[t]he entire trial was based on whether or not the recording was authentic and whether or not [it] had been manipulated." (*Id*. at PageID# 4100). But as the Court found in its previous Memorandum Opinion denying Petitioner's request for discovery related to the Qc2 evidence, Petitioner's contentions are mistaken. (*See* Doc. No. 53 at PageID# 4310-12). Prima facie evidence of rape can be proven through a victim's testimony. *See Elkins*, 102 S.W.3d 578, 582; *Smith*, 42 S.W.3d 101, 106; *Johnson*, 1992 WL 80349, at *7. That is also why Petitioner cannot show that he was prejudiced by trial counsel's performance with respect to Lacey's qualifications. The content of the victim's testimony and the credibility of the victim were very much issues of fact in Petitioner's trial, and the jury resolved those factual disputes in favor of the State. The

---

[19] Petitioner alleges that the the Qc2 recording is "a third copy of the recording of the controlled call produced by the State at its facility." (Doc. No. 48 at PageID# 4102). Petitioner does not specify the name of this facility, but trial counsel testified that the State had a second copy of the recording produced for the defense by the Tennessee Bureau of Investigation. (Doc. No. 13, Attach. 20 at PageID# 2271).

victim's testimony stands, regardless of Petitioner's stated concerns regarding the authenticity of the recording that was admitted and played at trial.

Petitioner has not demonstrated sufficient cause and prejudice to excuse the default of Claim 3, and the claim must be dismissed.

### iii. **Claim 5**

Claim 5 alleges a claim of ineffective assistance of trial counsel on two interrelated grounds: 1) for "mishandling" a trial continuance and 2) for failing to request state funds for Owen's testimony. (Doc. No. 1 at Page ID# 19-20). Petitioner maintains that when trial counsel failed to inform Owen that Petitioner's trial date had been changed, Owen lost the money he had used to reserve flights, hotels, and car rentals for the prior trial date and thus requested more money before agreeing to testify at Petitioner's new trial date. Trial counsel made an oral request for funding to secure Owen's attendance at the new trial date, and the trial judge directed counsel to put his requests for the funding in writing. However, ultimately trial counsel did not submit a written request.

In his pro se post-conviction petition, Petitioner argued that trial counsel should have requested a continuance,[20] but Petitioner failed to include the claim in either of his amended post-conviction petitions. He did not specifically incorporate into his amended petition the issues that had been raised in his pro se petition. Nor did Petitioner include this issue in his final summation following the post-conviction hearing. As a result, the post-conviction court did not rule on this

---

[20] While Petitioner did argue that trial counsel should have submitted a written request for funding in his post-conviction appellate brief, (Doc. No. 13, Attach. 25 at PageID# 2671-73), the TCCA did not specifically address the argument in its opinion. *See Curtis*, 2020 WL 476907, at *13-14. "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must [engage in a rebuttable] presum[ption] that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 300-01 (2013). It is unclear whether such a presumption applies in this instance. In any event, because trial counsel's failure to request a continuance and trial counsel's failure to request funding are interrelated claims, the Court will address the merits of both claims collectively herein.

issue in its order denying relief. *Curtis*, 2020 WL 476907, at *14. On appeal of the denial of post-conviction relief, the TCCA invoked *Cauthern*, finding that the court was precluded from reviewing the issue because Petitioner had waived review. *Id.*

As noted *supra* at page 60, the *Cauthern* rule constitutes an adequate and independent state procedural ground on which the TCCA could rest its denial of relief for procedural default purposes. Thus, the Court can review this defaulted claim only if Petitioner "can [either] demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[] or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Monzo*, 281 F.3d 568, 575 (citing *Coleman*, 501 U.S. 722, 750).

Petitioner maintains that appellate counsel was constitutionally ineffective for failing to argue that trial counsel rendered ineffective assistance when failing to request a continuance and obtain state funding. Again, Petitioner's attempt to show cause for his procedural default fails because Petitioner did not exhaust a claim that direct appellate counsel was ineffective in these ways. *See Curtis*, 2020 WL 476907, at *15-16 (on appeal of the denial of post-conviction relief, Petitioner argued appellate counsel was ineffective by failing to withdraw, failing to inform Petitioner of his right to file a Rule 11 application, and failing to raise the 404(b) evidence issue at the motion for new trial hearing). Thus, Petitioner's ineffectiveness-of-appeals-counsel claim is itself defaulted. *See Hodges*, 727 F.3d at 530 (quoting *Edwards*, 529 U.S. at 453) ("[A]n ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"). *See also Williams v. Lazaroff*, 648 F. App'x 548, 552-54 (6th Cir. 2016) (holding that Williams' ineffective assistance of trial counsel claims were procedurally defaulted and he could not establish cause to excuse the default by relying on the

ineffectiveness of appellate counsel, because his ineffective assistance of appellate counsel claim was itself procedurally defaulted).

However, even if the ineffectiveness of appellate counsel claim was not defaulted, Petitioner's underlying claim (that trial counsel was ineffective by failing obtain a continuance and seek additional funding) lacks merit. Appellate counsel could not have been ineffective by failing to raise trial counsel's alleged ineffectiveness in this regard, because (as discussed below) it was not deficient performance for trial counsel not to seek a continuance or funding to secure Owen's presence at trial.

The record shows that trial counsel did not follow up his oral request with a written request for four reasons. First, Owen was demanding more money from the defense, and Petitioner lacked funds to pay. (Doc. No. 13, Attach. 21 at PageID# 2288). Counsel chased down a recommendation by Petitioner to obtain money from a friend who owed Petitioner, but that effort was futile. (*Id.*) Counsel explained that "the reality of it was that nobody, certainly not Judge Martin, and most certainly not the AOC, [wa]s going to give [counsel] $6,000 to get Tom Owen down here to Lewis County, Tennessee." (Doc. No. 13, Attach. 21 at PageID# 2291). According to counsel, he knew the court was "tight" with the State's money and "AOC is 10 times as tight and [counsel had] been turned down on $2,000 being too much before." (*Id.*)

In any event, counsel believed that Owen should not have requested additional funding in the first place. Trial counsel explained, at length, how Owen had insisted after the fact that all money paid to him was nonrefundable as per language on his website (Doc. No. 13, Attach. 21 at PageID# 2322), even though Owen had "made a big point" of telling counsel that he always purchased refundable tickets in case plans change. (*Id.* at PageID# 2321). Counsel felt that "the bottom line was" that he had "thrown away" the initial money paid to Owen and "didn't want to

send Mr. Owen any more money." (*Id*. at PageID# 2322). He considered Owen a "charlatan and a fraud." *Curtis*, 2020 WL 476907, at *11.

Petitioner insists that, in making his decision not to call Owen, trial counsel misapprehended Owen's request for additional funds. Petitioner references Owen's May 11, 2018 affidavit in which he states that he was unable to recoup his original travel expenses and thus needed additional funding as compensation for his time and travel in order to appear at Petitioner's new trial.[21] (Doc. No. 54 at PageID# 4270 citing Doc. No. 50, Attach. 1 at PageID# 4216-17). On cross-examination during Petitioner's post-conviction hearing, trial counsel was presented with Owen's affidavit and testified that "he would not be surprised to learn Mr. Owen signed a sworn affidavit stating that he was not able to recoup his original travel expenses because 'Mr. Owen says whatever he needs to say to make himself look better.'" *Curtis*, 2020 WL 476907, at *8. Trial counsel reiterated that Owen told him that he (Owen) "got most of [the money he spent on travel expenses] back" but refused to testify without additional funds. Thus, the record shows that at the time he decided not to call Owen, trial counsel: (a) was aware of Owen's affidavit testimony that he had not received refunds for the expenses he incurred in connection with Petitioner's initial trial date; and (b) simply did not find Owen's affidavit testimony to be credible.

Third, to request court funding, trial counsel would have needed to obtain another continuance. As trial counsel explained, "[C]onsidering that [Petitioner's] last continuance lasted about a year, I'm pretty sure Mr. Curtis would not and did not authorize me to ask for a continuance so that we could take the necessary time to go to the AOC and get the Court to approve written

---

[21] Petitioner also references a letter from Owen to Petitioner dated August 13, 2018 in which Owen explains why he requested more money. (Doc. No. 50, Attach. 1 at PageID# 4215). However, this letter is not part of the state-court record. Because the letter essentially repeats what Owen said in his sworn affidavit and the Court is considering the affidavit, the Court will not expand the state-court record to include the letter.

motions." (Doc. No. 13, Attach. 21 at PageID# 2390). If counsel's request had been granted, Petitioner's trial would have been delayed even longer while Owen performed additional testing and prepared a new report.

Fourth, trial counsel testified that he believed that any "miniscule benefit" obtained by Owen's testimony would be "greatly outweighed" by his performance on cross-examination. *Curtis*, 2020 WL 476907, at *11. Trial counsel believed Owen's testimony at the pre-trial hearing "went extremely poorly for him," and trial counsel was afraid Owen would "fall apart" on cross-examination if he testified at trial. *Id*. at *8. Further, because Owen's pre-trial testimony contradicted much of his initial report, trial counsel believed that "the only benefit to Mr. Owen as a witness would be to confuse the less intelligent jurors" on the panel. *Id*. Counsel explained that "80 percent of what he [Owen] had told us to begin with turned out not to be the case. He had a horrible [a]ffect in court at least the limited part that we heard." (Doc. No. 13, Attach. 21 at PageID at PageID# 2323). Based on trial counsel's assessment of Owen's helpfulness, or lack thereof, trial counsel decided to change his trial strategy to attacking the credibility of the victim and establishing that Petitioner did not have his cell phone with him on the day of the controlled call. Trial counsel emphasized that, "[i]f Mr. Owen had stuck to his guns and could support it on his first report and not said some of the things he said, testified the way he did at our *Daubert* hearing, then, you know, I probably—I might have even faked getting sick and needing an appendicitis to get Mr. Curtis a new trial."[22] (Doc. No. 13, Attach. 21 at PageID# 2369).

Based on these reasons, trial counsel made a reasonable and informed strategic decision not to call Owen as an expert witness. It is a "longstanding and sound principle that matters of trial

---

[22] The Court surmises (and certainly hopes) that when he made this statement, trial counsel was being facetious and simply meant to emphasize his willingness to put Owen on the stand if, in counsel's estimation, Owen had been more helpful to the defense.

strategy are left to counsel's discretion." *Dixon v. Houk*, 737 F.3d 1003, 1012 (6th Cir. 2013). To fairly assess an attorney's performance, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." *Strickland*, 466 U.S. at 689. "[S]trategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 690.

Even if the Court assumes for the purposes of this analysis that trial counsel's performance was deficient, Petitioner has failed to demonstrate prejudice from trial counsel's failure to secure Owen's testimony at trial. Petitioner insists that Owen had favorable evidence to submit to the jury on Petitioner's behalf. However, Owen testified at the *Daubert* hearing that "80 percent" of the second recording's ""problems . . . were the result of this being a recording as opposed to a one-off from the digital version." *Curtis*, 2020 WL 476907, at *8. The remaining "inconsistencies" on the second recording, which was played at trial, he explained, "did not advance the petitioner's theory." *Id*.

While it is possible that Owen may have provided testimony favorable to the defense had he been called as an expert witness, Petitioner did not present Owen at Petitioner's post-conviction hearing to testify as to what favorable information Owen might have provided had he been afforded such opportunity. Moreover, the victim testified in detail as to the four instances of rape, and no corroborating physical evidence is required to convict Petitioner of those counts. *See infra* at page 77. Thus, Petitioner has not shown prejudice because of trial counsel's failure to seek a continuance and state funding to secure Owen's testimony at Petitioner's trial.

Petitioner has not demonstrated sufficient cause and prejudice to excuse the default of Claim 5. The claim must be dismissed.

#### iv. **Claim 6**

In Claim 6, Petitioner alleges that trial counsel was ineffective for "failing to send the critical recorder device to the forensic expert for testing as ordered by the trial judge." (Doc. No. 1 at PageID# 22-25).

Petitioner raised this claim on post-conviction appeal, (Doc. No. 1 at PageID# 22-24), but the TCCA invoked an adequate and independent state procedural ground to bar review of the claim, citing *Cauthern*. *Curtis*, 2020 WL 476907, at *4.

Even assuming, however, that Petitioner could show cause and prejudice for the default, the underlying ineffective assistance of trial counsel claim is without merit. This is true because Petitioner cannot show that, even if trial counsel's performance was deficient, the outcome of Petitioner's trial would have been different had trial counsel obtained the original recorder device for Owen to test.

The record shows that the recorder device was available for Owen to examine and test prior to trial. Specifically, during the *Daubert* hearing on August 6, 2014, the trial judge confirmed with the State that the recorder device "is actually in evidence" and " in control of the clerk," and "[t]he State is strictly stating it has no objection to it being sent to Mr. Owen and tested." (Doc. No. 13, Attach. 7 at PageID# 929). Trial counsel testified, however, that "at no point did [Owen] tell [trial counsel], [Owen] can't do this analysis unless you give [him] the original." (Doc. No. 13, Attach. 20 at Page ID# 2271). Petitioner correctly points out that the trial judge "strongly urged" trial counsel to send the original recorder device to Owen, (Doc. No. 13, Attach. 2 at PageID# 447), so that an "apples to apples comparison of the two experts" could occur, after the judge determined that the State's witness had been able to test using the original recorder device and Owen had not been afforded the chance to do so. (Doc. No. 13, Attach. 21 at PageID# 2371). Trial counsel and

the State then discussed how to send the original recorder device to Owen. (Doc. No. 13, Attach. 21 at Page ID# 2371). Ultimately, however, trial counsel elected not to make those arrangements. Petitioner alleges that trial counsel's decision constituted constitutionally inadequate performance because he (trial counsel) did not comply with the judge's suggestion.

Trial counsel testified that, initially, he believed it was important for both experts to have access to the same original recorder device. (*Id*. at PageID# 2372). However, after the *Daubert* hearing, "it became clear" to trial counsel "that the overwhelming majority of the problems with the recording were the result of it being a copy, that it was pointless to—it really didn't matter whether [Owen] got the original device or not." (Doc. No. 13, Attach. 21 at PageID# 2372). Further, trial counsel noted that Owen's expert opinion lacked credibility because, among other reasons, he had "made a huge deal" out of his 12-step methodology, of which step 8 was testing the recorder device, yet Owen had not tested the recorder device "before giving his opinion that he was going to go to trial with." (*Id*. at PageID# 2373). In fact, trial counsel believed that Owen's testimony at the *Daubert* hearing "went extremely poorly for him," leading trial counsel to fear that Owen would "fall apart" on cross examination if he testified at trial and testify that he, like the State's expert, believed it was Petitioner's voice on the controlled call. (Doc. No. 13, Attach. 21 at PageID# 2290, 2323); *Curtis*, 2020 WL 476907, at *8.

Moreover, Owen demanded more money to conduct additional testing on the original recorder device and to appear in court after the third continuance, leading trial counsel to believe that Owen was a fraud. (Doc. No. 13, Attach. 21 at PageID# 2399- 2400). Plus, Petitioner was indigent, and trial counsel did not believe the "AOC" would give him the amount requested by Owen. (Doc. No. 13, Attach. 21 at PageID# 2291-92). Additionally, requesting court funding would have required trial counsel to obtain another continuance as he waited on the court's

response and, if the court approved his request, Petitioner's trial would have been delayed even longer. As explained by trial counsel, Petitioner "was locked up all this time because he couldn't make bond", and trial counsel did not believe that Petitioner would agree to another lengthy continuance. (*Id*.)

Owen testified at the *Daubert* hearing that it was his understanding that the State's expert did not analyze the original recorder device but rather examined one he had purchased that was identical to the original recorder device. (Doc. No. 13, Attach. 5 at PageID# 793). And Owen agreed that "[i]n order to look at the original recorder you obviously don't want to tamper, add anything take away anything because it's the original . . . [s]o you routinely . . . as a matter of good practice . . . would . . . make a clone copy of that recorder." (*Id*. at PageID# 803). In response to the judge's questions, Owen clarified that, whereas Lacey bought (for testing purposes) the same kind of recorder device as the original recorder device (made by the same company),[23] Owen did not perform such testing because he believed that all recorder devices are different. (Doc. No. 30, Attach. 1 at PageID# 3258).

Consistent with that testimony, Owen explicitly testified at Petitioner's post-conviction hearing that he (Owen) did not need the original recorder device to offer his expert opinion on the

---

[23] Subsequent exchanges between the attorneys and the judge clarified that Lacey purchased a recorder device that was the same kind as the original recorder device, but "[t]he device hooked up to the recorder to do the piece that goes in the ear that does the microphone part" was "an upgraded newer one" because the original type was no longer available for purchase. (Doc. No. 30, Attach. 1 at PageID# 3263). There is conflicting, confusing evidence in the record regarding whether Lacey ever tested the original recorder device or recording. (*See* Doc. No. 30, Attach. 1 at PageID# 3263-74). Likewise, there is discussion by counsel and the judge reflecting that Owen had been provided with "the original" [unclear whether recording or recorder device], which thereafter was lost in the mail when Owen returned it to defense counsel using the United States Postal Service instead of the recommended mailing method. (*Id*.) The Court discerns that most of this confusion is the result of the attorneys, witnesses, and judge not making clear at times whether they are referring to the original recorder device or the original recording. Herein, to refer to these two respective things, the Court uses the terms "recorder device " and "recording" to distinguish between the two and thereby limit such confusion. However, any confusion in the underlying state records does not prevent the Court from being able to decide all claims raised herein by Petitioner, particularly given Owen's explicit statement that his analysis was not incomplete without having tested the original recorder device.

recording's authenticity, contradicting Petitioner's assertion that testing the original recorder device is critical:[24]

> Q. But my question is, is your analysis incomplete since you did not look at the original recorder?
>
> A. **No**. There are examinations done every day where you don't have the original recorder. In fact, most of the time you don't have the original recorder, especially when the event happens and three years later it goes to trial, nobody knows where the original recorder went, regardless of what kind of recorder it is. But there are many, many instances where you don't have the original recorder. It's nice to have to original recorder, but sometimes you just don't have it.

(Doc. No. 13, Attach. 17 at PageID# 1885) (emphasis added). The trial judge, who was very familiar with the competing experts' claims, noted on the record that Owen's failure to test the original recorder "doesn't invalidate [Owen's] report." (Doc. No. 13, Attach. 17 at PageID# 1907).

In short, when experienced trial counsel weighed Owen's potential usefulness to the defense, he determined that Owen would not be sufficiently helpful considering the many problems with Owen, especially given Owen's testimony that he did not need the original recorder device and his mistaken belief that the State's expert had not examined the original recorder device. Based on the facts and circumstances known to trial counsel at that time, his decision was reasonable. Therefore, Petitioner has not established that trial counsel provided constitutionally ineffective assistance by deciding not to send Owen the original recorder device for analysis. *See Strickland*, 466 U.S. at 690.

Even if trial counsel had performed deficiently when he decided not to send Owen the original recorder for analysis, Petitioner cannot show that he was prejudiced by counsel's decision.

---

[24] Curiously, although Owen testified that it would be "beneficial" to examine the original recorder device and that he would have run a test on the original recorder device if it had been provided to him (Doc. No. 13, Attach. 17 at PageID# 1872), he also testified without reservation that his analysis was complete even without having examined the original recorder device. Owen's apparent position was that he could do a complete analysis without doing everything "beneficial" for such analysis. The key is that Owen said his analysis was complete, and that is what matters, not that he happened to also say that doing something additional would be "beneficial."

That is to say, Petitioner cannot show that there is a reasonable probability that the outcome of his trial would have been different. Petitioner maintains that the State needed the recorder, "the only physical evidence," to prove his guilt. (Doc. No. 1 at Page ID# 43). He argues:

> This is the tragedy in this instant case[] because the petitioner is being denied the court-ordered access to the only physical evidence that ties him to the crimes he is convicted of committing, and the courts themselves have estopped him from providing the critical proof that he did not incriminate himself in the alleged perp call used to convict him at trial. This is a "Manifest Injustice in the 1st Degree" and should be cured by this court ordering the Respondent to turn over the recorder device for the court ordered testing.

(Doc. No. 48 at PageID# 4115). But the prosecution is not required to corroborate a rape victim's testimony with physical (or audio) evidence to satisfy its burden of proof. *See State v. Elkins*, 102 S.W.3d 578, 582 (Tenn. 2003) (affirming defendant's conviction for child rape where "jury had to decide who to believe, [the victim] or his mother" and "[c]learly, the jury chose to believe [the victim]" despite inconsistencies in his testimony); *State v. Smith*, 42 S.W.3d 101, 106 (Tenn. 2000) (finding that "there is no requirement that the [rape] victim's testimony be corroborated"); *State v. Johnson*, No. 03C01-9105CR00157, 1992 WL 80349, at *7 (Tenn. Crim. App. Apr. 22, 1992) ("prima facie evidence of the rape" can be "proven through the victim's testimony"). Thus, the victim's trial testimony that Petitioner raped her on the four occasions described in the indictment and bill of particulars provided a sufficient basis—without the controlled-call recording—for the appellate court's affirmation of Petitioner's conviction of four counts of rape of a child. *See Curtis*, 2016 WL 7654946, at *1-4. Given this testimony, Petitioner cannot show that the outcome of his trial would have been different had trial counsel sent the recorder to Owen and then presented Owen during a defense case-in-chief.

In summary, even assuming both that Petitioner could establish cause and prejudice for the defaulted Claim 6 and that that trial counsel performed deficiently by failing to enable Owen to

test the original recorder device, Petitioner cannot establish that the outcome of his trial would have been different. Claim 6 will be dismissed.

## v. **Claim 8**

Petitioner's final claim of ineffective assistance is that appellate counsel should have raised certain "non-frivolous issues" on direct appeal. (Doc. No. 1 at Page ID# 29-30). Petitioner contends that he [Petitioner] orally raised four issues[25] while testifying during his motion-for-new-trial hearing and advised appellate counsel to include those issues in the direct appeal, but appellate counsel did not follow Petitioner's instructions.

Petitioner attempted to raise an ineffective assistance of appellate counsel claim during his post-conviction proceedings. Because Petitioner was represented by counsel at this time, the post-conviction court directed counsel to amend the final summation if she believed Petitioner's concerns about appellate counsel had merit. Post-conviction chose not to amend the summation. Petitioner raised an ineffective assistance of appellate counsel claim in his pro se brief filed in support of his post-conviction appeal. (Doc. No. 13, Attach. 25 at Page ID# 2678-79). The TCCA, however, found that Petitioner was bound by the actions of his counsel and that Petitioner had waived the issue by abandoning it (by failing to include the claim in the final summation during the post-conviction hearing), relying on *House*, 911 S.W.2d at 714. *Curtis*, 2020 WL 476907, at *15.

The TCCA's reliance on, and application of, the *House* rule (*i.e.*, that petitioner is bound by the actions of his counsel) constitutes an adequate and independent state procedural ground on

---

[25] Petitioner alleges that, while testifying at his motion-for-new-trial hearing, he raised trial counsel's failure to object to 404(b) victim testimony and to the State's expert witness's qualifications as well as trial counsel's failure to investigate facts supporting a due process claim and failure to assert Petitioner's actual innocence. (Doc. No. 1 at PageID# 29).

which the TCCA could (and did) rest its denial of relief for procedural default purposes.[26] *See Monzo*, 281 F.3d 568, 576. Thus, the Court can review this defaulted claim only if Petitioner "can [either] demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[] or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Monzo*, 281 F.3d 568, 575 (citing *Coleman*, 501 U.S. 722, 750).

Petitioner maintains that his post-conviction counsel was constitutionally ineffective for failing to argue that direct appellate counsel rendered ineffective assistance when failing to raise certain issues on appeal. Again, Petitioner's attempt to show cause for his procedural default fails, but for a different reason.

"*Martinez* and *Trevino*'s equitable exception allowing the ineffective assistance of post-conviction counsel to constitute cause for procedural default applies only to claims of ineffective assistance of trial counsel; it does not apply to any other claims, including ineffective assistance of appellate counsel." *Hale v. Shoop*, No. 1:18-cv-504, 2021 WL 1215793, at *98 (N.D. Ohio Mar. 31, 2021) (citing *Martinez*, 566 U.S. at 9; *Trevino*, 569 U.S. at 422). In *Davila v. Davis*, __ U.S. __, 137 S. Ct. 2058, 198 L. Ed. 2d 603 (2017), the Supreme Court found that the *Martinez/Trevino* exception applies to "a single claim—ineffective assistance of trial counsel—in a single context" and expressly declined to extend it "to allow federal courts to consider a different kind of defaulted claim—ineffective assistance of appellate counsel." *Id.* at 2062-63. "[T]he law of [the Sixth

---

[26] The *House* rule is "adequate" because it was and is "firmly established and regularly followed" in Tennessee jurisprudence before, during, and after "the time of the petitioner's actions giving rise to the default." *Fautenberry*, 515 F.3d at 640-41; *see Aguilar v. State*, No. M2017-01763-CCA-R3-PC, 2018 WL 6181731, at *2-3 (Tenn. Crim. App. Nov. 27, 2018), *perm. appeal denied*, (Tenn. Mar. 28, 2019); *Olvera v. State*, No. M2009- 00039-CCA-R3-PC, 2010 WL 5343308, at *8 (Tenn. Crim. App. Dec. 22, 2010), *no perm. appeal filed*; *Daniel v. State*, No. E2002-02838-CCA-R3-PC, 2003 WL 22187067, at *13 (Tenn. Crim. App. Sept. 23, 2003), *perm. appeal denied*, (Tenn. Dec. 22, 2003); *Bates v. State*, No. E2000- 02354-CCA-R3-PC, 2001 WL 363067, at *3 (Tenn. Crim. App. Apr. 12, 2001), *no perm. appeal filed*; *Dean v. State*, No. E1998-00135-CCA-R3-PC, 2000 WL 337552, at *8 (Tenn. Crim. App. Mar. 21, 2000), *perm. appeal denied*, (Tenn. Nov. 13, 2000); *Brimmer v. State*, 1998 WL 612888, at *33-36 (Tenn. Crim. App. Sept. 15, 1998).

Circuit] is that *Martinez/Trevino*'s limited exception does not extend to claims of ineffective assistance of appellate counsel." *Porter v. Genovese*, 676 F. App'x 428, 434 (6th Cir. 2017) (citing *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013)). Thus, Petitioner cannot assert post-conviction counsel's ineffectiveness to excuse the default of Claim 8, which is a claim of *appellate* counsel's ineffectiveness.

In any event, Petitioner's underlying claim (that direct appellate counsel was ineffective by failing raise certain issues) lacks merit. Petitioner argues that direct appellate counsel "admitted in open court . . . that he did not present the defendant [with] a copy of the brief filed on his behalf prior to the New Trial hearing." (Doc. No. 1 at PageID# 29). As a result, Petitioner alleges, the TCCA "refused to analyze" the "404(b) issue." (*Id.*) The Court previously has addressed Petitioner's ineffectiveness argument with respect to the 404(b) issue and will not repeat its analysis of that argument here. *See supra* at pp. 56-63. With respect to the other three issues that Petitioner alleges appellate counsel should have raised, Petitioner asserts that, had appellate counsel made Petitioner aware of the claims trial counsel intended to pursue in his motion-for-new-trial brief, Petitioner would have been aware that "[appellate] counsel had left all of the State and Federal Constitutional claims out of his New Trial brief that he [Petitioner] had provided to his counsel as issues he wished to have reviewed, and[] [P]etitioner did not want and would not have agreed to allow references to a second victim." (*Id.* at PageID# 30). Petitioner, however, is mistaken. Appellate counsel, in fact, raised several constitutional issues in Petitioner's brief in support of a new trial.[27] Petitioner also alleges that counsel failed to raise these issues on direct

---

[27] In a Motion for New Trial and/or A Judgment of Acquittal filed on March 31, 2015, counsel Larry Joe Hinson, Jr. argued that there was insufficient evidence for the jury to find beyond a reasonable doubt that the victim was under the age of thirteen at the time of the alleged crimes. (*See* Doc. No. 13, Attach. 2 at PageID# 532-33). In a subsequent Motion for New Trial and/or A Judgment of Acquittal filed on May 4, 2015, counsel Larry Joe Hinson, Jr. argued the evidence was insufficient, the victim's husband-wife testimony was prejudicial, the jury saw the defendant in handcuffs and chains, not all of the evidence admitted at trial was given to the jury for deliberation, and the defendant could not present a full defense due to counts I-IV being tried in lieu of counts V and VI. (*See id.* at PageID# 557-58).

appeal as requested by Petitioner. (Doc. No. 1 at PageID# 31). While appellate counsel did not raise each of the four issues identified by Petitioner, appellate counsel raised the insufficiency of the evidence claim and the 404(b) testimony claim. *See Curtis*, 2016 WL 7654946, at *5.

In any event, Petitioner has failed to show how he was prejudiced by appellate counsel's failure to raise the other claims on appeal. Although Petitioner spends a great deal of time explaining how he gave oral testimony and submitted pro se motions and petitions arguing his points, Petitioner does not demonstrate that, but for appellate counsel's failure to raise these claims on appeal, there was a possibility of another outcome. (*See* Doc. No. 1 at PageID# 29-30).

Petitioner has not demonstrated sufficient cause and prejudice to excuse the default of Claim 8. The claim, therefore, will be dismissed.

   b. *Claim 10*

Petitioner next alleges that the State violated his right to a fair trial under both the "State and Federal Constitution" when it "spoliated/erased the original recording from the recording device prior to having the contents of the contested recorded conversation authenticated[.]" (Doc. No. 1 at Page ID# 41-46). And "[t]his recording," says Petitioner, "was the only physical evidence that tied the petitioner to the charged crimes, with the only other evidence being the uncorroborated testimony of the alleged victim." (Doc. No. 1 at PageID# 19).

Petitioner first claims that the destruction of the original recording evidence violated his rights under the Tennessee Constitution and the ruling of the Tennessee Supreme Court in *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). These claims are "not cognizable in a federal habeas corpus proceeding." *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986). *See also Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under

federal habeas corpus."). Thus, the part of Claim 10 based on the Tennessee constitution and *Ferguson* fails because it alleges a perceived error based on state law.

In support of his federal claim, Petitioner relies on the Fourteenth Amendment's due process clause. (Doc. No. 1 at Page ID# 41). Petitioner raised this claim on post-conviction appeal (Doc. No. 13, Attach. 25 at PageID# 2685-92), but the TCCA did not review the claim because Petitioner waived the claim by not raising it on direct appeal. *See Curtis,* 2020 WL 476907, at *16. Pursuant to Tennessee Code Annotated § 40-30-106(g), "a ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]" The TCCA noted that this statute bound Petitioner to "the action or inaction of his attorney" and that, since Petitioner "could have presented these issues for review on direct appeal but chose not to," the claims were waived. *Curtis*, 2020 WL 476907, at *16. This statutory rule constitutes an adequate and independent state procedural ground for denying relief based upon procedural default. *See Coe v. Bell*, 161 F.3d 320, 329-330 (6th Cir. 1998) (holding that court was unable to reach merits of Coe's malice-jury-instructions claim because claim was procedurally barred due to Coe having waived claim by failing to raise it at trial, on direct appeal, or in his first state post-conviction motion); *Hollis v. Perry*, No. 3:17-cv-626, 2018 WL 6181354, at *30 (M.D. Tenn. Nov. 27, 2019) (citing *Coe* and discussing the waiver rule).

In addition, Petitioner failed to include this claim in his final summation during his post-conviction hearing. *Curtis*, 2020 WL 476907, at *16. Since "the issues were not before the post-conviction court and no ruling was rendered," the TCCA found that it was precluded from reviewing the claim. *Id*. (citing *Cauthern*). This rule also constitutes an adequate and independent state procedural ground for denying relief as explained *supra*. *Monzo*, 281 F.3d at 576. Thus, the

Court can review this defaulted claim only if Petitioner "can [either] demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[] or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Monzo*, 281 F.3d 568, 575 (citing *Coleman v*, 501 U.S. 722, 750). Petitioner cannot make this showing.

According to trial counsel's accredited testimony, the defense received the first version of the recording from the State during discovery. *Curtis*, 2020 WL 476907, at *7. Trial counsel explained that "there's not any way [he] expected to get anything other than a copy of the original recording" because that was the standard procedure for how he had received similar evidence from the State in the past. (Doc. No. 13, Attach. 20 at PageID# 2270). Owen examined the copy of the recording provided by the State. *Id*. His initial report "indicated the recording was in an unusual format," so trial counsel requested the State provide "a copy as close to the original as possible." (*Id*. at PageID# 2271). According to trial counsel, "the State appreciated that it was important enough to Mr. Owen's analysis to get—give him a strike off of the original recording which, apparently, was digitally stored." *Id*. The State obliged, and the TBI "burned [the defense] one off of the actual digital recording which was on a server and [the defense] got that up to Mr. Owen." (Doc. No. 13, Attach. 20 at Page ID# 2271-72). Trial counsel acknowledged that this second recording, the "strike off," was "as close to the original of the phone call recording that [the defense] could get" because the original "had been overwritten and deleted off, and that original recorder was not available." (*Id*. at Page ID# 2272). Owen and the State's expert, Lacey, then analyzed this second recording, which was later played at trial. *Curtis*, 2020 WL 476907, at *7. Trial counsel stated that "at no point did [Owen] tell [trial counsel], [Owen] can't do this analysis unless you give [him] the original." (Doc. No. 13, Attach. 20 at Page ID# 2271).

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Impeachment evidence as well as exculpatory evidence "falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting Bagley, 473 U.S. at 682). Thus, to prevail on a *Brady* claim, the petitioner must prove that the evidence at issue was favorable to the defense, that the State willfully or inadvertently suppressed the evidence, and that, as a result, the petitioner was prejudiced. *Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). A petitioner can prove prejudice stemming from the evidentiary suppression by showing that the suppressed evidence was "material," meaning there was a "reasonable probability of a different result" had the evidence been provided to the defense. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotations omitted).

Petitioner's defaulted *Brady* claim lacks merit. Petitioner has not demonstrated that the original recording is favorable to him. Owen never requested the original recording. (Doc. No. 13, Attach. 20 at Page ID# 2271). In fact, Owen asked for a *better copy*, not the original recording. (*Id*.) In addition, after Owen analyzed the "strike off of the original"—which was the closest thing to the original recording available—Owen opined that the splicing Petitioner theorized likely did not occur, which also casts doubt on Petitioner's contention that the original recording was favorable to his defense for purposes of *Brady*. And although Petitioner insists that the State needed

the recording, "the only physical evidence" to prove his guilt (*see* Doc. No. 1 at PageID# 43), the Court already has explained that Petitioner is mistaken. While the recording certainly was incriminating, the evidence before the jury even in the absence of the recording was sufficient to convict Petitioner, as discussed *infra* in Claim 14.

In short, the "original recording" was immaterial, that is, there was no "reasonable probability, that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Claim 10, therefore, will be dismissed.

c. *Claim 12*

In Claim 12 of his petition, Petitioner alleges that the trial court violated his right to due process because evidence concerning the rape of his younger daughter was admitted during Petitioner's trial (which involved charges concerning only the rape of his older daughter). (Doc. No. 1 at PageID# 52-54). Petitioner also alleges that, in permitting this evidence, the trial court violated "both State and Federal Rule 14(b) Severing of Offenses." (*Id.*)

Petitioner raised this claim to the TCCA on post-conviction appeal, and the TCCA invoked the waiver rule articulated in *Cauthern* to deny relief because the issue was not included in Petitioner's final summation and the post-conviction court did not render a ruling on the issue in its order denying relief. (Doc. No. 13, Attach. 25 at Page ID# 2694-2700); *Curtis*, 2020 WL 476907, at *16.

The *Cauthern* rule constitutes an adequate and independent state procedural ground on which the TCCA could rest its denial of relief. Therefore, the Court can address this claim only if Petitioner pleads sufficient cause and prejudice to excuse the default or shows that the Court's failure to address this claim would result in a fundamental miscarriage of justice. This Petitioner cannot do, because the claim lacks merit.

First, Petitioner's claim concerning the alleged misapplication of Tennessee Rule of Criminal Procedure 14 is not cognizable in habeas corpus. "[F]ederal habeas corpus relief does not lie for errors of state law" because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (quotation omitted); *Clifton v. Carpenter*, 775 F.3d 760, 764 (6th Cir. 2014); *see also Watts v. Leibach,* No. 3:17-cv-795, 2019 WL 4343549, at *12-13 (M.D. Tenn. Sept. 12, 2019) (finding that an alleged error concerning severance of offenses brought pursuant to Tennessee Rule of Criminal Procedure 14 is not cognizable for review under Section 2254).

Second, Petitioner's claim concerning Federal Rule of Criminal Procedure 14's applicability to his state-court criminal trial also is not cognizable. The Federal Rules of Criminal Procedure do not apply to state proceedings and are not constitutional mandates that state courts must follow. *See Murphy v. Sloan*, No. 1:14-cv-2445, 2015 WL 7450993, at *12 (N.D. Ohio Oct. 27, 2015), *report & recommendation adopted* 2015 WL 7455564, at *1 (N.D. Ohio Nov. 23, 2015); *Felder v. Ohio Adult Parole Auth.*, No. 1:07-cv-1535, 2009 WL 3763067, at *14 (N.D. Ohio Nov. 9, 2009) (citing *Alvarez v. Straub*, 21 F. App'x 281, 283 (6th Cir. 2001)); *see also Ahlswede v. Wolff*, 720 F.2d 1108, 1110 (9th Cir. 1983) (finding that an alleged violation of a Federal Rule of Criminal Procedure is not cognizable in a petition for a writ of habeas corpus).

Third, the record before the Court shows that the witnesses' testimonial statements about which Petitioner complains were sterilized pursuant to the trial court's order on the State's motion in limine concerning Petitioner's conduct with his younger daughter. (*See* Doc. No. 13, Attach. 8 at Page ID# 1028, 1043, 1047; Doc. No. 13, Attach. 9 at Page ID# 1117, 1120, 1125). While testifying at trial, the victim acknowledged that she had "become concerned . . . for another individual" before describing the steps she took that eventually led to Petitioner's prosecution.

(*See* Doc. No. 13, Attach. 8 at PageID# 1028-1030). She did not name her younger sister or describe what she saw that caused her to become concerned. (*Id*.) During cross examination, the victim conformed her testimony to the trial court's instructions when she noted that she waited to pursue charges against Petitioner "[b]ecause [she] can forgive and forget, but when [she] saw someone else in trouble with that, that's why [she] went to [police]." (*Id*. at PageID# 1043). Again, the victim did not identify her younger sister or provide any details regarding the age or gender of the person about whom she thought was "in trouble." (*Id.*)

Witness Debbie Landers complied with the court's order by acknowledging that the victim asked her for advice because she was "concern[ed] about another person." (Doc. No. 13, Attach. 9 at PageID# 1117). Landers did not reveal any additional details about the person or what the victim said she saw besides stating that, "because the situation involved a minor", Landers believed they were required to report within two days. (*Id*.) Likewise, both M'Le Hudgins (an employee of the Davis House Child Advocacy Center) and Investigator Hilburn did not reveal the younger daughter's identity when testifying. (*Id*. at PageID#1120, 1125).[28] Although Petitioner contends that the trial court's admission of this evidence so permeated the trial that Petitioner could not receive a fair trial, the record shows that the victim and witnesses' testimonies were sufficiently neutralized to protect Petitioner's rights while allowing the victim to provide important context on the very material issue of why, after such a long hiatus, she finally reported the rapes. And to the extent Petitioner contends that evidence about an alleged second victim constituted improper

---

[28] Hudgins testified that the victim "was nervous and tearful and just upset and she wanted to know who she could talk to if she was worried about somebody." (Doc. No. 13, Attach. 9 at PageID# 1120). Hilburn testified that the victim told him "[s]he was concerned about another individual" and, "[b]ased on the conversation and things she was saying I began to believe she had been the victim of abuse herself." (*Id*. at PageID# 1125).

propensity evidence (*see* Doc. No. 1 at PageID# 54), there was a very proper non-propensity purpose for this testimony, namely, explaining why the victim came forward when she did.

As for the recording that was played for the jury and referenced Petitioner's younger daughter, Petitioner "agreed trial counsel advised the trial court that the recording did not need to be redacted because it was not 'fair to the State' to ask them to redact portions of the conversation and later argue the recording was manipulated." *Curtis*, 2020 WL 476907, at *7. Thus, Petitioner's argument he "contested the playing of the unredacted recording" is contradicted by his own testimony. (Doc. No. 1 at Page ID# 53).

This claim is without merit and will be dismissed.

> d. *Claim 14*

In his final claim, Petitioner alleges that the State failed to introduce sufficient evidence to convict him of the child rapes. (Doc. No. 1 at PageID# 60-63).

Although Petitioner properly exhausted an insufficiency-of-the-evidence claim regarding the State's use of leading questions[29] (*see* Doc. No. 13, Attach. 14 at PageID# 1719-21), Petitioner did not raise an insufficiency-of-the-evidence claim based on the credibility of the victim and other State witnesses' testimony. It is too late now for Petitioner to return to state court and assert the claim. Therefore, the claim is technically exhausted but procedurally defaulted. Regardless of the default, this claim lacks merit.

Petitioner was convicted of four counts of rape of a child. Tennessee defines "rape of a child" as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn.

---

[29] On direct appeal, Petitioner argued that the trial judge should not have allowed the prosecutor's use of leading questions when questioning Petitioner's older daughter and, without the testimony garnered from those leading questions, the evidence used to convict Petitioner was insufficient. (*See* Doc. No. 13, Attach. 14 at PageID# 1719).

Code Ann. § 39-13-522(a) (2010). "Fellatio" and "any other intrusion, however slight, of any part of a person's body" constitutes "sexual penetration." *Id*. § 39-13-501(7). Here, the victim's testimony satisfies the elements of "rape of a child."

At trial, the victim described Petitioner "penetrat[ing] her vagina with his fingers" on Valentine's Day in 1998 (Doc. No. 13, Attach. 8 at PageID# 1031, 1036-37); described a similar incident of digital-vaginal penetration after being named a cheerleader later that year (*id*. at PageID# 1037-39); described performing fellatio on Petitioner on his birthday in 1998 (*id*. at PageID# 1040-41); and described performing fellatio on Petitioner in a church bus between February 7, 1997 and December 26, 1998 (*id*. at PageID# 1042). The victim testified that these incidents occurred when she was twelve years old. (*Id*. at PageID# 1031). She testified that, after the fourth incident, she told Petitioner that she wanted him to stop because what he described as "messing around" made her "feel disgusting." (*Id*. at PageID# 1043). She additionally testified that her father (Petitioner) told her that "he wanted to be the one to show [her] the right way to do these things, he wanted to be the one to show [her] how to treat a man." (*Id*. at PageID# 1041). She explained to the jury that she did not want to (although she ultimately agreed to) make the "perp call" suggested by Investigator Hilburn because she "didn't want to betray" her dad. (*Id*. at PageID# 1047).

Petitioner insists that there is no physical evidence corroborating the victim's testimony. (Doc. No. 1 at PageID# 62). But the State does not need to corroborate the victim's testimony to establish Petitioner's guilt. *See State v. Smith*, 42 S.W.3d 101, 106 (Tenn. 2000) (finding that "there is no requirement that the [rape] victim's testimony be corroborated").

In arguing that the evidence is insufficient, Petitioner questions the victim's credibility. (*See* Doc. No. 1 at PageID# 60-63). However, the jury clearly believed the victim, even after

hearing her admit to two distinct instances of dishonest conduct (Doc. No. 13, Attach. 8 at PageID# 1023-25, Attach. 10 at PageID# 1287) and to possibly being confused about the precise locations where the rapes occurred (*id*. at PageID# 1075-78). Crucially, "[t]he credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact." *State v. Cribs*, 967 S.W.2d 773, 793 (Tenn. 1998). Importantly, "[a]n attack on witness credibility does not challenge the sufficiency of the evidence, only its quality." *Humphrey v. Mills*, 54 F. App'x 433, 434 (6th Cir. 2002).

The witness's accredited testimony constituted sufficient evidence of Petitioner's numerous rapes he committed against his then-prepubescent daughter. Petitioner has presented nothing to show that, if this claim were not defaulted, the evidence presented to the jury was insufficient to sustain his convictions. This claim, though defaulted anyway, is nonetheless without merit. Claim 14 will be dismissed.

Finally, to the extent that Petitioner invokes the fundamental-miscarriage-of-justice exception to excuse his default of Claim 14 and other claims, he is unable to make the required showing. A habeas petitioner can overcome a procedural default by demonstrating that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The "fundamental miscarriage of justice" gateway is open to a petitioner who submits new evidence showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, (1995) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); *McQuiggin v. Perkins*, 569 U.S. 383, 392–96 (2013); *Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Williams*, 380 F.3d at 973. Notably, a claim of

innocence in this context is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993) ).

Petitioner points to Owen's analysis of the recording of the controlled call as proof of his actual innocence. However, Owen's analysis and testimony concerning the recording were not "exculpatory," as was shown through the testimonies of trial counsel during post-conviction review and Owen himself at the *Daubert* hearing. Indeed, Owen thought that a spliced recording— had one in fact been created as Petitioner speculated—"would probably be able to be identified because it's very hard to do something like that and make it sound natural." (Doc. No. 13, Attach. 17 at Page ID# 1873). Counsel opted not to advance Petitioner's splicing theory because there was no evidence to support it, including from Owen. And, as counsel stated, "frankly, it wasn't believable or plausible." (Doc. No. 13, Attach. 21 at PageID# 2334-35).

Petitioner also insists that the Court should consider correspondence between Petitioner and Ed Primeau, a purported forensics expert in audio engineering. Petitioner believes this correspondence shows that Primeau is willing to test the original recorder and/or recording and would offer an expert opinion exonerating Petitioner of his crimes. However, this correspondence is not part of the existing state-court record, and Petitioner did not present this correspondence or Primeau himself at Petitioner's post-conviction hearing.

Furthermore, it is doubtful that a reasonable juror would have concluded that any testimony by Owen or Primeau about the original recorder or recording trumped the victim's testimony about what Petitioner did to her and when. In addition, the recording of the controlled conversation ("perp call") corroborated Petitioner's testimony. The recording was admitted into evidence under Tennessee law, and Petitioner has not shown that the recording was improperly admitted. Even

assuming that Petitioner was unconstitutionally prevented from making valid arguments that could have cast doubt on the accuracy of the admitted recording, those claims would go to the weight of the admitted recording and would not change the fact that there was validly admitted corroborating evidence.

E.  SUMMARY

In summary, Petitioner is not entitled to relief under Section 2254 because each of his claims either is not cognizable under the Habeas Rules, is without merit, or is procedurally defaulted without sufficient cause. Moreover, Petitioner has not shown that failure to consider his defaulted claims will result in a fundamental miscarriage of justice. The petition therefore will be denied in its entirety.

## VI. CONCLUSION

For the reasons set forth herein, the Court will deny Petitioner's Motion for Partial Summary Judgment and Motion to Appoint Counsel (Doc. No. 49); Motion to Request Permission to Exceed Page Limit (Doc. No. 51); Motion to Request District Court to Rehear Second Motion to Request Leave for Discovery, which the Court construes as a motion for reconsideration under Rule 54(b) (Doc. No. 55); and Motion to Request Permission to Amend Habeas Corpus Petition with Recent Decision from the Sixth Circuit. (Doc. No. 56).

Petitioner's Motion to Request the Habeas Court to Take Judicial Notice under Fed. R. Evid. 201, which the Court construes as a motion to take judicial notice and to expand the record (Doc. No. 52), will be denied in part and granted in part. Specifically, the motion will be granted insofar as the Court expands the state-court record to consider the Affidavit of Thomas J. Owen dated May 11, 2018. The motion will be denied in all other aspects.

Further, the petition seeking relief under 28 U.S.C. § 2254 will be denied, and this action will be dismissed with prejudice. In so ruling, the Court notes that it does not write on a clear slate

in adjudicating the petition. The Court does not resolve the petition by deciding, for example, whether Petitioner was in fact guilty (and if so, of what), whether Petitioner should have been convicted by the jury (and if so, of what), or even whether it personally believes in the first instance that Petitioner's claims are meritorious. Instead, in the manner discussed herein in detail, it applies established principles to determine the extent to which it can review Petitioner's claims at all, and, for those claims that it determines it can review, it applies the demanding standards of AEDPA.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the Court will deny a COA. However, Petitioner may seek a COA from the Sixth Circuit.

An appropriate Order will be entered.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE